

Judy McDermott
Plaintiff, Pro Se
366 Hibiscus Lane
Suisun City, CA 94585-3813
707/428-6513

E-filing

Fee Paid iss. (S)

FILED

JUL 16 2008

...W. WIEKING
...DISTRICT COURT
...DISTRICT OF CALIFORNIA
OAKLAND

ADR

SBA

# UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

JUDY A. MCDERMOTT,                )   **CIVIL CASE NO:**
        Plaintiff, Pro Se      )   **C08-03432**
                             )   **COMPLAINT**
                             )
V.                                )   **JURY TRIAL DEMAND**
                             )
JOHN E. POTTER,                   )   **(Agency Case No.)**
U.S. POSTMASTER GENERAL           )   66-000-0055-03   (EEO #10/11 Consolidated)
U.S. POSTAL SERVICE               )   66-000-0013-05   (EEO #12)
(CAPITAL METRO AREA) AGENCY       )   6H-000-0003-05   (EEO #13)
UNITED STATES OF AMERICA          )   6H-000-0001-06   (EEO #14)
        Defendant          )   66-000-0047-06   (EEO #16)
                             )   No # Assigned   (EEO #17)
                             )   66-000-0036-07   (EEO #18)
                             )   66-000-0001-08   (EEO #19)
_____ )   No # Assigned   (EEO #20)

## I. PARTIES

1.     Plaintiff, **JUDY A. MCDERMOTT**, is a citizen of the Untied States, female,

over the age of 40, and has been at all times hereto material, a resident of Solano County, State

of California. At the relevant times mentioned in this Complaint, Plaintiff was an employee of

the United States Postal Service (USPS), employed as a United States Postal Inspector, ISLE-

13, located at the San Francisco Bulk Mail Center (BMC), 2501 Rydin Road, Richmond,

California, Contra Costa County, the Division Headquarters located at 390 Main Street, 3rd

**COMPLAINT**     **PAGE  - 1 -**

Floor, San Francisco, California, San Francisco County, or the domicile at 201 13th Street, Room 112, Oakland, California, Contra Costa County.

2.    The Plaintiff for all relevant periods for the **Cause of Actions** listed below worked at the above locations and reported to managers located at the 390 Main Street Facility, 3rd Floor, San Francisco, California, 2501 Rydin Road, Richmond, California, or 201 13th Street, Room 112, Oakland, California, at the time she filed her EEO complaints and this Civil Complaint herein against the Agency.

3.    Defendant, **John E. Potter,** is Postmaster General of the United States located in Washington DC, and, in that capacity, is responsible for the operation of the United States Postal Service and all Divisions therein, including the United States Postal Inspection Service (US PIS). The United States Postal Service is an employer of more then five hundred employees.

## II. JURISDICTION AND VENUE

4.    **Jurisdiction.**. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, for employment discrimination.  This Court has jurisdiction over Plaintiff's federal claims for relief pursuant to 42 U.S.C. § 2000e et. seq., 28 U.S.C. § 1331 and 1343(a), and 29 Code of Federal Regulations, Section 1614.

5.    **Venue.**  Venue is proper in the Northern District of California pursuant to Title 28 U.S.C. § 1391(b) because the claims arose in this judicial district.

6.    **Intradistrict Assignment:** This lawsuit should be assigned to the San Francisco Division of the court because a substantial amount of the acts and omissions giving rise to this

1   lawsuit occurred in this District during the period addressed in the Cause of Actions in this

2   Complaint, including a pending Civil Complaint against the Agency filed on 12/13/07 (#C-07-

3   06300) for EEO #15 (Agency #66-000-0037-06) and assigned in San Francisco.

4
        7.      Plaintiff has filed 20 EEO complaints dating from 1998 through 2007 opposing

5
6   unlawful employment practices by the Defendants.

7       8.      A list of Plaintiff's last 10 EEO complaints filed from 2003-2007 as addressed in

8
    the Cause of Actions herein, are listed below, with the relevant Title 7 violations alleged,
9
10  relevant time-frames for actions that supported the filing of Equal Employment Opportunity

11  (EEO) complaints, and this subsequent Civil Complaint.  For each EEO complaint listed, the

12  Agency was contacted timely within 45 days of the alleged discriminatory incident in

13
    accordance with 29 CFR Sections 1614.105(a)(1) and 1614.106, and subsequent pre-EEOs and
14
15  Formal EEO complaints were filed timely after Plaintiff received EEO forms from the Agency.

16  Timely requests for EEOC hearings were requested upon Plaintiff's receipt of the Report of

17
    Investigation (ROI) and Investigative files from the Agency.
18
19      9.      The Plaintiff has exhausted all administrative remedies and/or EEO complaints

20  have been pending before the Agency for over 180 days, and Plaintiff is timely filing this Civil

21  Complaint addressing EEO complaints #1-10 as listed in the Cause of Actions below, in

22
23  accordance with 42 USC 2000e-16(c), and 29 CFR 1614.407(b).

24      10.     **ATTACHMENT 1** to this **COMPLAINT** lists all 20 EEO complaints filed by

25  the Plaintiff from 1998 through 2007, including the named alleged discriminating officials for

26
27  EEO Complaints #10-20 listed herein as the subject of the Cause of Actions to this Complaint.

28

COMPLAINT        PAGE   - 3 -

EEO complaints filed prior to those listed as Cause of Actions in this Complaint are included and incorporated with this Complaint, to support Plaintiff allegations of the on-going pattern of discrimination, harassment and retaliation dating back prior to 1998 targeting Plaintiff and other females who filed EEOs and complained of the same illegal conduct, resulting in a continuing Hostile Work Environment (HWE) for the last 20 years.

11. **ATTACHMENT 1** to this **COMPLAINT** also shows that each subsequent manager assigned to the SF Division of the Untied States Postal Inspection Service (US PIS), was named in EEO complaints as alleged discriminating officials joining in the illegal conduct targeting Plaintiff after she started to file EEO complaints, supporting allegations that the mindset within the Agency is that discrimination and retaliation against those filing EEOs is acceptable and is condoned by headquarters' management. The named discriminating officials in **ATTACHMENT 1** were aware of Plaintiff's on-going EEO activities.

12. **EEO #10 (Agency #66-000-0055-3)** (EEOC #370-2005-00127X) (2003 Petition and Correspondence to Ombudsman Jim Birch - Alleging sex discrimination (female), Age discrimination, Reprisal for prior EEO activity, and an On-going HWE):

> **SUMMARY**: Plaintiff circulated a petition in 2003 signed by 49 employees regarding alleged misconduct by SF managers, which resulted in the removal of the top three SF managers from their positions in 2003. Shortly thereafter, Plaintiff was discriminated and retaliated against when she was punitively reassigned to a known "punishment" team that did not utilize her training, background and skills, and was then forced to stay on this "punishment" assignment for 3 ½ years - years

longer than any other inspector, due to her role in circulating the 2003 petition and

her letters sent supporting the petition, and her history of filing EEO complaints.

| | | |
|---|---|---|
| a. | 08/05/03 | Plaintiff contacted an EEO counselor within 45 days of incident. |
| b. | 08/22/03 | Plaintiff filed pre-EEO - within 10 days of receipt of forms. |
| c. | 10/14/03 | Plaintiff received forms to file a formal EEO complaint. |
| d. | 10/20/03 | Plaintiff filed formal EEO Complaint #10. |
| e. | 11/14/03 | The Agency consolidated Final EEO #10 with pre-EEO #11. filed on 11/14/03 (see EEO #11 below). |
| f. | 05/12/04 | Plaintiff filed EEO affidavit for EEO 10/11 and subsequently timely requested an EEOC hearing. |
| g. | | EEO Complaints #10/11 are currently pending at the SF EEOC before EEOC AJ Virginia Mellema. |
| h. | | Plaintiff's formal EEO complaint has been pending before the Agency for at least 180 days. 42 USC 2000e-16(c), 29 CFR 1614.407(b) |
| i. | 06/28/08 | Plaintiff requested a Right to Sue letter from EEOC, and received an Order from AJ Mellema on 7/10/08 advising the Agency of this. 29 CFR 1614.407(b) |

13.    **EEO #11 (Agency #66-000-0055-3)** (EEOC #370-2005-00127X) ("Fineman"

letter - Alleging sex discrimination (female), Reprisal for prior EEO activity, and an On-going

HWE):

**SUMMARY**:  Headquarters' managers did not address the employee issues and

concerns in the 2003 petition and letters sent to Ombudsman Birch in support of the

petition.  After the three SF managers were removed from their positions in 2003,

interim SF managers were "detailed" into the SF Division whose conduct appeared

to be the same as the three managers removed from their positions.  In order to have

someone address the employee issues surrounding the 2003 petition, signed by 49

people, Plaintiff sent a letter outside the Agency to the Chairman of the Board of

Governors (BOG) (hereto referred to as the "Fineman" letter) with a copy to

Congress.  Within two weeks of the release of the Fineman letter, Internal Affairs

Division (IAD) was contacted and Plaintiff was investigated for a "trumped up"

charge that she threatened a co-worker.  IAD was contacted by the interim SF

managers who were named in the Fineman letter for alleged misconduct.

Management contacted IAD to further discriminate and retaliate against Plaintiff

for releasing the Fineman letter and for her on-going EEO activities.

| | | |
|---|---|---|
| a. | 10/14/03 | Plaintiff contacted an EEO counselor within 45 days of incident. |
| b. | 11/04/03 | Plaintiff filed a pre-EEO - within 10 days of receipt of forms. |
| c. | 11/14/03 | The Agency consolidated pre-EEO #11 with EEO #10. |
| d. | 05/12/04 | Plaintiff filed EEO affidavit for EEO 10/11 and subsequently timely requested an EEOC hearing. |
| e. | | EEO Complaints #10/11 are currently pending at the SF EEOC before EEOC AJ Virginia Mellema. |
| f. | | Plaintiff's formal EEO complaint has been pending before the Agency for at least 180 days.  42 USC 2000e-16(c), 29 CFR 1614.407(b) |
| g. | 06/28/08 | Plaintiff requested a Right to Sue letter from EEOC, and received an Order from AJ Mellema on 7/10/08, advising the Agency of this. 29 CFR 1614.407(b) |

14.    **EEO #12   (Agency #66-000-0013-05)** (EEOC #370-2006-0054X) (Appeal No.

0120063389). (Janene Gordon retaliation/discrimination incidents - Alleging sex discrimination

(female), Age discrimination, Reprisal for prior EEO activity, and an On-going HWE):

**SUMMARY:**   Postal Inspector Janene Gordon was discriminated and retailed

against for participating in Plaintiff's August 2004 EEOC hearing when she was

denied administrative time for the time she spent during Plaintiff's EEOC hearing,

disparate from every other hearing participant, and again when she was punitively

reassigned from Richmond to San Francisco 2 ½ months after the 8/04 EEOC

hearing.  Discrimination and retaliation against Gordon deters Plaintiff and others

from speaking out about discrimination and participating in the EEOC process, adversely affecting a term, condition and benefit of Federal employee, to be provided a work environment free from discrimination and retaliation.

| | | |
|---|---|---|
| a. | 11/26/04 | Plaintiff contacted an EEO counselor within 45 days of incident. |
| b. | 12/20/04 | Plaintiff filed pre-EEO - within 10 days of receipt of forms. |
| c. | 01/22/05 | Plaintiff received forms to file a formal EEO complaint. |
| d. | 02/03/05 | Plaintiff filed formal EEO Complaint #12. |
| e. | 02/18/05 | Agency issued FAD – Dismissed (rcvd. 2/22/05). |
| f. | 02/26/05 | Plaintiff filed an appeal with the OFO. |
| g. | 07/07/05 | The OFO reversed the Agency FAD– Agency must investigate. |
| h. | 08/24/05 | Plaintiff filed EEO affidavit and subsequently timely requested an EEOC hearing. |
| i. | 03/27/06 | EEOC AJ Jeanne Player issued Summary Judgment –Dismissed (rcvd 3/28/06). |
| j. | 04/06/06 | Final Agency Decision agreeing w/ AJ Player (rcvd 4/6/06). |
| k. | 04/28/06 | Plaintiff appeal to the OFO. |
| l. | 04/12/08 | Plaintiff letter to OFO regarding status of EEOs 12, 13, 15, 17. |
| m. | 04/18/08 | OFO issues Decision – EEO Dismissed (rcvd. 4/21/08).  Plaintiff has 90 days from receipt to file a Civil Action.  Plaintiff has exhausted all administrative remedies under 42 U.S.C. 2000e-16(c) and 29 CFR 1614, and is filing this civil action within the statutory requirements of 90 days. |

15.    **EEO #13 (Agency #6H-000-0003-05)** (OFO Appeal #01A61348) (Docket # 0520060947) (Marilyn Lee discrimination/retaliation incident - Alleging sex discrimination (female), Reprisal for prior EEO activity, and an On-going HWE):

**SUMMARY**:  Marilyn Lee, SF INC Secretary, was discriminated and retaliated against after she signed a petition circulated by Plaintiff in 2003 signed by 49 people, and met with US PIS managers in June 2003, which resulted in the removal of the SF Inspector in Charge (INC) and the two Assistant Inspector in Charges (AIC) from their positions in 2003.  Bill Atkins was named the new SF INC.  After

Akins learned that Lee signed the petition and met with top US PIS managers

regarding her concerns in the Division, Atkins relocated Lee's desk away from his

office area so she could not overhear conversations by management as Lee told the

managers in the June 2003 meeting that she had been able to do with the prior

management team.  Atkins then "detailed" Lee to another position so that she could

no longer be the INC secretary, privy to his confidential information.  When Lee

requested that her "detail" be terminated due to the negative effect it was having on

her health, management refused to return her to her regular position as the INC

secretary because of her prior role in removing the former SF INC from his

position.  Discrimination and retaliation against Lee deters Plaintiff and others from

speaking out about discrimination and participating in the EEOC process, adversely

affecting a term, condition and benefit of Federal employment, to be provided a

work environment free from discrimination and retaliation.

| | | |
|---|---|---|
| a. | 08/29/05 | Plaintiff contacted an EEO counselor within 45 days of incident. |
| b. | 09/06/05 | Plaintiff contacted an EEO counselor for the 2nd time requesting forms. |
| c. | 09/15/05 | Plaintiff filed pre-EEO - within 10 days of receipt of forms. |
| d. | 10/29/05 | Plaintiff received forms to file a formal EEO complaint. |
| e. | 11/12/05 | Plaintiff filed formal EEO Complaint #13. |
| f. | 11/22/05 | Agency issued FAD – Dismissed (rcvd. 11/28/05). |
| g. | 12/09/05 | Plaintiff filed an appeal with the OFO. |
| h. | 07/18/06 | OFO denied Plaintiff's Appeal (rcvd. 7/21/06). |
| i. | 07/31/06 | Plaintiff appeal to OFO asking for reconsideration. |
| j. | 08/21/06 | OFO received Plaintiff's appeal for reconsideration. |
| k. | 09/14/06 | Agency response to Plaintiff's appeal – EEO should be dismissed. |
| l. | 08/07/07 | Plaintiff letter to OFO regarding status of EEO 12, 13, 15, 17. |
| m. | 10/16/07 | OFO letter stating they will send Plaintiff a response. |
| n. | 04/12/08 | Plaintiff letter to OFO regarding status of EEOs 12, 13, |

o.    04/18/08    OFO issued Decision–EEO Dismissed. Plaintiff's Appeal Denied (rcvd 4/21/08). Plaintiff has 90 days from receipt of OFO Decision to file a Civil Action. Plaintiff has exhausted all administrative remedies under 42 U.S.C. 2000e-16(c) and 29 CFR 1614, and is filing this civil action within the statutory requirements of 90 days.

16.    **EEO #14 (Agency #6H-000-0001-06)** (EEOC #550-2007-00390X) (Denied pre-retirement training class/On-going pattern of illegal conduct - Alleging sex discrimination (female), Reprisal for prior EEO activity, and an On-going HWE):

**SUMMARY:** Plaintiff was discriminated and retaliated against when she was the first Postal Inspector ever denied attendance at the pre-retirement training class in the city of her choice, in retaliation for continuing to file EEO complaints. Immediately after INC Atkins learned Plaintiff was filing another EEO, he was overheard in a public hallway speaking to Ed Lawee, Agency Representative, calling Plaintiff a "Fucking Bitch" stating he did not want her in the San Francisco Division. Additional incidents were included by Plaintiff in this EEO to show the on-going pattern of discrimination and harassment targeting Plaintiff, including disparity in monetary awards and write-ups for an 11/04 employee assault case, and a supervisor's pattern of negatively tainting and disparaging Plaintiff to her co-workers, as part of an on-going pattern of HWE harassment.

a.    02/10/06    Plaintiff contacted an EEO counselor within 45 days of incident.
b.    02/18/06    Plaintiff filed pre-EEO - within 10 days of receipt of forms.
c.    04/01/06    Plaintiff letter to Agency requesting EEO forms.
d.    04/10/06    Plaintiff received forms to file a formal EEO complaint.
e.    04/11/06    Plaintiff filed formal EEO Complaint #14.
f.    05/30/06    Plaintiff filed an EEO affidavit and subsequently timely requested an EEOC hearing.

| | | |
|---|---|---|
| g. | 12/21/07 | EEOC AJ Jeanne Player Orders Summary Judgment -- Dismissed (rcvd 12/24/07). |
| h. | 12/24/07 | Agency Final Decision issued agreeing with AJ Player (rcvd. 12/29/07). Plaintiff can file an appeal in 30 days or file a Civil Court Action. |
| i. | 01/22/08 | Plaintiff requests an appeal with OFO. |
| j. | 02/01/08 | Plaintiff filed an appeal with the OFO. |
| k. | 02/05/08 | Plaintiff filed an appeal with OFO containing additional info. |
| l. | 05/06/08 | OFO denied Plaintiff's Appeal (rcvd 5/708). Plaintiff has 90 days to file Civil Court action. Plaintiff has exhausted all administrative remedies under 42 U.S.C. 2000e-16(c) and 29 CFR 1614, and is filing this civil action within the statutory requirements of 90 days. |

17.     **EEO #15 (Agency # 66-000-0037-06)** (OFO Appeal #0120070109) (Civil Complaint filed 12/13/07, C-076300 SI) (Management setting Plaintiff up for Disciplinary Action after learning she was filing an EEO - Alleging sex discrimination (female), Reprisal for prior EEO activity, and an On-going HWE):

**SUMMARY**: As part of the pattern of on-going discrimination, harassment, retaliation and HWE, immediately after learning Plaintiff refused re-dress and was filing another EEO complaint, and was aware Atkins had called her a "Fucking Bitch" in a public hallway, INC Atkins immediately approached Plaintiff's supervisor to have him take disciplinary action against her for a "non-event," in an attempt to set Plaintiff up for more serious disciplinary action in the future, including removal.   Plaintiff filed a Civil Complaint on this EEO.   Incidents addressed in EEO (#15) which are relative to Plaintiff's allegations of the Agency's on-going pattern of illegal conduct are included herein.

| | | |
|---|---|---|
| a. | 04/17/06 | Plaintiff contacted an EEO counselor within 45 days of incident. |
| b. | 04/28/06 | Plaintiff filed pre-EEO - within 10 days of receipt of forms. |
| c. | 08/08/06 | Plaintiff received forms to file a formal EEO complaint. |
| d. | 08/16/06 | Plaintiff filed formal EEO Complaint #15. |

e.    09/10/07    OFO issued Decision–EEO Dismissed. Plaintiff's Appeal Denied (rcvd
                  9/22/07). Plaintiff has 90 days from receipt of OFO Decision to file a
                  Civil Action. Plaintiff has exhausted all administrative remedies under
                  42 U.S.C. 2000e-16(c) and 29 CFR 1614, and is filing this civil action
                  within the statutory requirements of 90 days.

f.    12/13/07    Plaintiff filed Civil Complaint C07-06300 SI, which is pending.

18.    **EEO #16 (Agency #66-000-0047-06)** (EEOC #550-2007-00302X) (On-going incidents of management discrimination, retaliation, and HWE targeting Plaintiff - Alleging sex discrimination (female), Disability discrimination for work-related stress, Reprisal for prior EEO activity, and an On-going HWE):

**SUMMARY**: Plaintiff filed this EEO complaint to address the series of on-going incidents of management discrimination, harassment and retaliation, targeting her, as well as management's attempts to interfere and impede with Plaintiff's ability to perform her job, which lead Plaintiff to take work-related stress leave from 8/30/06 – 9/12/06. When Plaintiff returned to work on 9/13/06, she was further harassed by her supervisor who refused to accept her medical report to support her sick leave, and then insisted she file a CA-2 stress claim for the time she was off work. When Plaintiff refused to file a CA-2 and told her supervisor that he was harassing her, the supervisor then advised Plaintiff he was placing her off work due to inadequate medical documentation supporting her sick leave. Plaintiff had already been back to work for two full days when she was placed off work. Management made numerous requests to Plaintiff asking for additional in-depth medical information to support her sick leave, in excess of what Plaintiff was required to provide according to Postal rules and regulations, further harassing her.

| | | |
|---|---|---|
| a. | 09/26/06 | Plaintiff contacted an EEO counselor within 45 days of incident. |
| b. | 09/29/06 | Plaintiff filed pre-EEO - within 10 days of receipt of forms. |
| c. | 10/19/06 | Plaintiff received forms to file a formal EEO complaint. |
| d. | 10/31/06 | Plaintiff filed formal EEO Complaint #16. |
| e. | 01/03/07 | Plaintiff filed an EEO affidavit and subsequently timely requested an EEOC hearing. |
| f. | 06/04/08 | EEOC AJ Jeanne Player Orders Summary Judgment – Dismissed (rcvd 6/5/08). |
| g. | 6/10/08 | Final Agency Decision (FAD) agree with Summary Judgment dismissing complaint, rcvd 6/13/08. Plaintiff can appeal within 30 days to the OFO or file a Civil Action within 90 days of receipt of FAD. |
| h. | | Plaintiff has exhausted all administrative remedies under 42 U.S.C. 2000e-16(c) and 29 CFR1614, and is filing this civil action within the statutory requirements of 90 days. |

19.    **Pre-EEO #17 (No Agency # Assigned)** (Quan Howard's 12/1/06 letter denying Plaintiff's sick leave/Threatened Plaintiff w/FFD Medical Exam/Ed Lawee assisted with 12/1/06 Howard letter sent to Plaintiff containing hostile and antagonistic remarks directed at Plaintiff - Alleging sex discrimination (female), Age discrimination, Reprisal for prior EEO activity, and an On-going HWE):

**SUMMARY**:   On 11/30/06 EEOC AJ David Kelly issued his Memorandum Opinion and Order (MOO) regarding Plaintiff's 8/4/04 EEOC hearing, stating the Agency was liable for discrimination, harassment, retaliation and a sexually HWE, on-going for years.  Plaintiff was subsequently discriminated and retaliated against when one day after the MOO was issued, on 12/1/06 Plaintiff's former Supervisor Quan Howard sent her a letter denying her sick leave she used for work related stress leave taken three months earlier from 8/30/06 – 9/12/06.  Plaintiff had already provided additional medical documentation on 9/28/06 responding to each request for addition medical information, which should have been sufficient to

support her sick leave usage.  In Howard's 12/1/06 letter, Howard also stated that

he wanted to send Plaintiff for a Fitness for Duty (FFD) medical exam but was

advised not to.  Ed Lawee, Agency Representative, assisted Howard in writing the

12/1/06 letter, when is clearly hostile, bias and antagonistic toward Plaintiff.  The

Agency refused to investigate allegations in this EEO stating they were previously

investigated in EEO #16 **(Agency #66-000-0047-06).**

| | | |
|---|---|---|
| a. | 12/17/06 | Plaintiff contacted an EEO counselor within 45 days of incident. |
| b. | 12/26/06 | Plaintiff filed pre-EEO - within 10 days of receipt of forms. |
| c. | 02/19/07 | Plaintiff T/C Agency ref status of case. |
| d. | 02/25/07 | Plaintiff letter to Agency ref status of case. |
| e. | 03/19/07 | Plaintiff letter to Agency ref status of case. |
| f. | 03/23/07 | Plaintiff T/C Agency ref status. Follow-up w/ letter to Agency on status of case. |
| g. | 03/26/07 | Plaintiff received forms to file a formal EEO complaint. |
| h. | 04/07/07 | Plaintiff filed formal EEO Complaint #17. |
| i. | 04/16/07 | The Agency refused to investigate the issues, stating it was amended to EEO #16.  No documents were provided by the Agency supporting their contention. |
| j. | 04/20/07 | Plaintiff requests the Agency provide documentation showing the issues in this case were previously investigated, and if not request the issues be investigated. |
| k. | 04/26/07 | Agency Partial Acceptance/Partial Dismissal for EEO #18, (rcvd 5/2/07) addressed that the Agency will not investigate being denied sick leave on 12/1/06, threat to send for FFD. |
| l. | 05/03/07 | Plaintiff letter requesting that the issues in #17 be investigated, or EEO #18 amended to include issues. |
| m. | 07/19/07 | Plaintiff requests the Agency investigate the allegations in EEO #17. |
| n. | 08/07/07 | Plaintiff letter to OFO requesting that the Agency investigate this EEO. |
| o. | 9/10/07 | OFO stated they will review status of this EEO. |
| | 09/24/07 | Plaintiff letter to the Agency on Status of case |
| p. | 10/16/07 | OFO stated they will review the status this EEO. |
| | 11/24/07 | Plaintiff letter to Agency ref status of case. |
| | 12/14/07 | Plaintiff letter to Agency ref status of case. |
| q. | 04/12/08 | Plaintiff letter to OFO regarding status of EEOs 12, 13, 17. |
| r. | | Plaintiff's formal complaint has been pending before the Agency for at least 180 days. 42 USC 2000e-16(c), 29 CFR 1614.407(b). |

s.    06/28/08    Plaintiff requested a Right to Sue letter from EEOC, and received an Order from AJ Mellema on 7/10/08, advising the Agency of this. 29 CFR 1614.407(b).

20.    **EEO #18 (Agency # 66-000-0036-07)** (EEOC #550-2007-00400X) (Punitive Transfer to External Crimes Oakland team - Alleging sex discrimination (female), Age discrimination, Reprisal for prior EEO activity, and an On-going HWE):

**SUMMARY**: In March 2007, Plaintiff was punitively reassigned to the External Crimes (EC) team in Oakland, CA, a training team of new inspectors, working an assignment she had never worked in her 20+ years as an inspector, and reporting to a male supervisor whom she testified in her 8/04 EEOC hearing had joined in the harassment against her. The punitive transfer occurred 67 days after EEOC AJ David Kelley issued his 11/30/06 Memorandum Opinion and Order (MOO) stating the Agency was liable for discrimination, harassment, retaliation, and a sexually hostile work environment on-going for years, and which also stated that Plaintiff was, "entitled as nearly as possible to be made whole."

a.    02/27/06    Plaintiff contacted an EEO counselor within 45 days of incident.
b.    03/03/07    Plaintiff filed pre-EEO - within 10 days of receipt of forms.
c.    03/23/07    Plaintiff received forms to file a formal EEO complaint.
d.    04/07/07    Plaintiff filed formal EEO Complaint #18.
e.    05/03/07    Plaintiff requested the Agency amend EEO #18 to include allegations addressed in EEO #17 that they did not investigate.
f.    05/29/07    Plaintiff filed an EEO affidavit and subsequently timely requested an EEOC hearing.
g.        EEO #18 currently pending before the SF EEOC AJ Virginia Mellema.
h.        Plaintiff's formal complaint has been pending before the Agency for at least 180 days.  42 USC 2000e-16(c), 29 CFR 1614.407(b).
i.    6/28/08    Plaintiff requested a Right to Sue letter from EEOC, and received an Order from AJ Mellema on 7/10/08, advising the Agency of this. 29 CFR 1614.407(b).

21.    **EEO #19 (Agency #66-000-0001-08)** (EEO #550-2008-00192X), (Refusing Medical Report to Support Sick Leave Usage/Disparate Agency Discrimination Policies, Practices and Procedures - Alleging sex discrimination (female), Reprisal for prior EEO activity and an On-going HWE):

> **SUMMARY**:  Management continued to discriminate, harass and retaliate against Plaintiff with repeated requests for additional medical documentation to support sick leave she used for work related stress, disparate from what they required other employees to submit, and in excess of what Postal rules and regulations require. The Agency refused to accept a doctor report from Plaintiff's treating physician for sick leave she used for work-related stress from 8/24/07 – 12/31/07, even though the wording on the doctor note was the same wording used on two prior doctor notes submitted in support of her prior sick leave requests which were accepted by the Agency as adequate documentation.  The Agency continued to make excessive requests for medical documentation for sick leave Plaintiff has used, in retaliation for filing EEOs to further harass her, which has exacerbated an already HWE.
>
> The Agency's discrimination policies, practices and procedures are discriminatory. Plaintiff learned via an Agency Discovery response she received on 9/17/07 that Ed Lawee, Agency Representative, has been providing free legal advice, input and/or assistance to Government witnesses and named discriminating officials at various stages of the pre-EEO and EEO complaint process, while those filing EEOs are not provided this same benefit of free legal assistance.  Additionally, on Plaintiff's

pending EEOs, Ed Lawee, who is named in four of Plaintiff's EEOs -as a

discriminating official, and as a witness in one EEO, has been allowed to continue

to provide his input and/or assistance to government witnesses, when he is clearly

bias, hostile and antagonistic toward Plaintiff, further exacerbating an already HWE

with Plaintiff's co-workers.

| | | |
|---|---|---|
| a. | 10/1/07 | Plaintiff contacted an EEO counselor within 45 days of incident. |
| b. | 10/10/07 | Plaintiff filed pre-EEO - within 10 days of receipt of forms. |
| c. | 10/29/07 | Plaintiff received forms to file a formal EEO complaint. |
| d. | 11/13/07 | Plaintiff filed formal EEO Complaint #19. |
| e. | 12/27/07 | Plaintiff filed an EEO affidavit and subsequently timely requested an EEOC hearing. |
| f. | | EEO #19 is currently pending before the SF EEOC AJ Virginia Mellema. |
| g. | | Plaintiff's formal complaint has been pending before the Agency for at least 180 days. 42 USC 2000e-16(c), 29 CFR 1614.407(b). |
| h. | 06/28/08 | Plaintiff requested a Right to Sue letter from EEOC, and received an Order from AJ Mellema on 7/10/08, advising the Agency of this. 29 CFR 1614.407(b). |

22..    **Pre-EEO #20 (No Agency # assigned)** (Ref the status of EEO #17 investigation

- Alleging sex discrimination (female), Age discrimination, Reprisal for prior EEO activity, and

an On-going HWE):

**SUMMARY**:  Plaintiff filed a pre-EEO regarding the status of EEO #17 (No Case

#).  The Agency previously refused to investigate EEO #17 allegations stating that

the issues in EEO #17 were investigated in EEO #16 (#66-000-0047-06)

| | | |
|---|---|---|
| a. | 12/24/07 | Plaintiff contacted an EEO counselor ref the status of EEO #17, after numerous requests to the Agency to investigate EEO #17. |
| b. | 12/30/07 | Plaintiff received forms to file a pre-EEO complaint. |
| c. | 01/05/08 | Plaintiff filed pre-EEO. |
| d. | 01/17/08 | Agency responds that they will not conduct an investigation because the |

e.
issue for EEO #17 was investigated with EEO #18 (66-000-0036-07). Plaintiff's formal complaint has been pending before the Agency for at least 180 days.  42 USC 2000e-16(c), 29 CFR 1614.407(b).

## III.  STATEMENT OF FACTS

23.    Plaintiff began her career with the United States Postal Service (USPS) on or about December 1982 in Spokane, WA.  On or about June 1986 she was hired as a Postal Inspector working for the United States Postal Inspection Service (US PIS), which is the law enforcement branch of the U.S. Postal Service.

24.    Plaintiff was initially assigned to work in Cincinnati, Ohio, where she was assigned to a team conducting postal financial audits, and later was assigned to a team conducting investigations involving postal employees filing fraudulent worker's compensation fraud claims.

25.    While in Cincinnati, Plaintiff received numerous accommodations, awards and/or year-end merit awards for her work accomplishments, including a far-exceeds year-end merit while assigned to the Workers' Compensation Fraud team.

26.    On or about January 1990 Plaintiff was transferred to the Oakland Division of the US PIS (which later was merged with and became the San Francisco Division of the US PIS), where she was initially assigned to a Capital Investment team.

27.    · Local US PIS management officials for the San Francisco (SF) Division consist of an Inspector In Charge (INC) and two Assistant Inspector In Charges (AICs) located at 390 Main Street, San Francisco, CA.  Plaintiff reports to a Team Leader, who reports to one of two

AICs, who reports to the INC.  There are approximately seven domiciles in the SF Division of the US PIS.

28.     Sometime in 1993 Plaintiff was reassigned to the Unabom Task Force where she remained for approximately one year.  She was placed on this task force due to her ability to get along with people.

29.     In approximately mid-1994 Plaintiff was assigned to the Internal Crimes (IC) team located at the Richmond Domicile located at the SF Bulk Mail Center (BMC), 2501 Rydin Road, Richmond, CA, responsible for investigating postal employee mail theft, reporting to supervisor Mark Aasmundstad.

30.     Plaintiff continued to receive numerous accommodations, awards and merits for her work, including far-exceeds year-end merits in 1993 and 1996 for her work on the Capital Investment team and the Internal Crimes (IC) team.

31.     In 1998, while on the IC team, Plaintiff began to experience what she believed to be discriminatory treatment by a male co-worker, which she believed was based on her gender, when she was the only one on the team excluded from his investigations.

32.     When Plaintiff reported the discriminatory treatment to Mark Aasmundstad, her male supervisor, her complaint was unexpectedly met with hostility and criticism of her work performance as compared to male team members.

33.     In 1998 Plaintiff had 14 Internal Crimes (IC) identifications, while male team members had 3 and 5 identifications.   For this same time period Plaintiff had 12 cases with

arrests or on-going administrative action compared to 6 cases each for her two fellow team members.

34.   Unknown to Plaintiff at the time she reported the discrimination to Aasmundstad, he was named in at least three prior EEOs by three female postal inspectors, and was currently involved in an internal investigation as a result of complaints filed by two of the female postal inspectors.

35.   After Plaintiff came forward with her initial complaint of discrimination in April 1998, she subsequently experienced on-going discrimination, harassment, and retaliation from her supervisor, male team members, managers, and others in the Division who joined in the harassment and retaliation against her.

36.   From 1998 thru at least 2000, as a result of speaking out about the on-going discrimination and retaliation, Plaintiff was subsequently denied a preferred territory assignment, given a disparately larger workload than team members and reassigned to a facility where she had no prior experience, denied equipment to perform her job, denied assistance in her investigations, denied monetary awards to which she was entitled, and was sexually assaulted during a training class.

37.   Plaintiff's work environment became increasingly more hostile.  Co-workers continued to "shun" her, and make negative and derogatory comments about her.  Three supervisors stated Plaintiff should be sent for a FFD medical exam.  A male supervisor whom she had never worked with and who was domiciled in another city put in writing three times

that Plaintiff was the "problem" in the Division, and then distributed his comments to other male supervisors during a meeting.

38.    Supervisors, co-workers, and at least one manager would routinely walk by Plaintiff and ignore her.

39.    Plaintiff began to experience physical and mental symptoms as a result of the Agency's continuing illegal conduct and the resulting HWE.  Beginning in June 1998 Plaintiff started to receive medical treatment for symptoms of: chest pains, anxiety, depression, tearfulness, headaches and migraines, and sleeplessness.

40.    Plaintiff requested intervention from Don Davis, INC of the SF Division at that time.  However, Davis took no action to assist Plaintiff in any manner or to remedy the situation, and allowed the illegal behavior to continue.

41.    The Agency had a "hands-off" approach to the sexually-hostile atmosphere with which the Plaintiff was faced.

42.    Management subsequently "downplayed" the concerns Plaintiff and other female inspectors had regarding team leader Aasmundstad.

43.    As a result of the above described illegal conduct by the Agency, Plaintiff subsequently filed a series of seven EEO complaints from approximately 1998 thru December 2000, opposing continuing unlawful employment practices.  Plaintiff alleged a pattern and practice of discrimination based on gender, and retaliation for prior EEO activity, in which others joined in the harassment against her, resulting in a HWE.

44.     INC Davis retired from the agency in approximately 2000 and was subsequently replaced with Alan Kiel who became the new SF INC.

45.     INC Kiel continued the pattern of discrimination and retaliation targeting Plaintiff, and she continued to file EEO complaints naming INC Kiel and other SF managers as alleged discriminating officials from approximately 2001-2002, as addressed in EEO complaints #8 and #9.  Plaintiff cited an on-going pattern of discrimination, harassment, and retaliation, which included in part, management threatening to send her for a FFD medical exam due to her continued EEO activities, denying her a detail opportunity, and denying her adequate official time to address EEOs , all of which exacerbated an already HWE.

46.     INC Kiel and his two AICs were subsequently removed from their positions in 2003, due to a petition circulated by Plaintiff and signed by 49 employees as addressed in EEO #10 below.

47.     Each management group arriving in the SF Division after Don Davis left, continued the illegal pattern of conduct targeting Plaintiff due to her EEO activities, escalating an already HWE, for which she continued to file EEOs up until 2007.

48.     The mindset within the agency is that EEO filers will become the target of discrimination, harassment, and retaliation for their EEO activity, supported by headquarters' management who encourage and condone the behavior, turning a blind eye, in an attempt to deter the EEO process and put out the message what happens to those utilizing Title 7 rights.

49.     US PIS Headquarters' managers are aware of the on-going illegal conduct dating back prior to Plaintiff, when females inspectors filed a petition in 1989 and later a class action

EEO, regarding the on-going gender discrimination targeting females, and the subsequent retaliation and HWE, yet there has been no intervention to date, with a total disregard for Title 7 laws and employee rights.

50.    In August 2004, Plaintiff participated in an eight day EEOC hearing in San Francisco, CA before EEOC Administrative Judge (AJ) David Kelley in which the first seven of her EEO complaints filed from 1998-2000 were heard.

51.    A ruling by AJ Kelley was not issued at the end of the hearing;  However, on October 7, 2005, AJ Kelley issued a "NOTICE RE FORTHCOMING SUMMARY JUDGMENT," in which he stated that he intended to find in Plaintiff's favor on certain of her claims heard during the 8/04 EEOC hearing.  The Agency was on notice as early as October 2005 that Plaintiff had prevailed on some of her EEO complaints, yet the illegal conduct targeting her continued unabated.

52..    After filing EEO complaints in 1998, Plaintiff no longer received monetary awards for any of her accomplishments, and was placed on a punishment assignment for 3 ½ years, much longer than any other inspector, where she performed menial, degrading, non-criminal work that did not utilize her background, training, skills or experience.

53.    Plaintiff first sought medical treatment in 1998 and continues to seek medical treatment to date, as a result of the effects of the Agency's on-going illegal conduct and the HWE harassment as addressed in each of the Cause of Actions listed below.  The Agency's on-going illegal conducted and HWE exacerbated Plaintiff's diagnosed medical condition of anxiety, depression and symptoms of PTSD, which her medical doctor testified during the

November 2007 Damages hearing was a direct result of the cumulative, punitive, and traumatic work stress to which she was exposed to over many years.

54.    Plaintiff had no pre-existing medical condition prior to filing EEO complaints, and all the doctors involved, including the Agency's doctor, stated that Plaintiff was not a malingerer.

55.    Plaintiff took four different periods of time off work for work-related stress using her own sick leave (once in 2000 after the Innes incident (6 weeks), once in 2004 for two weeks after the 8/04 EEOC hearing, once in 1/2006 (for two weeks), and once in 9/06 for 5 weeks. The need for time away from work was escalating due to the effects of the ongoing illegal conduct by the Agency and the increasingly HWE.

56.    Plaintiff's sick leave usage also increased significantly from 1-2 days used per year prior to EEOs to several weeks per year after filing EEOs as she continued to deal with the effects of the on-going illegal conduct. Plaintiff testified in her 8/04 EEPC hearing that she was using her own annual and sick leave to avoid being forced to file a work-related stress claim which she was vehemently opposed to doing.

57.    On November 30, 2006, EEOC AJ David Kelley issued a Memorandum Opinion and Order (MOO) for Plaintiff's August 2004 EEOC hearing involving EEOs #1-7, in which Plaintiff prevailed on the issues listed in six of her seven EEO complaints.

58.    AJ Kelley's 11/30/06 MOO outlined that the Agency was found liable for discrimination, harassment, retaliation and a sexually HWE, on-going for years. Plaintiff was

found to be the most credible witness while her named harasser was impeached several times during his testimony.

59.     Even after the 11/30/06 MOO was issued, the illegal conduct targeting Plaintiff continued, for which she filed EEO complaints.

60.     On 4/28/07, Plaintiff filed a CA-2 Stress Claim due to the effects of the on-going illegal conduct by the Agency and the HWE, and was placed off work by her treating physician. Plaintiff has not returned to work, and has been on Leave without Pay (LWOP) since October 2007.

61.     Even after she left the Agency, the illegal conduct targeting Plaintiff continued, for which she filed EEO complaints.

62.     Plaintiff has been constructively discharged from the Agency as a result of the effects of the on-gong illegal conduct targeting her from 1998 to date, and the hostile and antagonistic work environment.

63.     In November 2007 and March 2008 Plaintiff participated in a Damages hearing as a result of the Agency liability from the 8/04 EEOC hearing as addressed in the 11/30/06 MOO.

64.     The Agency's own doctor who examined Plaintiff, agreed with Plaintiff's doctors, stating that Plaintiff's medical and physical condition resulted from triggers in her employment situation dating from 1998 which have continued in terms of their effect to the present, exacerbated in 2007.

65.     A written ruling on the Plaintiff's damages has not been issued by the EEOC.

66.     The relationship with the Agency and Plaintiff for the past 10 years has been hostile and antagonistic.

67.     The Agency has a record of long-term resistance to anti-discrimination efforts.

68.     Each EEO Complaint from 1998 - 2002 listed herein (EEOs #1-9), prior to the EEOs listed in this Complaint as Cause of Actions, was included to show the Agency's on-going pattern and practice of discrimination, harassment and retaliation targeting Plaintiff once she came forward and filed EEOs starting in 1998 and continuing to date, on-going with each set of managers assigned to the SF Division, which has created and exacerbated a HWE for Plaintiff for over 10 years.

69.     Plaintiff incorporates by reference herein as a part of this Complaint, the issues, facts and outcome of Plaintiff's 8/04 EEOC hearing for EEOs #1-7, including the EEO Investigative files, witness EEO affidavits and declarations, hearing transcripts, the 11/30/06 MOO and other documents, records and testimony relevant to EEOs #1-7, in support of allegations of the Agency's on-going discriminatory and retaliatory conduct and the resulting HWE, dating from 1998 to date, including the history of government witnesses, most of which were law enforcement officers, providing false testimony and/or lacking credibility while providing sworn testimony, which is continuing to the present, in the EEOs addressed in the Cause of Actions herein.

70.     All EEOs filed by Plaintiff dating back to 1998 must be viewed together with prior EEO complaints to show the, "totality of the circumstances," of what has occurred relative to the Agency's on-going pattern of discrimination, harassment and retaliation dating back prior

to 1998, which as created a HWE, and for which Plaintiff has been adversely affected, must not be viewed as separate, isolated incidents.

71.    As a direct result of the wrongful acts and conduct of the Defendant and each named alleged discriminating official listed in **ATTACHMENT 1** to this Complaint, Plaintiff was caused to suffer severe emotional and physical distress for which she initially sought medical treatment in 1998 and continues to seek medical treatment to date.

72.    Plaintiff has incurred past costs in pursuit of filing EEO Complaints and will continue to incur costs in the future in prosecuting the Cause of Actions herein, including any future attorney fees necessary.

73.    Plaintiff has been adversely affected as addressed in each Cause of Action below.

74.    Plaintiff has suffered a personal loss or harm with regard to a term, condition or privilege of Federal employment, when she was not provided the right to work in an environment free from harassment and discrimination, due to the Agency's on-going pattern and practice of illegal conduct.

75.    Allegations which may not, standing alone, sufficiently aggrieve a complainant may, when taken in conjunction with already pending complaints, state a claim for relief for a pattern of conduct demonstrating harassment or reprisal.

76.    The Agency has known of the harassing conduct targeting Plaintiff, on-going for ten years, and failed to take prompt and effective remedial action to end the harassment.

77.    In accordance with the Civil Rights Act of 1964, as amended, and Title 29, CRF

part 1614, Plaintiff, as a precondition to the filing of this suit, has exhausted all of her administrative remedies and/or EEO complaints have been pending before the Agency in excess of 180 days.

78.    Each EEO complaint Plaintiff filed and addressed below, (#1-20) is included as part of this Civil Complaint to support allegations of the Agency's on-going pattern and practice of discrimination, harassment and retaliation targeting Plaintiff once she came forward and filed EEOs in 1998, which has contributed to and exacerbated the already HWE. The relevant Agency officials were aware that Plaintiff had engaged in prior protected activity.

79.    **EEO Complaints #1-7 as address in Plaintiff's 8/04 EEOC hearing**
(Alleging sex discrimination (female), Reprisal for prior EEO activity, and an On-going HWE).

80.    After an eight day EEOC hearing before EEOC AJ David Kelley in August 2004, addressing EEOS #1-7 AJ Kelley issued an 11/30/06 Memorandum Opinion and Order (MOO) stating the Agency was found liable for discrimination, harassment, retaliation and a sexually HWE on-going for years. This 11/30/06 MOO is incorporated by reference herein to the Cause of Actions to this Complaint.

81.    The 11/30/06 MOO addressed that Plaintiff was the most credible witness while government witnesses were impeached on the stand and/or found to be non-credible in their testimony. One inspector was not allowed to testify in the 8/04 hearing by the AJ because she "walked away" from her prior testimony.

82.    The pattern of the lack of credibility by the Agency and their witnesses as seen in the 8/04 EEOC hearing has continued in Plaintiff's pending EEOs, examples of which are listed under the Cause of Actions herein. Many of the witness Declarations and EEO affidavits

submitted contained blatantly false, inaccurate and/or misleading information. The Agency's alleged "offers of proof" were not accurate and/or truthful, and no written testimony was obtained to support said "offers of proof." Many of the Agency's EEO responses contained blatantly false and/or inaccurate information. The Agency's inaccurate and false information placed on the record was subsequently relied upon by the one EEOC AJ who ruled Summary Judgment dismissing several of Plaintiff's EEO complaints, which were subsequently filed herein in this Civil Complaint.

83.    The 11/30/06 MOO addressed that Plaintiff was punitively denied monetary awards, that she was treated more harshly after filing EEOs compared to those named as harassers, that her co-workers no longer cooperated in her investigations, she was negatively labeled, threatened with FFD medical exams, that she was denied equipment to perform her job, and that she was assaulted during a training class for which the agency took no action. The work environment was found to be sexually hostile for years.

84.    The 11/30/06 MOO found that the Agency failed to investigate Plaintiff's allegation of unlawful employment practices as required, instead placing in the EEOC hearing record that that they did not believe discrimination was occurring but that it was a "personality conflict" between Plaintiff and her supervisor. This same comment was made in January 2007 in an EEO affidavit by the Acting SF INC, as the reason for not conducting an investigation in Plaintiff's current allegations. To date, management still is not conducting investigations as required. As recently as January 2007 two supervisors stated that just because Plaintiff alleges harassment does not mean an investigation has to be conducted.

85.     Prior to the 8/04 EEOC hearing, at least four managers made statements that Plaintiff needed to be sent for a FFD medical exam, after she filed EEOs. Statements that Plaintiff should be sent for a FFD medical exam are still being made by managers as recently as 2007.

86.     Plaintiff's on-going discrimination and retaliation as addressed by Plaintiff in EEOs #1-7 are part of the Agency's accepted discrimination policies, practices and procedures.

87.     Plaintiff suffered a personal loss or harm with regard to a term, condition or privilege of Federal employment, when she was not provided the right to work in an environment free from harassment and discrimination, due to the Agency's on-going pattern and practice of illegal conduct, which is on-going today.

88.     Plaintiff sought medical treatment and continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which exacerbated her diagnosed medical condition.

89.     As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

90.     **EEO # 8: filed 5/15/01 (Agency No.: HO-0084-01)**
(Alleging sex discrimination (female), Reprisal for prior EEO activity, and an On-going HWE).

91.     This was the 8th EEO complaint filed by Plaintiff. Plaintiff named incoming SF INC Kiel and AIC Gamache as discriminating officials. Plaintiff was denied adequate official time to address EEO complaints.

92.     After Don Davis retired in 2002, the incoming SF INC Alan Kiel, and the two AICs, Juliana Nedd and Greg Gamache, continued the pattern of illegal conduct targeting

Plaintiff and escalating an already HWE, due to her EEO activity. The subsequent removal of these three managers from their positions in 2003 is addressed in EEO complaint #10.

93.     The disparate treatment Plaintiff received from AIC Gamache was addressed and acknowledged by AJ Kelley in his 11/30/06 MOO.

94.     Plaintiff was adversely affected when she was denied adequate official time for her EEO complaints, disparate from at least two male inspectors who were provided unlimited time to address their EEO complaints, and one male who filed a CA-2 stress claim who was allowed the use of a US PIS support clerk for assistance with his CA-2 stress claim while he was off work.

95.     Plaintiff was forced to use her own personal time to address her EEO complaints.

96.     The EEOC AJ assigned to the case, AJ Player stated she could not address the lack of official time being provided to Plaintiff by the Agency, and stated that it would have to be addressed with INC Kiel or Postal Attorney Corrine Lee who was assigned to the case. Lee never responded to Plaintiff's two requests regarding official time being provided to her to address her EEO complaints.

97.     Plaintiff was initially told she could have 1-2 hours of official time to address her on-going EEO complaints. Plaintiff's EEO complaint addressed that this was an unrealistic number, so Plaintiff tracked her personal time spent on EEOs so that she could be reimbursed for personal hours spent on EEOs, for which the Agency refused to provide her official time.

98.    The disparity of allowing two males unlimited time for EEO complaints while limiting Plaintiff to 1-2 hours was discriminatory and part of the on-going HWE harassment.

99.    Plaintiff submitted official time requests to INC Kiel who would generally only approve a portion of the requested time.

100.    Plaintiff's EEO complaint also addressed that she and another female inspector who filed several EEOs, were not being sent Internal Crimes referrals, but instead the referrals were sent to other team members in an effort to keep these two EEO filers' statistics low to affect their year-end merit.

101.    Plaintiff's EEO complaint addressed that AIC Gamache was tainting her to her new team leader and that Gamache continued to walk by her ignoring her, providing several examples in her EEO complaint.

102.    Gamache made a statement to others in the Division that Plaintiff was not a "team player" because she filed EEO complaints. Gamache's behavior toward Plaintiff only became negative and retaliatory after Plaintiff filed EEO complaints.

103.    Gamache was found to have treated Plaintiff disparately due to her EEO history as addressed in the 11/30/06 MOO.

104.    This EEO complaint was subsequently dismissed by the Agency.

105.    Plaintiff incorporates by reference herein as a part of this Complaint, the issues, facts, documents and records in EEO complaint #8, in support of allegations of the Agency's on-going discriminatory and retaliatory conduct and the resulting HWE, dating from 1998 to date.

106.    Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

107.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

108.    **EEO #9: filed 07/29/02 (Agency No: HI-0075-02)**
(Alleging sex discrimination (female), reprisal for prior EEO activity, and an on-going HWE).

109.    This was the 9th EEO complaint filed by Plaintiff. Plaintiff named INC Kiel and AIC Nedd as discriminating officials. As a result of Plaintiff's EEO activities she was threatened with a FFD exam, as part of the on-going HWE harassment targeting her.

110.    Plaintiff was treated disparately when management denied her request for a "detail" opportunity to Redding, CA, and then gave the "detail" to two male inspectors, who had not volunteered and who did not want the "detail."

111.    Plaintiff sent an email on 1/10/02, to INC Kiel addressing her disappointment in being denied the Redding detail, feeling she was being treated disparately due to her EEO history. Plaintiff also addressed on-going negative issues she had observed occurring in the SF Division.

112.    AIC Nedd became upset with the email Plaintiff sent to INC Kiel because the issues in the 1/10/02 email largely addressed her conduct. AIC Nedd ordered Plaintiff and her supervisor to meet with her.

113.    The meeting was held on January 17, 2002, where AIC Nedd threatened to send Plaintiff for a FFD medical exam, in front of her new supervisor, Bill Kienzle, in an effort to intimidate and harass her from filing EEOs.

114.    During the meeting AIC Nedd also told Plaintiff she hoped she would stop sending emails. Plaintiff advised Nedd that she would continue to send emails when she saw things happening in the Division that were not right. Nedd responded that maybe she needed to send Plaintiff for a FFD medical exam.

115.    Plaintiff advised Nedd that she needed to do what she needed to do, and Plaintiff then said she needed a representative in the meeting if that was the direction the meeting was taking. The meeting was terminated and Plaintiff left the room, while her supervisor remained in the room for one hour speaking with Nedd.

116.    There was no just cause for Nedd to threaten to send Plaintiff for a FFD medical exam. Nothing in Plaintiff's actions or demeanor during the 1/17/02 meeting or in Plaintiff's actions as a Postal Inspector warranted Nedd's threat to send Plaintiff for a FFD medical exam, but was said by Nedd to further harass, intimidate and retaliate against Plaintiff for her EEO activities, perpetuating a HWE, and to deter the EEO process. After the meeting, Kienzle told Plaintiff that Nedd attempted to escalate the meeting but that Plaintiff had remained calm.

117.    On 1/15/02 Kiel denied Plaintiff's October 2001 request to reimburse her annual leave she used for her EEOs. Kiel denied this request, less than one week after Plaintiff sent the 1/10/02 email about issues in the Division.

118.    Supervisors are responsible for merits, awards and prime assignments.

119.    At least three managers prior to Nedd stated Plaintiff should be sent for a FFD medical exam, and at least 3 managers after Nedd made the same statements, as recently as

2007. Comments regarding sending Plaintiff for FFD medical exams has been on-going for ten years and is one more example of the on-going HWE harassment targeting Plaintiff.

120.    Nedd had previously attempted to deter the EEO process when Plaintiff went to her about an incident in September 2001 when an Inspector inserted himself into Plaintiff's on-going investigation and tried to intimidate a postal manager into taking disciplinary action against a postal employee, in violation of the code of ethics and conduct. Nedd stated she would address the matter and hoped that Plaintiff would not file an EEO.

121.    Plaintiff was adversely affected by not being given the same opportunities for a "detail" opportunity as other inspectors, which she could use for promotional opportunities and/or include in her year-end merit write-up, disparate from others in the Division not filing EEOs. Plaintiff is adversely affected when managers continue to threaten to send her to a FFD medical exam insinuating that they will take her job, as well continuing to taint her to her co-workers, as part of the on-going HWE harassment.

122.    This EEO complaint was subsequently dismissed by the Agency.

123.    Plaintiff incorporates by reference herein as a part of this Complaint, the issues, facts, documents and records in EEO complaint #9, in support of allegations of the Agency's on-going discriminatory and retaliatory conduct and the resulting HWE, dating from 1998 to date.

124.    Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

125.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

126.    **On-going chronological events addressed in subsequent EEO complaints.** In retaliation for filing EEOs against Nedd, Plaintiff was set up to fail at her job by having her territory doubled, and removing her support help at the Richmond domicile.

127.    In February 2002, less than one month after the 1/17/02 Nedd meeting, Plaintiff was assigned a disproportionately larger territory than other team members when she was assigned the entire Sacramento District Internal Crimes territory in addition to the Oakland territory that she already had, doubling her workload.

128.    In August 2002, Plaintiff's support help at the Richmond Domicile (Liz Karp) was transferred, after having been assigned to Richmond for at least 8 years.    Karp was transferred one month after Plaintiff filed an EEO on 7/29/02 naming AIC Nedd.  Plaintiff was left with no support help at the Richmond domicile after just having her territory increased.

129.    There was no other domicile in the SF Division without support help, with the exception of Bakersfield, CA who had only one inspector assigned there, and who was not a top producer of stats.

130.    Plaintiff was responsible for performing all the duties previously performed by Karp. Plaintiff made repeated requests for support help, which fell on deaf ears.  Plaintiff sent emails to management stating the lack of support help was affecting her ability to perform her job.

131.    Plaintiff believed support help (Karp) was taken from the Richmond domicile in retaliation for filing the EEO naming Nedd on 7/29/02 and her prior EEOs, and was done in an effort to make Plaintiff fail at her job, a pattern that continued by later managers, as addressed in subsequent EEOs.

132.    Taking Plaintiff's support help, adversely affected Plaintiff who was required to perform the clerical and support work previously performed by the full-time support clerk, which negatively affected Plaintiff's ability to perform her own job.

133.    Karp was never given any reason for her reassignment from Richmond to SF, and the amount of work performed by Plaintiff and Inspector Alan Anderson at the Richmond domicile in 2002 would lend credibility to the belief that support help was needed there.

134.    Plaintiff and Inspector Alan Anderson obtained more stats than the rest of the IC team combined in 2002, yet their support help at the Richmond domicile was taken away. Plaintiff had the highest number of IC stats in the SF Division in 2002.

135.    Management eventually took away all the inspectors domiciled at Richmond except for the Plaintiff, so she had no one to work with.

136.    To further harass Plaintiff, Nedd named Plaintiff the "Division Clean-up Coordinator" in a February 2003 email, which she then disseminated, further trying to embarrass and humiliate Plaintiff by giving her this title.

137.    Plaintiff was adversely affected when she was subjected to a more burdensome work load, and denied secretarial support after complaining of discrimination.

138.     Management provided no support help to Plaintiff, even after it was announced on 12/13/02, that the SF Division was receiving approximately 15 additional support positions when the ISOG closed in December 2002.

139.     Plaintiff eventually sent an email to her supervisor, Anita Beppu and AIC Donnelly on 5/7/03 out of frustration from having no support help and twice the workload, requesting that she be assigned to another team if no support help was forthcoming to the Richmond domicile.

140.     Plaintiff heard no response from anyone regarding her 5/7/03 email asking for support help.

141.     Plaintiff was subsequently reassigned from the IC Richmond team to the Threat and Assault (ECA) team in San Francisco due to her 5/7/03 email, as addressed in EEO #10 below.  The ECA team was a known "punishment" team in the Division that did not utilize Plaintiff's background, skills or expertise.

142.     Plaintiff's punitive transfer to the ECA team in SF came within months of Plaintiff circulating a petition signed by 49 employees in February 2003 which resulted in the removal of the three SF managers as addressed in EEO #10 below.

## FIRST CAUSE OF ACTION
### (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; 42 U.S.C. 2000e ET SEQ.)
### EEO #10/11 (AGENCY NO.: 66-000-0055-03)

143.     **EEO #10:  2003 Petition:**  This is the 10th EEO complaint filed by Plaintiff since 1998, alleging on-going discrimination (gender), age discrimination, harassment,

retaliation and a HWE, due to her EEO activities.    EEO #10 was combined with pre-EEO #11 by the Agency into one complaint with one Agency number.

144.    In February 2003 Plaintiff began correspondence with Jim Birch, Ombudsman for the US PIS, regarding on-going issues and problems within the SF Division.

145.    Plaintiff organized a petition, signed by 49 employees, which was sent to Jim Birch on 2/22/03 regarding allegations of misconduct occurring in the SF Division.

146.    After sending the petition to Birch, Plaintiff subsequently sent a letter with 31 Exhibits to Birch on March 4, 2003, providing examples of the issues and concerns as addressed in the 2003 petition, and to lend credibility to items addressed in the petition. Plaintiff addressed fraud, waste, abuse, mismanagement and discrimination.

147.    As a result of the 2003 petition and correspondence to Birch, SF AICs Nedd and Gamache were removed from their positions in mid-March 2003.  One AIC was placed on a "detail" and later promoted, and the other AIC placed on a "detail" inventorying guns within the Agency and allowed to work out of his residence until he retired.

148.    After the two AICs were removed from their positions in 2003, Inspectors James Donnelly and John Wisniewski were "detailed" to the SF Division as interim Acting SF AICs effective 3/31/03.  INC Kiel remained the SF INC.

149.    Interim SF managers Wisniewksi and Donnelly stated in their EEO affidavits that prior to their arrival in SF they were aware Plaintiff filed numerous EEOs.

150.    Wisniewski's EEO affidavit stated that in March 2003 Deputy Chief Inspector (DCI) Burke asked him to take a "detail" to SF as Acting AIC, and that he was aware of the

petition sent to Ombudsman Jim Birch and he was aware of the Fineman letter (as addressed in EEO #11).  Wisniewski told Plaintiff that he was hand-picked by Chief Postal Inspector (CPI) Lee Heath.

151.    Donnelly's EEO affidavit stated the he was asked to go to SF due to the 2003 petition and a number of issues.

152.    INC Kiel who was allowed to remain as the INC, whereby he repeatedly approached his secretary, Marilyn Lee, about why she had signed the 2003 petition, which was upsetting to her.

153.    Lee had signed the 2003 petition at Plaintiff's request.

154.    INC Kiel told people in the Division he was aware that Plaintiff was the number one signer on the petition.  The signers on the petition were to have remained confidential.

155.    Lee asked Birch to intervene and stop Kiel from continuing to approach her about the petition, but Birch refused to help.  Lee requested assistance from Plaintiff.

156.    Plaintiff sent an email to Ombudsman Birch on 5/14/03 stating she would go outside the Agency due to Kiel's continued harassment of his Secretary, Marilyn Lee, for signing the 2003 petition, if Birch did not intervene.

157.    On 5/19/03, just five days after Plaintiff sent the email to Birch indicating she would go outside the Agency if Kiel was not addressed, INC Kiel announced his retirement, effective 6/30/03.

158.    On May 28, 2003, INC Kiel sent a survey to the Division employees asking them to address concerns they had about the Division. No one from management ever addressed the employee issues as addressed in these surveys, or the issues in the 2003 petition.

159.    EEO affidavits submitted by Wisniewski and Donnelly both stated that Kiel voluntarily retired. AIC Robert Bethel stated he had no knowledge of why Kiel retired.

160.    Removing three managers from their positions in the US PIS had never previously been done, and all managers in the entire Agency were aware of the circumstances surrounding Kiel's retirement, and the two AICs' reassignments, disparate from statements provided in EEO affidavits.

161.    At the same time INC Kiel retired, Postal Inspector General (IG) Karla Corcoran was being investigated for the some of the same issues addressed in the SF 2003 petition and supporting correspondence sent to Birch.  Corcoran, as the Postal IG, had oversight of the US PIS and was subsequently removed from her position in August 2003.

162.    CPI Heath was forced to remove the three SF managers from their positions, knowing that if issues in the SF Division went public, he could be under the same scrutiny by Congress as Postal IG Corcoran.

163.    When INC Kiel retired, Wisniewski became the Acting INC, Donnelly remained the Acting AIC and SF team leader Greg Campbell was named the Acting AIC.

164.    As a result of the 2003 petition, several headquarters and local managers met privately with some of the SF employees in June 2003, regarding issues addressed in the 2003 petition, at the request of the CPI Heath.  INC Kiel was still the SF INC.

165.    The week of June 16, 2003, Marilyn Lee, INC Secretary for Kiel, met off-site with numerous local and headquarters' managers regarding INC Kiel continuing to approach her about why she signed the petition.  At the meeting were Ombudsman Jim Birch, Larry Katz, Legal Counsel, Mike Ahern, Deputy Chief Inspector (DCI) and SF managers John Wisniewski, James Donnelly and Greg Campbell.  During this meeting, Lee told top managers that Plaintiff was the only person that helped her regarding Kiel continuing to approach her about the 2003 petition.

166.    After Lee met with managers in June 2003, both Lee and Plaintiff were punitively reassigned to positions that adversely affected them.  Lee was removed from her bid position as the INC Secretary in retaliation for her role in the 2003 petition and her June 2003 meeting with managers as addressed in EEO #13 below.  On June 26, 2003, Plaintiff was notified she was being reassigned from the Internal Crimes (IC) team in Richmond, to the Threat and Assault (ECA) team in SF, a known "punishment" team, effective 7/1/03.

167.    Plaintiff considered the transfer to the ECA team punitive, and done in retaliation for the 2003 petition and her letters to Ombudsman Birch.

168.    Internal Crimes investigations involving employee mail theft are Plaintiff's area of expertise, as are Workers' Compensation Fraud investigations.

169.    Plaintiff's transfer was announced four days prior to INC Kiel's retirement date, and approx. 10 days after Lee stated to managers that Plaintiff was the only one that helped her when Kiel continued to approach her about the 2003 petition.

170.    AIC Donnelly confirmed in his EEO affidavit that Kiel had input into Plaintiff's transfer to the ECA team.

171.    On June 30, 2003, Plaintiff met with acting AIC Donnelly; and objected to her transfer to the ECA team, which was known as the least significant team in the Division.

172.    AIC Donnelly told Plaintiff she was being transferred due to the 5/7/03 email Plaintiff sent to her supervisor, a copy of which he handed to Plaintiff which he had highlighted with a yellow marker (as addressed in EEO #9 above).

173.    Plaintiff's 5/7/03 email to Anita Beppu, her supervisor, asked for a support person for her and Inspector Anderson at the Richmond domicile stating they were "frustrated with the lack of support we are receiving to assist us with our workload." Plaintiff pointed out that the stats she and Anderson received exceed the stats of the rest of the team together, yet their support help had still been taken from them. Plaintiff's 5/7/03 email stated the lack of support is, "impairing our ability to perform our job to the level previously performed – just look at our stats." Plaintiff's email addressed the filing that need to be done and old customer complaints received that could not be located. Plaintiff's email asked management to, "reassess resources and get us some help. If you see no immediate change for as at the BMC, I would request to be reassigned to a team where I will be given support to perform my job." Plaintiff's email stated she was frustrated being without support help.

174.    Support help had previously been transferred from Richmond in August 2002 by former AIC Nedd in 7/02 as addressed in EEO #9 above, in an effort to set Plaintiff up to fail

1    and to interfere with her ability to perform her job, in retaliation for Plaintiff continuing to file

2    EEOs which upset management.

3         175.    Plaintiff's EEO complaint #10 contained 38 pages of Plaintiff's on-going

4    requests for support help at Richmond, and records showing the clerical work Plaintiff was

5

6    forced to perform in order to run the Richmond office in 2002 and 2003. This was work

7    previously performed by the support clerk. Plaintiff advised management that having to do her

8    regular duties and the duties formally done by the full-time support clerk was affecting her

9

10   ability to perform her job.

11        176.    In March 2003, fifteen additionally support clerks were transferred into the SF

12   Division, yet management still did not provided support help at Richmond, even after Plaintiff

13   continued to request assistance.

14

15        177.    In Plaintiff's meeting with AIC Donnelly, he was adamant that no support help

16   was forthcoming to the Richmond domicile, and that was the reason Plaintiff was being

17   reassigned – because she had requested it and they were trying to accommodate her request.

18

19        178.    Plaintiff asked Donnelly why she was being assigned to the ECA team, the most

20   insignificant team in the Division, when two new criminal teams were just formed with two

21   new team leaders, and two other teams had openings. Donnelly stated the ECA team was

22   where Plaintiff was, **"needed and had openings."**

23

24        179.    In 2003, two male Inspectors, Quan Howard and Mike Ramos, were both

25   allowed to be transferred to the assignment of their choice. Disparately, Plaintiff (female) was

26   transferred to the ECA team, against her wishes.

27

28

180.    Plaintiff advised Donnelly that AIC Nedd had set Plaintiff up to fail by doubling her workload and taking away support help at the Richmond office, resulting in Plaintiff going from having the highest Internal Crimes (IC) stats in the SF Division in 2002 to the lowest stats in 2003. Donnelly had no interest in what Plaintiff said.

181.    Donnelly acknowledged to Plaintiff during this meeting, and later in his EEO affidavit that INC Kiel had input into Plaintiff's transfer to the ECA team.

182.    Plaintiff told Donnelly that she felt the transfer to the ECA team was in retaliation for the 2003 petition and her history of filing EEOs. Donnelly stated Plaintiff was not reassigned to the ECA due to 2003 petition, but that she was reassigned due to her 5/7/03 email because no support help was forthcoming at the Richmond office.

183.    On 7/2/03, just one day after Plaintiff was transferred to the ECA team, Liz Karp, Support Clerk, was sent to the Richmond office to perform the clerical work that Plaintiff had been requesting be done for over a year. Karp left a note for Plaintiff stating she had been sent to the Richmond office by management.

184.    Karp being sent to the Richmond office to perform support work contradicted Donnelly's statement to Plaintiff that no support help was forthcoming at the Richmond domicile as being the reason Plaintiff was transferred to the ECA team.

185.    The reason management gave for transferring Plaintiff from the IC Richmond team to the ECA team in SF was pretext for discrimination, done in retaliation for her role in the 2003 petition and the removal of 3 SF managers, and her history of filing EEOs. The transfer to the ECA team adversely affected her.

COMPLAINT      PAGE  - 44 -

186.    Plaintiff's punitive transfer to the ECA team, known in the Division as a "punishment" team, did not fit Plaintiff's background, skills or expertise, and exacerbated an already HWE.

187.    The SF Division was the only Division in the entire country with an ECA team, having been formed in 2002 by of Juliana Nedd (the SF AIC removed from her position in 2003), who promoted Sally Diaz as the ECA team leader. The ECA team was later disbanded in April 2004 due to the inconsequential, menial, work conducted.

188.    There were other teams in the Division that had openings that would have better utilized Plaintiff's training, background and expertise, including two newly formed criminal teams that worked complex criminal investigations.

189.    The ECA team was known in the Division as a "punishment" team comprised of new inspectors, non-performers, or those in trouble with management.

190.    Inspector Yessenia Dingui, stated during a 2003 IAD investigation in reference to Plaintiff being assigned to the Threat and Assault (ECA) team in 2003, "*No one wants to come onto our team. Everyone thinks that our team is like, you know, the dead-end or whatever. No one likes the team so whenever, you know, you try to try to punish them or whatever the case may be, you know, they get placed on our team. So there's a negative connotation when it comes to ECA and, you know, people coming onto the team. So she is not happy to be on the team and she made it known that she didn't appreciate being on the team.*"

191.    Inspector Regina King during the IAD investigation of Plaintiff in 2003, stated in reference to the Threat and Assault Team, "*And we work assaults where for the most part*

*they're not really credible. You know, we're kind of babysitting with the post office and doing a lot of paperwork."*

192.    Several witnesses in Plaintiff's 8/04 EEOC hearing stated that Plaintiff's assignment to the ECA assignment appeared retaliatory and that it was a team where perceived "troublemakers" were sent, and an assignment that did not appear to fit Plaintiff's experience and skill level.

193.    Wisniewski stated in his EEO affidavit that the ECA assignment is as important as any other and requires a thorough investigator regardless of tenure.    However, Ryan McAlhaney, Mark Heath, and Yessenia Dingui, were all new inspectors assigned to the ECA team in 2002 immediately after graduating from the US PIS training academy, and had no prior criminal or investigative background or experience. Atkins' EEO affidavit dated 8/16/04 stated ECA is "a very meaningful assignment normally given to more experienced inspectors."

194.    Plaintiff's background and accomplishments would warrant that she be placed on a team where criminal work is conducted, having received "far exceeds" merits in almost all of the assignments she has worked in her career, as well as numerous monetary awards for her work – all prior to EEO complaints being filed.

195.    Plaintiff believed management was purposely trying to humiliate and degrade her by transferring her to the most inconsequential team in the Division, where new inspectors, non-performers, or those in trouble with management were assigned.

196.    Everyone in the SF Division knew Plaintiff was punitively reassigned to the ECA team in retaliation for her role in the 2003 petition and the removal of the three SF

managers.  Some inspectors made jokes to Plaintiff about her new "assignment" on the ECA team.

197.    Management punitively reassigning Plaintiff to the ECA team deters the EEO process and sends out the message to others regarding what will happen if they speak out about the Agency's illegal conduct, effecting a term, condition, and benefit of Federal Employment to work in an environment free of discrimination and harassment.

198.    Prior to Plaintiff being reassigned to Diaz's ECA team, management offered Diaz two other inspectors for her team whom Diaz refused to accept.  Diaz told Donnelly she would take Plaintiff on her team instead because, "at least Plaintiff works."  Diaz's comment alluded that the other two inspectors that management wanted to place on her team did not work, and further supports Plaintiff's contention that non-performers were routinely assigned to the ECA team, disparate from EEO affidavits provided by managers.

When Plaintiff was assigned to the ECA team, McAlhaney and Heath were allowed off the ECA team, after having been on the team less than one year.

199.    AICs Donnelly and Campbell submitted EEO affidavits that stated McAlhaney and Heath were **not** reassigned off the ECA team to allow Plaintiff to be transferred to the ECA team.    Wisniewski's EEO affidavit stated that Heath **was** moved off ECA to make room for Plaintiff on the ECA team.

200.    The ECA team was comprised of non-performers and/or those in trouble with management.    While Plaintiff was on the ECA team, one inspector on the team was on a Performance Improvement Plan (PIP) and later resigned from the agency, one inspector was

investigated for alleged misuse of his government credit card and an alleged physical assault, and one inspector was told by Diaz that she was not performing adequately and should look for another job with another agency. And then there was Plaintiff, who had filed 9 EEOs up to this date and circulated a petition resulting in the removal of the three SF managers. .

201.    SF AIC Robert Bethel's 8/23/04 EEO affidavit stated that ECA is not reserved for inspectors in trouble, stating ECA addressing employee safety is one of the Agency's highest priorities. Acting INC Wisniewski's EEO affidavit stated the ECA team is as important as any other and that the position requires a thorough investigator regardless of tenure. Acting INC Donnelly stated ECA is very important. AIC Campbell's EEO affidavit stated ECA is not reserved for inspectors in trouble.    Sally Diaz stated in her 9/10/03 IAD interview that she refused to accept two inspectors on her team, alluding that they were not "workers," but that she would accept Plaintiff.

202.    Plaintiff's transfer to the ECA team was an adverse employment action. Plaintiff's commute to the SF ECA team increased her commute an additional 2-3 hours per day and changed her work hours. Plaintiff was assigned the SF territory which had almost twice the number of incoming complaints as other territories assigned to ECA team members, and the work performed was humiliating and degrading and did not utilize Plaintiff's background, skills, and expertise. All actions contributed to the on-going HWE.

203. ·  Plaintiff was assigned to work the SF territory on the ECA team even though she had never worked in the SF area during the past 17 years and was not familiar with the location of the post offices or the postal managers. Plaintiff's work hours increased significantly on the

ECA team.

204.    When Plaintiff came to the ECA team, Inspector Yessenia Dingui, who previously had been assigned the SF territory on the ECA team, was relocated from SF to Oakland against her wishes, stating she was **"pushed"** out of SF when Plaintiff was assigned to the team.  The Agency could have left Plaintiff in Richmond to work the Oakland territory, but chose to transfer her to SF further adversely affecting her.

205.    Plaintiff was humiliated and degraded by the menial work she was forced to perform, most of which was not even criminal in nature, including giving workplace violence prevention stand-up talks at post offices, and eventually was required to conduct surveys to ensure letter carriers had locked their postal vehicles.  The work Plaintiff was forced to perform was largely non-law enforcement work that anyone being paid minimum wage could have performed.

206.    The "need" for the ECA team was determined by the number of referrals received from the post offices, so the team leader encouraged postal management to report even the most non-credible threat and assault allegations to the ECA team.  The more referrals the ECA team received, even if no investigation was conducted by inspectors, the more there was an appearance for the need of the ECA team, which justified its existence.

207.    Plaintiff contacted Ombudsman Birch on July 14, 2003 via email regarding her punitive transfer to the ECA team believing it to be a result of the 2003 petition and correspondence to him, as well as her on-going EEO activities.  Birch declined to intervene or get involved.

208. Prior to her the transfer to the ECA team in 7/03, Plaintiff had filed 9 EEO complaints.

209. The ECA transfer was not the first time Plaintiff was punitively reassigned as a result of speaking out about discrimination. In 1998, after coming forward with complaints of discrimination, Plaintiff was punitively transferred to a less desirable territory, assigned to a facility where she had no prior experience, and her workload was increased over that of her team members.

210. Punitive transfers are part of the on-going HWE routinely condoned by the Agency beginning in 1998 and continuing through 2007.

211. Management forced Plaintiff to stay on the Threat and Assault assignment (later assigned to the Security/Prevention team in 4/04) for 3 ½ years, from 7/03 – 10/06, longer than any other inspector was forced to stay on that assignment. Heath and McAlhaney were allowed off the assignment after less than one year, Dingui was allowed off after approx. two years. At least 4-5 additional inspectors were allowed off the ECA (and later Security/Prevention) assignment anywhere from 2 months to 1 ½ years on the assignment, bypassing Plaintiff, who remained on the punitive assignment against her wishes.

212. Each day Plaintiff was forced to stay on the Threat and Assault assignment, she knew it was in retaliation for the petition and her on-going EEO activity, meant to punish her and put out the message to others. In the Agency's 12/22/06 EEO response the Agency refused to state why Plaintiff was left on the Threat and Assault assignment for approx. 3 ½ years while other inspectors were allowed off the assignment after a much shorter time period.

213.   Management was aware Plaintiff believed her assignment to the ECA team working employee threats and assaults (and later the Security/Prevention team once the ECA team was disbanded and Threats and Assaults were assigned to that team), was punitive, and that being forced to stay on the assignment for 3 ½ years for retaliatory purposes was negatively impacting Plaintiff's health.

214.   The EEO investigator had to send out 2 and 3 EEO affidavits to several of the managers involved in this case, in an attempt to get them to answer questions they were asked. The managers refused to provide some of the documents she requested for her investigation.

215.   In 2004 EEO affidavits submitted by Donnelly, Wizniewski and Campbell, they stated the reason Plaintiff was transferred to the ECA team was because no other team leader in the Division would take Plaintiff, inspectors did not want to work with her, Anita Beppu did not want Plaintiff on her IC team, and Diaz was the only team leader that would take Plaintiff, and then only reluctantly

216.   In a 11/5/07 Declaration that IC Team Leader Anita Beppu provided Plaintiff, Beppu denied that she told management she did not want Plaintiff on her IC team. In a 6/21/05 email, Team Leader Bill Kienzle stated he specifically asked for Plaintiff to be assigned to his criminal team and management told him, "no." Beppu and Kienzle's responses discredit EEO affidavits submitted by the three interim SF Mangers, and underscore the hostility directed towards her by management. In Plaintiff's 8/04 EEOC hearing, several witnesses testified they enjoyed working with Plaintiff, she was a good inspector, and that they would work with her again.

217.    Bill Atkins was named the new SF INC in July 2003 and was scheduled to report to the SF Division in September 2003.

218.    Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

219.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS
### ACT OF 1964, AS AMENDED; 42 U.S.C. 2000e ET SEQ.)
### Pre-EEO #11 (AGENCY NO.: 66-000-0055-03)

220.    **Pre-EEO #11: Fineman Letter:** This is the 11th EEO complaint filed by Plaintiff since 1998, alleging on-going discrimination (gender), harassment, retaliation and a HWE, due to her EEO activities.  This pre-EEO #11 was consolidated with EEO #10 into one complaint.

221.    Plaintiff was investigated by Internal Affairs Division (IAD) for a "trumped up" charge that she threatened a co-worker, immediately after Plaintiff released a letter outside the Agency alleging Agency misconduct.

222.    After the 2003 petition was sent to Birch, Headquarters' managers and interim SF Managers Donnelly, Wisniewski and Campbell did not address the employee issues and concerns in the 2003 petition and letters sent to Birch.  In fact, the interim SF manager's conduct appeared to be the same conduct as the three SF managers that were removed from their positions.

223.    On August 4, 2003, Plaintiff sent a letter (and 92 Exhibits) to Postal Board of Governor (BOG) David Fineman and Senator Dianne Feinstein (hereto referred to as the "Fineman" letter), requesting an investigation by an outside agency into the allegations addressed in the 2003 petition and letters to Birch, as well as the on-going Agency conduct by the interim SF managers which appeared to be the same as prior SF managers.

224.    The 8/4/03 Fineman letter alleged fraud, waste, abuse, mismanagement, discrimination and on-going retaliation within the SF Division, and included 92 exhibits supporting the allegations therein.

225.    The Fineman letter alleged in part that interim SF managers Donnelly and Wisniewski falsified records, and alleged that Campbell was using his position as a team leader to solicit funds from Division employees for his church.

226.    The Fineman letter was released during the same time that the Postal Inspector General (IG), Karla Corcoran, was being investigated for some of the same issues addressed in the Fineman letter.

227.    Plaintiff requested that BOG Chairman Fineman not release the letter to the US PIS due to known acts of retaliation by the Agency; However, by letter dated 8/12/03, Larry Katz, US PIS Chief Legal Counsel, informed Plaintiff that BOG Chairman Fineman had forwarded him the Fineman letter.

228.    Plaintiff immediately contacted her legal counsel when she learned the Fineman letter had been released to the US PIS believing retaliation targeting her was imminent.

229.    On August 18, 2003, Donnelly questioned Plaintiff about a hotel charge on a travel voucher she submitted after working 16 hours at the SF P&DC until almost 1:00 a.m., and being required to respond to Menlo Park, CA early the next morning.  Donnelly told Plaintiff that the next time she could sleep on her office floor or pay for the hotel room herself, and that the Agency would not pay for future hotel room costs for her.

230.    Donnelly confronted Plaintiff about the hotel charge, within one week of the release of the Fineman letter, which alleged misconduct by Donnelly and the other interim SF managers.

231.    Other inspectors routinely stayed at hotels paid by the Agency after working long hours, without being questioned by management.  Inspector Candace Wilkes routinely stayed in a hotel paid for by the Agency, when working late hours at the North Bay P&DC. Wilkes has never filed an EEO complaint.

232.    Plaintiff's Supervisor, Sally Diaz, told Plaintiff that she had no problem with Plaintiff charging the hotel room on her travel voucher.

233.    Donnelly singled Plaintiff out and harassed her about the hotel charge in retaliation for the release of the Fineman letter in which his alleged misconduct was addressed.

234.    On August 20, 2003, Mike Ahern, DCI, who was Acting SF INC John Wisniewski's supervisor, was in SF and met with Liz Karp about why she went to the Richmond Domicile on 7/2/03 to provide support help. The Fineman letter addressed Karp. going to the Richmond Domicile to perform support work immediately after Plaintiff was told by AIC Donnelly that no support help was forthcoming and that was why she was being

transferred to the ECA team (as addressed in EEO #10 above). When Ahern came to SF in August 2003, he was aware of the content of the Fineman letter.

235.    In August 2003 Ahern met with Mr. Robert O'Connell, USPS Attorney, who was handling Plaintiff's first 7 EEO cases, so Ahern was also aware of Plaintiff's seven EEO complaints assigned to Mr. O'Connell. While in SF, Ahern also met with the interim SF managers regarding the content of the Fineman letter.

236.    Plaintiff was out of the office from August 25 through September 8, 2003. Plaintiff returned to work on September 9, 2003.

237.    On the morning of September 9, 2003, ECA Support Clerk Linda Ng came into Plaintiff's office to speak with her. Later that afternoon, Sally Diaz, Team Leader, had a team meeting that lasted over an hour, and again Ng was present in this meeting with Plaintiff. During this team meeting Diaz stated she would be gone for a few days but would not say why. Diaz and Ng were out of the office for the next two days.

238.    On September 10, 2003, INC Bill Atkins reported to the SF Division and had a going-away gathering for departing interim SF managers Wisniewski and Donnelly. INC Atkins gave a speech to the SF Division employees and introduced his new acting AIC, Robert Bethel who also was previously assigned to the Seattle Division with Atkins.

239.    Atkins stated during his welcome speech that he knew there were problems in the Division and he stated that retaliation was a thing of the past. He stated that EEOs in this Division were the highest in the nation, and said that frivolous EEOs hurt the Division.

240.    Atkins' comments regarding EEOs in a public forum was inappropriate and

Plaintiff believed the comments were directed at her. A manager attempting to dissuade employees from participating in the EEO process constitutes unlawful interference with the EEO process.

241. Several hours after Atkins gave his welcome speech, AIC Bethel, came to Plaintiff's office and said he wanted to speak to Plaintiff and then escorted her to Atkins' office. When Plaintiff arrived at Atkins' office, one of the first things Atkins said was, **"there have been some problems in the Division and I'm not sure why, but your name has been put out there."** He was immediately cut off by AIC Bethel.

242. Disparately, Atkins' responses in three EEO affidavits sent to him in 2004 indicated he had no knowledge of the Ng incident, no knowledge of Plaintiff's EEOs and no knowledge of any issues occurring in the SF Division. This is also disparate from the content of his welcome speech to the Division, in which he referred to on-going issues in the Division.

243. In the 9/10/03 meeting, Plaintiff was advised by Bethel that she was being investigated by Internal Affairs Division (IAD) for a threat she made against a co-worker. He would not state what the threat was or who Plaintiff allegedly threatened.

244. Bethel told Plaintiff that IAD would be interviewing her the following day and said that Plaintiff would have to turn in her service weapon at that time. Plaintiff told Atkins and Bethel at the end of the meeting, "I find it interesting that the three managers are gone and you receive my letter, and now this is happening." Plaintiff was referring to the Fineman letter. Atkins did not respond.

245.    As Plaintiff walked back to her office, Acting AIC Greg Campbell, walked by her in the hallway without acknowledging her, which was different from how he normally treated her.

246.    It is not standard policy to give a "suspect" 24 hours notice that they will interviewed by IAD, but was done to further harass Plaintiff and create a HWE when she had to wait another day after being told IAD was in town to investigate her.

247.    Bethel and Atkins later told Plaintiff they had nothing to do with contacting IAD to investigate her; However, Atkins was named as SF INC in 7/03 and as such, had knowledge of what was occurring in the SF Division.

248.    Wisniewski's 5/4/04 EEO affidavit stated he contacted Mike Ahern (DCI) and Larry Katz about Plaintiff's alleged threat against Ng.

249.    Contacting DCI Ahern and Katz, is not proper protocol for an alleged threat complaint.  Proper protocol is to fill out a referral form and refer the complaint to the head of IAD.  There was no business reason for the interim SF managers to contact Ahern and Katz, except that the interim SF managers had been notified they were named by Plaintiff in the Fineman letter and saw this as an opportunity to retaliate against Plaintiff.

250.    All three interim SF managers were aware of the Fineman letter when they contacted Ahern and Katz regarding Plaintiff's alleged threat against Ng, which both Ng and Diaz had advised them was not credible.

251.    **Yessenia Dingui IAD interview:**  Inspector Yessenia Dingui was interviewed by IAD inspectors on 9/10/03.  The interview was taped.  Dingui stated that Ng told her about

Plaintiff's comment about punching her in the face, and that Ng said she did not think Plaintiff

was really going to punch her. Dingui stated it appeared that Ng told Regina King, Acting team

leader, about the incident in passing but did not report the incident as a threat.

252.    Dingui said that after she spoke to Ng, she subsequently called and left a voice

mail with Diaz about the incident because she did not think King would do anything about it.

Dingui did not advise IAD that that she had also contacted AIC Campbell, a close friend of

hers, about Plaintiff's comment to Ng.    Diaz later confirmed to Plaintiff that Dingui had been

the one who had initially informed AIC Campbell about Plaintiff's comment to Ng.

253.    **Regina King IAD interview:**  Inspector Regina King was interviewed by IAD

inspectors on 9/10/03. The interview was taped.  King said she was the SF Division recruiter

assigned to the ECA team but was the acting ECA team leader when Ng came to her about the

comment Plaintiff made about punching her in the face.  King thought Ng was not reporting the

incident as a threat, but was just "venting," and therefore King took no action.  King said Ng

also "went off" during this conversation about inspector Jimmy Woo who Ng said made similar

comments to her in the past.

254.    King stated the ECA assignment was bothering Plaintiff and she was frustrated

by it because she thought the work was not important or relevant, and Plaintiff though she was

being retaliated against by management by being placed on the ECA team.

255.    Some of the questions the IAD inspectors posed to King concerned issues

directly from the Fineman letter.

256.    King stated Diaz had previously discussed with her that Plaintiff may need to be sent for a FFD medical exam, and that they had both discussed that Plaintiff may have an obsessive-compulsive disorder.

257.    Managers stating that Plaintiff should be sent for a FFD medical exam was addressed in Plaintiff's 8/04 EEOC hearing.  Managers continue to make these same comments about Plaintiff, 10 years later, with no basis other than Plaintiff continues to file EEO complaints and speaks out about the Agency misconduct.

258.    Managers making comments about sending Plaintiff for a FFD medical exam, without just cause, started in 1998 with three managers, continued in 2002 with Nedd, in 2003 with Diaz, and in 2006 by Howard, and is an example of the on-going pattern of HWE harassment targeting Plaintiff for ten years.

259.    The IAD interview transcripts of King and Dingui both indicate that the IAD inspectors had conversations and discussions with both inspectors prior to the interview being taped, some of which had nothing to do with the Ng incident.

260.    **Plaintiff IAD interview:**  On September 11, 2003, Plaintiff reported to work where Regina King, Acting ECA Team Leader, told her that IAD inspectors were there to interview her. King took Plaintiff's service weapon prior to the interview.

261.    Plaintiff was interviewed by IAD inspectors Brian Vranizan and Beverly Canova, who stated Linda Ng, ECA Support Clerk, lodged a complaint against Plaintiff for threatening to punch her in the face.

262.    Plaintiff acknowledged making a comment about punching Ng in the face, but said that it was said as a joke, and that both she and Ng laughed after the comment was made.

263.    Vranizan said that when he and Canova interviewed Ng, she acknowledged that Plaintiff and she both laughed after the comment was made and Ng told them she did not feel threatened by Plaintiff's comment. Vranizan stated Ng was upset that it had escalated to the point where IAD was involved, and Ng kept asking during their interview of her when she could speak to Plaintiff about the incident, since Ng had been placed off work for two days and had been unable to speak to Plaintiff.

264.    Plaintiff asked why IAD was involved when Ng, the "victim," did not even feel threatened by Plaintiff's comments. Inspector Canova stated that IAD was involved because they felt someone may have "intimidated" Ng into minimizing the alleged threat. Canova's mannerisms led Plaintiff to believe that Canova's comment was not truthful. Additionally, Plaintiff was aware that just the day before Ng came into Plaintiff's office to talk to her, and that Ng was also present during an hour long team meeting with Plaintiff, supporting that Ng was not intimidated by Plaintiff or afraid to be around her.

265.    Vranizan then told Plaintiff that IAD became involved even though Ng did not feel threatened because the threat complaint had gone to managers higher than Sally Diaz, and IAD then had to investigate – referring to the interim SF managers.

266.    Vranizan stated that everyone they interviewed felt that the incident was blown out of proportion.

267.   Standard US PIS procedure on the SF Threat and Assault team is that an investigation is NOT conducted if the "victim" does not feel threatened, because it is considered a "non-credible" threat; However, Plaintiff was singled out and treated differently.

268.   The IAD "investigation" of Plaintiff occurred less than one month after the Fineman letter was released to the US PIS.

269.   Both interim SF managers Campbell and Donnelly were previously assigned to Threat and Assault assignments during their careers and both were aware of what constitutes a credible threat and whether an investigation is required.

270.   Plaintiff advised the two IAD inspectors that she felt the IAD inspectors were there for other reasons besides the alleged threat to Ng, referring to the Fineman letter released just weeks earlier.   Plaintiff believed that IAD was there to retaliate and harass her at the direction of CPI Heath and Katz who were angry and upset that Plaintiff had released information outside the Agency, and that IAD was not there for any legitimate "threat" Plaintiff had made.

271.   Vranizan told Plaintiff that he would be writing a short report which he would send to INC Atkins and it would be up to Atkins to determine whether any disciplinary action would be taken against Plaintiff.  A report from IAD dated 11/17/03 was submitted to Atkins.

272.   IAD inspectors were aware of the Fineman letter, because IAD inspectors interviewed AIC Campbell on 9/11/03 relative to allegations of his misconduct addressed in the Fineman letter.  The other two interim SF managers were not interviewed by IAD.

273.   **Linda Ng IAD Interview:**   Linda Ng was interviewed by IAD inspectors on 9/11/03. Ng stated Plaintiff was frustrated about a form and said, "I feel like punching you." Ng stated she felt uncomfortable about Plaintiff's comment but never felt threatened by it. Ng but said the incident did not reach the level of a credible threat in her opinion and she never felt Plaintiff was going to strike her. Ng stated she told King and Dingui about Plaintiff's comment, and later Diaz approached her and asked her to provide a statement.

274.   **Ng/McDermott meeting:**   The day after Plaintiff was interviewed by IAD she called in sick, When Plaintiff returned to work on 9/15/03 she had an email from Linda Ng dated 9/12/03, titled "**SHOCK.**" In the email, Ng stated she was sorry for what happened and that it got out of hand and said that someone previously had, "intimidated me over a period of a year," and when Plaintiff made the comment to her it surprised and hurt her.

275.   On 9/15/03 Ng came to Plaintiff's office to discuss the incident and was very apologetic. Ng told Plaintiff that she did not feel threatened by Plaintiff's comment, and she felt so bad that the incident had escalated that she emailed INC Atkins that morning and asked him how she could take back what happened. Ng said she wanted to quit her job and had attempted to resign her position because she felt so bad, but management refused to accept her resignation.

276.   Ng stated she reacted badly to Plaintiff's comment due to the bad experience she previously had with another inspector on the team.

277.    Plaintiff explained to Ng that it was not her fault, and that management saw an opportunity to use Ng to go after Plaintiff, because they were upset over Plaintiff being vocal about things in the Division.

278.    Ng told Plaintiff that she only told Dingui and King about Plaintiff's comment. King was the Acting ECA Team Leader at the time, and Dingui, was an ECA team member who was close friends with AIC Campbell. In King's IAD interview she said she did not think Ng was reporting the incident as a threat, and therefore she took no action and never told Sally Diaz about the incident.

279.    **Sally Diaz IAD interview:**   Sally Diaz was interviewed on 9/10/03 by IAD inspectors regarding the Ng incident and also about issues from the Fineman letter.    Diaz refused to allow her interview to be taped.

280.    Diaz said she learned about Plaintiff's comment to Ng from a voice mail Dingui left her.

281.    Diaz said AICs Campbell and Donnelly told her to get a statement from Ng. Diaz said AIC Campbell told her that AIC Donnelly did not want Diaz to interview Plaintiff about the incident.

282.    Diaz said the instructions NOT to interview Inspector McDermott came from Headquarters, referring to Washington DC.

283.    Headquarters' managers inserting themselves and dictating who should and should not be interviewed is not Standard Operating Procedure in a threat investigation.

284.    Diaz said she went to Ng who said it was not that big of a deal.  Ng told Diaz that she had not reported the incident to King as a "threat," but that she just "talked" to King about it.

285.    Diaz said Ng did not want to provide her a statement, and only provided a statement after Diaz threatened to bring Ng to her office and document the entire incident.  Diaz said Ng "begged" her to not to talk to Plaintiff, and told Diaz that if she spoke with Plaintiff she also had to speak to Inspector Woo, whom Ng said had put his fist in Ng's face 3-4 times.

286.    Diaz told IAD inspectors she had spoken to Woo who could not recall the incidents involving Ng except maybe doing it once jokingly.

287.    Diaz told IAD inspectors that she did not believe the threat to be credible, and that it did not warrant the attention of IAD, and she considered it an administrative matter to be handled locally.

288.    Diaz said that she and King both discussed that Plaintiff fits the profile of someone who has an obsessive compulsive or paranoid personality.

289.    Diaz's comments to King about Plaintiff being obsessive compulsive or having a personality disorder is just one more example of managers tainting Plaintiff to her co-workers exacerbating the HWE.

290.    Diaz said Plaintiff believed the ECA team was where the misfits were placed and she considered being placed on the ECA team retaliation by management due to a petition she sent to the Ombudsman.

291.   **Diaz/McDermott meeting:**   On 9/15/03 Diaz came to Plaintiff's office and asked if she could still work on the ECA team after the IAD investigation.   During this conversation Diaz said that she was instructed by IAD and SF management not to talk to Plaintiff about was discussed during her IAD interview.

292.   Plaintiff believed Diaz was told not to discuss the IAD interview, even after the interview was completed because IAD discussed issues from the Fineman letter with her and headquarters' management's role in IAD being sent to SF.

293.   Diaz told Plaintiff that her IAD interview lasted 3 hours and was adversarial. Diaz told Plaintiff that she would not lie for management and that she felt confident Plaintiff would get to the bottom of what happened.

294.   Diaz told Plaintiff that she was not the person that went forward with the complaint involving Plaintiff, and acknowledged that it was Dinghui that reported it to AIC Campbell. This is disparate from Campbell's 8/27/04 EEO affidavit stating he heard about the incident from Diaz, and Dingui's 9/10/03 IAD interview where she said she told Diaz about the incident and specifically omitted that she also contacted AIC Campbell, her close friend.

295.   AIC Donnelly stated in his 5/11/04 EEO affidavit that he heard about the Ng incident from Greg Campbell.

296.   Plaintiff believed that AIC Campbell, after hearing about Plaintiff's comment to Ng saw an opportunity for him and the other two interim SF managers to retaliate against Plaintiff for naming them in the Fineman letter.

297.   Wizniewski's 5/4/04 EEO affidavit stated he reported the alleged threat incident

COMPLAINT       PAGE  - 65 -

1    to Mike Ahern, Deputy Chief Inspector (DCI), and Larry Katz, Chief US PIS Legal Counsel,

2    and that the decision to initiate an investigation was made by, **"national headquarters"**. No

3    one explained why Ahern and Katz were contacted instead of the IAD manager, in direct

4
5    opposition to protocol which is to contact the manager of IAD

6        298.    Ahern had just been to SF the month prior and discussed the Fineman letter with

7    interim SF managers.

8        299.    Diaz told Plaintiff that she told Wisniewski and Donnelly that the comment
9
10   Plaintiff made to Ng was not a credible threat, and told them if she would have received the

11   complaint on her ECA team they would not have done anything with it.

12       300.    Diaz told Plaintiff that she also told SF management and IAD inspectors that
13
14   Plaintiff was aware of an incident with Donnelly where he made a comment to an inspector that
15   was much worse than Plaintiff's comment to Ng, and yet IAD was not called in to investigate
16   Donnelly.

17       301.    Donnelly's comment was made in the presence of Diaz and Howard in which he
18
19   said he was going to "shove a boot up Quan Howard's ass." Diaz said she later went to
20   Donnelly and told him that his comment was inappropriate, especially since she was the
21   supervisor of the Threat and Assault team.
22
23       302.    Diaz told Plaintiff that she supported Plaintiff during the IAD interview and the
24   IAD inspectors sarcastically asked her, "What are we suppose to go back and tell the Chief,"
25   referring to CPI Heath. IAD inspector's comments about CPI Heath's interest again supports
26
27   that the interview was not about the alleged threat, but was about retaliation for the Fineman
28

letter and that Heath had an interest in the outcome in the results of the investigation of Plaintiff.

303.    IAD is never contacted when a victim does not feel threatened and IAD especially had no reason to be contacted in this matter. Ng provided her 8/26/03 statement to Diaz, which did not indicate in any manner that she felt threatened by Plaintiff's comment to her and in fact stated that they both joked after the comment was made. Even after Diaz told the interim SF managers that it was not a credible threat, that it should be handled locally, and that AIC Donnelly had made a worse comment than Plaintiff, IAD still was sent to SF to "investigate Plaintiff.

304.    The interim SF managers refused to fully answer questions posed to them by the EEO investigator, causing her to send 2-3 EEO affidavit requests to them in order illicit responses. Even then, some questions posed were ignored by the managers. The Agency also refused to provide a copy of the 11/17/03 IAD report to the EEO investigator.

305.    Plaintiff requested and was denied copies of the IAD inspector's interview notes and tapes of the interviews regarding the Ng incident.  Only after three FOI requests, did Plaintiff obtain a copy of the 11/17/03 IAD report.

306.    AIC Campbell was also interviewed by IAD inspectors on 9/11/03 for an email he sent to the entire Division soliciting funds for his church, which Plaintiff addressed in the Fineman letter.  INC Atkins took no disciplinary action against Campbell, which Atkins documented by letter dated 10/1/03.

307.    Plaintiff was treated disparately when management (males) took no disciplinary action against Plaintiff as a result of the IAD investigation, but refused to put anything in writing to that effect. However, management did provide something in writing for AIC Campbell (male) after he was interviewed by IAD, stating he was cleared from any wrongdoing.

308.    Plaintiff is adversely affected when her official records indicates that she had an "H" case for threatening a co-worker, with no record showing that it was a non-credible threat and that no disciplinary action was taken against her, disparate from how AIC Campbell (b/m) was treated.

309.    Plaintiff was treated disparately when she was investigated by IAD for her comment to Ng, yet Donnelly (male), was not investigated by IAD after Diaz advised management and IAD inspectors that Donnelly's comment to Howard was worse than Plaintiff's comment to Ng.

310.    Plaintiff was also treated disparately than Jimmy Woo (male) when Diaz interviewed Woo herself about alleged threats he made against Ng in the past, instead of IAD being contacted to interview him.

311.    Retaliating against Plaintiff for the release of the Fineman letter, put out the message to others in the Division what will happen if you speak out about Agency misconduct, and deters the EEO process.

312.    To further support Plaintiff's position that Ng did not feel threatened by Plaintiff and there was no animosity, on 4/12/04 Ng sent Plaintiff a box of Sees candy when Plaintiff

was transferred off the ECA team, and in 12/04 Ng sent Plaintiff a Christmas card which stated, "you're phenomenal," and, "with all my respect and admiration."

313.   The Agency's reasons provided for contacting IAD to conduct an investigation of Plaintiff were pre-text for discrimination, harassment and retaliation, due to Plaintiff releasing the Fineman letter outside of the Agency, and her continuing to speak out about the Agency's illegal conduct, as part of the on-going HWE harassment targeting Plaintiff, condoned by Headquarters' managers.

314.   Plaintiff was adversely impacted when SF Managers contacted IAD to investigate her without just cause, due to the Fineman letter and her EEO activities, continuing the on-going pattern of HWE harassment, which affects a term, condition and benefit of Federal employment to work in an environment free from retaliation for utilizing Title 7 rights.

315.   **Plaintiff reassigned to the Richmond Domicile/On-going retaliation/HWE:** On October 1, 2003, Plaintiff was transferred back to the Richmond Domicile to continue working ECA in the Oakland territory.  Regina King, the SF Division Recruiter assigned to the SF ECA team, was also transferred to Richmond to help Plaintiff with her interviews when required.

316.   Diaz told Plaintiff she was being transferred back to the Richmond Domicile because Diaz needed to return Inspector Dingui back to SF so Diaz could more closely monitor her work performance.  Diaz told Plaintiff that she told Dingui her work performance was so bad that she should look for another job.  However, in Diaz's 11/21/07 Declaration submitted on behalf of the Agency four years later, Diaz stated that she transferred Plaintiff back to the

Richmond domicile after only three months in SF, stating, "in fact to accommodate her preference to be at the Richmond BMC domicile, I had transferred her back to that location effective October 1, 2003." Diaz excluded from her Declaration that Plaintiff was transferred to Richmond because Diaz needed to move Dingui back to SF to monitor her work more closely, and that it was **not** done to "accommodate" Plaintiff's preference as Diaz indicated.

317.    Diaz advised Plaintiff that Inspector Dingui contacted AIC Campbell in tears, after Diaz advised Dingui to look for a new job.

318.    Dingui stated in her 9/10/03 IAD interview regarding her contact with Plaintiff on the ECA team in SF, *"Once she came on the team, I got pushed over there. And so, I've been in Oakland for most of the part……"* Dingui's statement indicates that she preferred the SF office but was forced to transfer to Oakland so that Plaintiff could be transferred to SF, which further adversely impacted by increasing Plaintiff's commute by 2-3 hours per day.

319.    In February 2004 Diaz permanently assigned a support clerk to the Richmond Domicile to provide support help for Plaintiff and King.

320.    Atkins personally told Plaintiff on 2/3/04 during a phone conversation regarding Plaintiff's request for official time to address her EEO complaints, that not only was he aware of Plaintiff filing EEOs prior to coming to SF, but that he was aware former INC Kiel and AIC Nedd did not make positive comments about Plaintiff. Atkins' comments confirm that he had knowledge of on-going issues within the SF Division prior to being assigned as the SF INC, since both Nedd and Kiel were gone by the time he reported to the SF Division in September

2003.  His comments also supports the hostilities directed toward Plaintiff by the former SF managers, a pattern which has continued for 10 years.

321.    On December 1, 2003, AIC Robert Bethel met with Plaintiff and said he wanted to detail her out of the Division to the Joint Terrorism Task Force (JTTF) stationed at the FBI offices in Oakland, stating that Plaintiff could not get along with anyone.  Bethel had only been in the SF Division for 2 months when he made this negative comment about Plaintiff.

322.    Plaintiff objected to being transferred to the JTTF outside the Division as punitive due to EEO history.  Only after Plaintiff told Bethel she would do as requested, but would tell the other federal Agencies exactly what she thought of the US PIS if they asked, did he relent and not make her report to the JTTF.

323.    Within one hour after Plaintiff's meeting with Bethel on 12/1/03, Diaz contacted her and said that Bethel was making Diaz the new IC team leader and Plaintiff was being transferred to the IC team to work for her.  An hour later, Diaz contacted Plaintiff and said that they were not going to the IC team as Anita Beppu was not agreeable to the change, and management was going to give Beppu longer to improve the IC team statistics.

324.    In March 2004, it was announced the ECA team was being disbanded effective 4/5/04, and that Sally Diaz would be the new IC team leader.  Anita Beppu was reassigned off the IC team  to the JTTF against her wishes.   Beppu provided Plaintiff a 11/5/07 Declaration which stated that she believed her transfer to the JTTF was punitive, supporting Plaintiff's contention that management wanting to assign Plaintiff to the JTTF in 2003 was also punitive.

325.    The ECA team was disbanded largely due to Plaintiff being vocal about the menial, non-criminal duties the team performed, which Plaintiff addressed in the Fineman letter. The SF ECA team was the only ECA team in the entire county.

326.    Two ECA positions were retained and transferred to the Security/Prevention team reporting to Jeff Kovacs.    The negative connotation associated with the Security/Prevention team was well known in the SF Division and was testified to in Plaintiff's 8/04 EEOC hearing when several inspectors stated that it was a team that did not perform criminal work and they would not want to be assigned to that team.

327.    Plaintiff was transferred to the Security/Prevention team on 4/5/04, and assigned to work one of the Threat and Assault positions. The 2nd position was given to Inspector Jennifer Lim who was transferred off the IC team at Diaz's request.

328.    Diaz was not happy that her ECA team was disbanded and blamed Plaintiff for being vocal and causing her to lose her team. Diaz began to label Plaintiff as a trouble maker and someone who was hard to get along with after it was announced the ECA team was being disbanded, and began discrediting Plaintiff's work and character to others in the Division.

329.    Plaintiff confronted Diaz on 4/9/04 about the negative comments Diaz was making about her to numerous people in the Division; However, Diaz denied making any negative or disparaging comments about Plaintiff to anyone in the Division.    During this conversation, Diaz brought up the number of EEOs filed by Plaintiff.

330.    On May 17, 2004, Plaintiff was notified by email that AIC Campbell wanted copies of all the Threat and Assault incidents to, "see what actions inspectors take on the

reported incidents." The team with the two threat and assault positions reported to AIC Bethel at the time, not AIC Campbell, and it appeared Campbell was trying to scrutinize Plaintiff's work after she named him in the Fineman letter for which he was interviewed by IAD. This was not the first time Plaintiff's work was singled out and scrutinized by managers after speaking out about the Agency's illegal conduct.

331. Even though there was pressure on the IC team to obtain stats, and was the reason Beppu had been transferred off the team and placed on the JTTF, Plaintiff was not transferred back to the IC team in 4/04 given her background, experience and prior success on IC. Instead, Jimmy Woo, a 20 year inspector with no prior IC experience was transferred to IC, and Inspector Bernie Saluta was "detailed" to the IC team due to the pressure for stats. Shortly thereafter, Woo was transferred off the IC team when it became apparent that IC was not his area of expertise.

332. Plaintiff was kept in the Threat and Assault position, even though her background, experience and skills could have been utilized on the IC team. On 4/20/04 Plaintiff was named the new SF Division Assault Coordinator, and an email was disseminated to the entire Division, which was embarrassing and humiliating given the menial, inconsequential, work performed.

333. Plaintiff believed she was being kept in the Threat and Assault position even though her experience was needed on the IC team, in retaliation of the Fineman letters and her history of filing EEOs, to further punish and retaliate against her.

334.    Plaintiff was not given the same opportunity as other inspectors to work viable, criminal assignments using her background, skills and expertise, but was specifically placed on a "punishment" assignment and left there to do menial, degrading, non-criminal work for 3 ½ years in retaliation for her EEO activities and as part of the on-going HWE harassment.

335.    Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

336.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; 42 U.S.C. 2000e ET SEQ.)
### EEO #12 (AGENCY NO.: 66-000-0013-05)

337.    **EEO #12:   Inspector Janene Gordon retaliation/discrimination:** This is the 12th EEO complaint filed by Plaintiff since 1998, alleging on-going discrimination (gender), age discrimination, harassment, retaliation and a HWE, due to her EEO activities.

338.    Plaintiff alleged a hostile work environment harassment claim, when as part of an on-going pattern of discrimination and retaliation, management unlawfully interfered with Plaintiff's EEO process when the Agency took adverse actions against her representative in her EEOC hearing, exacerbating an already HWE.

339.    Inspector Janene Gordon was denied official time for the time she spent during Plaintiff's 8/04 EEOC hearing, and was forced to use annual leave, disparate from every other hearing participant who received official time and was paid administrative leave for time attributed to the 8/04 hearing.

340.    Gordon was further discriminated, harassed and retaliated against due to her participation in Plaintiff's 8/04 EEOC hearing when 2 ½ months after she participated in the 8/04 hearing, she was advised that she was being relocated from her Richmond Domicile office to San Francisco, which adversely affected her.

341.    **Denying Gordon Administrative Time for the 8/04 EEOC Hearing**:    In August 2004, Plaintiff was involved in an eight day EEOC Administrative Hearing in SF, CA before EEOC Administrative Judge (AJ) David Kelley.   The issues involved seven EEO complaints filed by Plaintiff from 1998-2000 as addressed in EEO #1-7 Section above.

342.    AJ Kelley approved Inspector Gordon as a witness in a 2/7/04 Order. Subsequently, in 6/04 Plaintiff requested that Gordon sit with her during the 8/04 hearing and testify at the Damages Hearing to be scheduled at a later date.

343.    AJ Kelley authorized Gordon to be present during the 8/04 hearing, and both the Agency Representative and Gordon's supervisor had advance notice that Gordon was authorized by AJ Kelley to be present during the 8/04 hearing.   Gordon sat with Plaintiff for five days of the hearing.

344.    Ed Lawee, US PIS Attorney, was also aware Gordon was sitting with Plaintiff during the hearing, as he was the Agency liaison who was handling witness notifications for the EEOC hearing for Mr. O'Connell, the Postal Attorney assigned the case. Lawee arrived at the SF EEOC hearing on the first day of the hearing when Gordon was present inside the hearing room sitting at Plaintiff's table.   Lawee was also in the hearing waiting room on several

occasions monitoring witnesses throughout the eight day hearing, and was aware Gordon was present with Plaintiff during the hearing.

345.    Plaintiff asked Gordon to sit with her because Gordon was due to retire in May 2005 and it was less likely that Gordon would be the target of retaliation for her participation in the 8/04 hearing.

346.    On the 2nd day of Plaintiff's EEOC hearing, Gordon requested that AJ Kelley put in the hearing record for Gordon the same admonishment about retaliation for participating in the EEOC hearing that was given to other participants in the hearing.   Based on past experience of the Agency, Gordon believed she would probably be retaliated against for her role and wanted it on the record.

347.    At no time did AJ Kelley or Mr. O'Connell ask Plaintiff if Gordon was going to be her "employee representative," or her "technical advisor," nor did Plaintiff name Gordon as either.

348.    Only after the last day of the 8/04 hearing when it became evident that Plaintiff may have prevailed on some of her cases, and after AJ Kelley stated that he would be making credibility findings against some of the Agency witnesses, did Gordon's supervisor have an issue with Gordon's participation in Plaintiff's 8/04 hearing.

349.    On 8/20/04, the day after the end of the hearing Gordon was contacted by her supervisor Dennis Jones, who stated that **people in headquarters** were asking about her role in Plaintiff's hearing.  Jones refused to tell Gordon **who** in headquarters had made the inquiries.

350.    Plaintiff addressed in prior EEOs the interest by CPI Lee Heath and Larry Katz, Chief US PIS legal counsel, in her on-going EEOC case.

351.    Gordon was subsequently advised she would not be paid official time for the time she spent in Plaintiff's hearing, and was advised she could take annual leave or LWOP. Gordon was advised the Agency would pay her administrative leave for one day she spent during the hearing. Management paid Gordon one day administrative time and denied administrative leave for the other four days.

352.    Gordon used four days of annual leave which cost her approximately $2,000. The costs incurred by Gordon will have to be reimbursed by Plaintiff.

353.    Gordon sat with Plaintiff for five days during the 8/04 hearing, until she was requested to conduct a polygraph examination out of state as part of her job.

354.    Almost 20 witnesses testified during Plaintiff's 8/04 hearing, all of whom received official time and were paid administrative leave, disparate from Gordon who was denied four days of official time and was required to use annual leave.

355.    Two retired Inspector witnesses, both males, Mark Aasmundstad and Don Davis submitted bills for their participation in Plaintiff's hearing totaling approx. $4,200.00 which was paid by the Agency.

356.    The Agency stated the reason Gordon was not provided official time for her time spent in Plaintiff's 8/04 EEOC hearing was because she served as Plaintiff's "technical advisor" which is not compensable, and because Gordon failed to tell her supervisor in advance that she would be participating in Plaintiff's hearing.

357.   The Agency's reasons for denying Gordon administrative time for the time spent in the 8/04 hearing were pretext for discrimination and retaliation, deters the EEOC process, puts out the message to others what will happen to them if they participate in the EEO process, deters Plaintiff's Federal EEO rights, and was part of the on-going HWE harassment targeting Gordon and Plaintiff.

358.   Gordon served as Plaintiff's "employee representative," during the 8/04 EEOC hearing, and did not serve as Plaintiff's "technical adviser," as stated by the Agency. The Agency is required to pay an "employee representative" for time spent in an EEOC hearing, while they are not required to pay for a "technical advisor" during an EEOC hearing.

359.   In determining that Gordon served as Plaintiff's "technical advisor," the Agency relied on a comment made by AJ Kelly, documented in the hearing transcripts, in which he jokingly asked Gordon after she was introduced if she was Plaintiff's "technical advisor," to which Gordon jokingly replied yes.   This was solely what the Agency relied on in determining Gordon was Plaintiff's "technical advisor."

360.   Both Gordon and Plaintiff explained to the Agency that the question by AJ Kelley was said in a joking manner as was Gordon's response, with all parties laughing; However, this explanation provided by Gordon and Plaintiff was disregarded by the Agency.

361.   The Agency did not contact either AJ Kelley or Mr. O'Connell who were present during the 8/04 hearing to verify or refute the accuracy of Gordon and Plaintiff's explanation of how the comment of Gordon being the "technical advisor" occurred, relying solely on the hearing transcripts.

362.    The EEOC Administrative Judge Handbook states that any "technical advisor" has to be approved by the EEOC AJ **prior** to the EEOC hearing, who must also determine, "whether the technical adviser possesses factual knowledge relevant to the case and could be a witness for either party." Gordon was never approved by AJ Kelly as a "technical advisor" prior to Plaintiff's 8/04 hearing, or at any time after the hearing began.  This further supports that Gordon was not Plaintiff's "technical advisor."

363.    Gordon did not serve as Plaintiff's "technical advisor," as she had never filed a formal EEO complaint, nor had she ever participated in an EEO hearing.  Gordon is not an attorney and she did not question witnesses during the 8/04 hearing.

364.    The Agency provided no examples from the hearing transcripts of duties performed by Gordon during the hearing which supported that Gordon served as Plaintiff's "technical advisor."

365.    The hearing transcripts support that Gordon's role during the time she spend in the 8/04 hearing in no way resembled that of a "technical advisor," and more closely resembled that of an, "employee representative."

366.    Plaintiff provided a 11/30/05 letter addressing the duties performed by Gordon during her 11/04 EEOC hearing, which included: sitting with Plaintiff during the hearing, providing support, being present for the portion of the hearing for the witnesses that Plaintiff felt would be most difficult for her to confront, asking for a recess on Plaintiff's behalf during an emotional point in the hearing, and making calls to witnesses when their hearing testimony time changed.

367.    During the hearing, Gordon contacted several of Plaintiff's witnesses on behalf of Plaintiff as testimony times changed.  This was the same role provided by Ed Lawee on behalf of the Agency.  Lawee (male) was compensated for his time, disparate from Gordon (female).

368.    **Second Discriminatory/Retaliatory Act – transferring Gordon to SF:** Gordon was further discriminated, harassed and retaliated against when 2 ½ months after she participated in Plaintiff's 8/04 EEOC hearing, she was ordered to relocate her office from the Richmond Domicile to San Francisco.

369.    This was the second retaliatory and discriminatory incident Gordon was subjected to after she participated in Plaintiff's 8/04 EEOC hearing.

370.    Gordon's new office location in San Francisco adversely affected her by increasing her commute 2-3 hours per day, altering her work hours, increasing her daily parking costs, and humiliating and degrading her because everyone in the SF Division knew she was being punitively relocated due to her participation in Plaintiff's EEOC hearing.

371.    A supervisor's attempts to dissuade an employee from participating as a witness constitutes unlawful interference with the EEO process.

372.    On 11/5/04, Gordon's supervisor, Dennis Jones, and SF AIC Robert Bethel ordered Gordon to vacate her Richmond office by the close of business (COB) on 11/26/04. This occurred six months prior to Gordon's mandatory retirement date on 5/3/05.

373.    Management told Gordon she was being moved from her Richmond office to SF because Sally Diaz, Team Leader, had an **immediate need** for her office in Richmond.  Diaz

1    wanted to relocate a team member, Ryan McAlhaney, (w/m, 34 years old) from his SF office to

2    the Richmond office, displacing Gordon (w/f, 56 years old).

3

4    374.    Diaz's attitude toward Plaintiff had been addressed in Plaintiff's prior EEOs, and

5    Diaz was in the process of trying to be promoted to a higher level manager position - which

6    ultimately happened six months later.

7    375.    Rewarding employees for joining in the harassment has been discussed

8

9    repeatedly in Plaintiff's EEO complaints and is an on-going pattern of conduct condoned within

10   the Agency.

11   376.    Diaz's 12/5/05 EEO affidavit stated she request Gordon's office, "around the

12   beginning of November 2004."  At the time Diaz requested Gordon's office for McAlhaney,

13

14   both management and McAlhaney were aware that he was going to be transferred out of SF in

15   the near future.

16   377.    Rather than relocate her office to SF, Gordon advised management she would be

17

18   retiring in December 2004 instead of her planned mandatory retirement date of 5/3/05. SF AIC

19   Bethel still insisted that Gordon vacate her Richmond office insisting there was an **immediate**

20   **need** for McAlhaney to have her office. Gordon's supervisor, Dennis Jones, later confirmed

21

22   with Gordon that she needed to move out of her Richmond office by COB on 11/26/04, due to

23   an **immediate need** for Gordon's Richmond office to be vacated

24   378.    AIC Bethel and INC Atkins were personal friends who were domiciled in the

25   Seattle Division together prior to Atkins being named the SF INC.  Atkins promoted Bethel as

26   the SF AIC once Atkins became the SF INC in 2003.

27

28

COMPLAINT        PAGE   - 81 -

379.    The INC Secretary Lee stated in her EEO affidavit, "I witnessed INC Atkins' attitude toward Janene Gordon dramatically change prior to her sitting in with McDermott during her EEOC hearing and then after.  Tom Gamez even made a comment to me after McDermott's EEOC hearing that Atkins did not like Gordon."

380.    Managers' behavior and attitude toward Gordon completely changed after she participated in Plaintiff's 8/04 EEOC hearing.  Atkins subsequently placed obstacles in the way to interfere with a planned retirement party for Gordon in 12/04.

381.    AIC Bethel sent an email to Diaz on 11/24/04 asking if Gordon had vacated her office.  Diaz was not the one sending emails to ensure Gordon vacated the office, but instead it was AIC Bethel.

382.    Gordon was subsequently allowed to stay at the Richmond domicile until she retired in 12/04, but Gordon had to move out of her office and put her possessions in the gym room which contained no desk, phone or filing cabinets.

383.    From November 27, 2004 through December 20, 2004, McAlhaney was at the Richmond office for ½ day.  McAlhaney moved only a handful of his items from his SF office to the Richmond office, with the walls and desk drawers remaining empty, because he clearly was aware he was to be transferred any day.

384.    AIC Bethel's 11/30/05 EEO affidavit regarding McAlhaney's transfer out of SF he stated, "In November 2004, when he was being directed to the BMC office, there was no indication of a transfer out of the San Francisco Division." Bethel knew this to be an inaccurate statement.

385.    Managers are aware months in advance of pending inspector transfers, and have to be for planning purposes.  SF management and McAlhaney were aware he was to be transferred at any time, when they ordered Gordon to vacate her office.  Diaz's 12/5/05 EEO affidavit stated McAlhaney was, "unofficially notified of his transfer out of SF on 12/8/04."  Plaintiff avers McAlhaney's "unofficial notice" came much earlier and was the reason he did not relocate any of his possessions to the Richmond office in November 2004.

386.    Management was also aware when they told Gordon in November 2004 to vacate her office that McAlhaney had scheduled training and scheduled annual leave in December 2004, yet still forced Gordon to vacate her office in November 2004, and relocate to the gym room.

387.    Diaz's rationale for requesting McAlhaney to be reassigned to the Richmond office as stated in her EEO affidavit was, "I felt it would be efficient that inspector McAlhaney work out of the BMC domicile," and "Operationally it was more beneficial to have Inspector McAlhaney domiciled there."

388.    McAlhaney was assigned the same territory that Inspector Jeff Taylor previously had before his transfer out of the Division, and Taylor had been domiciled in SF for years working that territory now assigned to McAlhaney, negating the sudden **immediate** need for McAlhaney to be domiciled in Richmond in order to work his assigned territory.

389.    Except for the ½ day McAlhaney was at the Richmond office, Gordon's old office remained vacant for seven months, until July 2005, when Inspector Luz Stiles, who reports to Diaz, was transferred from her SF office to the Richmond Office.  Stiles arrival at

Richmond did not occur until two months after Gordon's mandatory retirement date in May 2005.

390.    The Agency's reasons for relocating Gordon to SF were pre-text for discrimination, and was done to retaliate against Gordon due to her participation in Plaintiff's 8/04 EEOC, adversely affecting both Gordon and Plaintiff.

391.    Plaintiff was adversely affected by the Agency's illegal conduct targeting Gordon, because Plaintiff could not ask any employee to sit with her in future EEOC hearings on her pending EEO complaints, due to the retaliation and discrimination targeting Gordon. Plaintiff rights, as part of a term, condition and benefit of Federal employment to be provided a work environment free of retaliatory conduct, were violated.

392.    The EEOC has interpreted "adverse employment action" to mean any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.

393.    Retaliation against Gordon exacerbated an already HWE, not only for Gordon, but for Plaintiff and others wishing to pursue the EEO process, but can not freely do so knowing retaliation and harassment will occur against them and witnesses involved.

394.    All managers involved in denying Gordon (female) official time for Plaintiff's (female) hearing are males.  Gordon was ordered to vacate her office by AIC Bethel (w/m) and Dennis Jones (w/m) for a much younger male, Ryan McAlhaney (w/m).

395.   **On-going HWE:**  Plaintiff's EEO #12 addressed other examples of the on-going pattern of harassment, discrimination, retaliation, and the continuing HWE within the SF Division since she began filing EEO complaints.

396.   In April 2005, Inspector Regina King (b/f) was "detailed" as the Acting IC Team Leader for Diaz who was "detailed" as Acting SF AIC.  Plaintiff was not offered this IC detail opportunity, even though Plaintiff had been an inspector longer than King, and had more IC experience.  King had never filed an EEO in SF.

397.   This was not the first time since filing EEOs that Plaintiff was denied promotional opportunities provided to those not participating in the EEO process.

398.   Plaintiff was advised in June 2005, that Diaz, while serving as the Acting SF AIC, a management position, Diaz stated that Plaintiff was not doing any work on the ECA assignment.   After hearing Diaz's negative comments about her, Plaintiff pulled up the victim/witness (IHF) entry records for her ECA assignment.  Plaintiff had 135 IHF entries compared to 37 IHF entries for the inspector assigned the other ECA position.  Diaz did not make negative comments about the inspector who only had 37 IHF entries, instead she was once again disparaging Plaintiff to others in the Division.

399.   Plaintiff's reputation has continually been attacked by managers since filing EEOs.  Diaz's prior negative and disparaging comments about Plaintiff were addressed above, in EEOs #10/11.  Plaintiff has been adversely affected by the on-going negative and disparaging comments Diaz continues to make about Plaintiff to her co-workers, and serves to exacerbate the HWE harassment of Plaintiff.

400. Prior to Diaz being named in Plaintiff's EEOs as joining in the harassment against her, Diaz was interviewed for Plaintiff's 2001 Security Clearance in which Diaz stated in regard to Plaintiff, "She is highly focused and does not give up on a case until it is resolved. She works her cases efficiently and is able to bring them to a timely conclusion." These comments are disparate from comments Diaz made to IAD inspectors during the 2003 investigation of Plaintiff regarding the Ng incident as addressed in EEO #11.

401. At the time Plaintiff filed this EEO complaint, three of Diaz's team members were domiciled at the Richmond domicile with Plaintiff, who would only say good morning and good night to Plaintiff, with rare communication in between.

402. Discrimination and retaliation against those filing EEOs is an on-going pattern of the Agency as evidenced by Plaintiff's past EEOs, her pending EEOs, and the EEOs of other employee's alleging retaliation for their prior EEO activity.

403. CPI Heath and Larry Katz, previously reassigned an entire team of Inspectors from Hawaii to the mainland in July 2004 in retaliation for on-going discrimination and harassment complaints. Reassigning an entire domicile of inspectors had never been done in the past. US PIS managers then further disparaged these Hawaii inspectors by making comments to inspectors across the country that the Hawaii team reassignments were due to "non-performance" issues.

404. The Hawaii team's statistics were some of the highest in the SF Division at the time they were punitively reassigned in 2004, negating comments made by managers that the transfers were made due to "non-performance" issues.

405.    The reason management provided for reassigning Hawaii inspectors was pre-text for discrimination, and was done to retaliate, harass and deter the EEO process. Management discrediting and negatively tainting inspectors for coming forward with complaints of discrimination and harassment, is an on-going pattern within the Agency and was discussed at length in Plaintiff's 8/04 EEOC hearing.

406.    None of the Hawaii inspectors filed EEO complaints due to fear of further retaliation by the Agency.  When EEOs were not filed by these inspectors, two of the inspectors were subsequently placed on higher level "details."

407.    Discrimination, harassment, retaliation and the ensuing HWE, was a constant theme in Plaintiff's 8/04 EEOC hearing, and for which the Agency was subsequently found liable.

408.    Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

409.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS
### ACT OF 1964, AS AMENDED; 42 U.S.C. 2000e ET SEQ.)
### EEO #13 (AGENCY NO.: 6H-000-0003-05)

410.    **EEO #13:   Marilyn Lee retaliation/discrimination:**  This is the 13th EEO complaint filed by Plaintiff since 1998, alleging on-going discrimination (gender), harassment, retaliation and a HWE, due to her EEO activities.

COMPLAINT        PAGE  - 87 -

411.    Plaintiff alleged a hostile work environment harassment claim, as part of an on-going pattern of discrimination and retaliation, when management unlawfully interfered with Plaintiff's EEO process by taking adverse action against Marilyn Lee, INC Secretary, who signed the 2003 petition circulated by the Plaintiff which alleged Agency misconduct, including discrimination, exacerbating an already HWE.

412.    The Agency previously discriminated and retaliated against Inspector Janene Gordon for her participation in the EEO process as addressed in EEO #12 above, adversely affecting Plaintiff.

413.    In this current EEO complaint, the Agency discriminated and retaliated against Marilyn Lee, INC Secretary, when Lee was "detailed" from her bid position as the INC Secretary, which she held for approx. 10 years, and then was told she could never return to her position as the INC Secretary, after she signed the 2003 petition circulated by Plaintiff and met with US PIS managers in June 2003 regarding why she signed the petition.

414.    **2003 Petition:**    In February 2003 Plaintiff organized a petition in the SF Division, which was signed by 49 employee of the US PIS, addressing alleged misconduct by the SF managers, as outlined in EEO #10 above.

415.    Marilyn Lee signed the 2003 petition at Plaintiff's request.

416.    As a result of the 2003 petition, and correspondence to Ombudsman Jim Birch, the two AICs were removed from their positions in approx. March 2003 and placed on "details," while INC Kiel was allowed to remain in his position as the SF INC.

417.   Kiel approached Lee on numerous occasions asking her why she signed the 2003 petition. Kiel repeatedly approaching Lee about the petition was upsetting to Lee, but Ombudsman Birch refused to intervene on Lee's behalf.

418.   Only after Plaintiff advised Birch that she would go outside the Agency if they did not address Kiel continuing to contact Lee about the petition, did Kiel announce his retirement.

419.   As a result of the 2003 petition, several headquarters and local managers met privately with some SF employees in June 2003, regarding issues addressed in the 2003 petition, at the request of the CPI Heath. INC Kiel was still the SF INC.

420.   The week of June 16, 2003, Lee met off-site with numerous local and headquarters' managers regarding INC Kiel continuing to approach her about the 2003 petition. Lee indicated those present included headquarters' managers Jim Birch, Larry Katz, Mike Ahern, and local interim SF managers John Wisniewski, James Donnelly and Greg Campbell.

421.   During the June 2003 meeting, Lee told the managers that one reason she signed the 2003 petition was due to discrimination by one of the SF AICs. Lee also addressed examples of conversations by SF managers she "overheard" while she was sitting at her work desk. Lee's work desk was located directly outside the SF managers' offices. During the meeting, Lee told the managers that the only person that helped her with Kiel continuing to approach her about the petition was Plaintiff.

422.   Ten days after Lee's meeting with Birch and the other managers in which Lee stated Plaintiff was the only person that helped her with the Kiel incident, Plaintiff was

punitively reassigned – as addressed in EEO #10 above.  Plaintiff only learned about Lee's comments to the managers in July 2005.

423.    When the new SF INC, Bill Atkins arrived in the SF Division on 9/10/03, Lee was still the INC secretary.

424.    Atkins was aware of the issues within the Division that resulted in the removal of the three SF managers and prompted his promotion to the SF INC position.  On 9/10/03, Atkins' first day as the SF INC, Plaintiff was called to Atkins' office where Atkins stated to Plaintiff, *"There have been some problems in the Division and I'm not sure why, but your name has been put out there."*  This was further addressed in EEO #10/11 above.

425.    Atkins was aware that Lee had signed the 2003 petition, and that Lee had met with managers in June 2003 and advised them she had overheard the prior SF mangers' conversations when she was at her work desk located just outside their offices, some of which prompted her to sign the 2003 petition.

426.    Soon after INC Atkins arrived in the SF Division, he relocated Lee's desk from outside the SF manager's offices to a secluded corner office out of earshot of discussions taking place in the manager's offices.  Lee's work desk had been located outside the SF managers for approximately 10 years while she was the INC secretary..

427.    After relocating Lee's office area, Atkins subsequently "detailed" Lee from the INC Secretary position to the Administrative (Admin.) Center Supervisor position in June 2004, where she would no long be privy to any of the new SF manager's conduct, conversations and activities.

428.   Atkins was well aware that Lee had signed the 2003 petition which resulted in the removal of the prior INC.

429.   Lee initially objected to the "detail" until Atkins continued to approach her about it and she felt obligated to take the "detail."

430.   After several months as the Admin. Center Supervisor, Lee's health was negatively affected.  Lee requested that her "detail" be terminated and she requested to be returned as the INC secretary.

431.   Lee made numerous requests to be returned as the INC secretary for health reasons, but her requests were denied, even though management saw that Lee's health was being negatively impacted due to the "detail" as the Admin. Center Supervisor.

432.   Lee had received a monetary award and a far-exceeds merit from Atkins while she was his INC secretary, so refusing to return her to the INC secretary position was not due to her inability to perform the job.

433.   Management disregarded the negative affect the Admin. Center Supervisor job was having on Lee, because they perceived her to be a "traitor," to the prior INC for signing the 2003 petition that resulted in his removal from his position.  Atkins did not want Lee doing the same thing with him.

434.   In an attempt to remove herself from the on-going HWE directed at her, Lee obtained a "detail" with the Postal OIG, which was approved by Atkins in writing.  After Lee announced to the entire Division that she was leaving the US PIS, Atkins cancelled her OIG "detail, forcing to stay in the HWE.

435.    In June 2005 Lee was advised by her supervisor, Sheilah Castor, that Lee would never be returning to her former job as the INC secretary working for Atkins.

436.    Management refused to return Lee to her regular position as the INC secretary, stating she was too valuable as the Admin. Center Supervisor, and that there was no one else available to take her place as the Admin. Center Supervisor.

437.    Numerous employees had served as Admin. Center Supervisor prior to Lee, and numerous served in that position during the past 4 years after Lee left the Agency, negating the Agency's contention that no one was available to replace Lee as the Admin. Center Supervisor.

438.    On July 20, 2005, Lee advised Plaintiff about the discrimination and retaliation targeting her when management refused to return her to the INC secretary position, and advised that she was now off work due to the ongoing discrimination, harassment and retaliation which resulted in a HWE.

439.    The Agency refusing to return Lee to her bid position as the INC Secretary was a direct result of Lee signing the 2003 position at Plaintiff's request.  If Lee would not have signed the 2003 petition she would not have been removed from her position as the INC secretary by the incoming SF INC, Atkins.

440.    The Agency's reasons for refusing to return Lee as the INC secretary was pretext for discrimination and retaliation due to Lee signing the 2003 petition and meeting with managers in June 2003 about conversations she overheard between prior SF managers. This was one more example of the on-going HWE harassment occurring within the SF Division.

441.    Retaliation against Lee caused a HWE not only for Lee, but for Plaintiff and others wishing to pursue the EEO process but can not freely do so knowing retaliation and harassment will occur against them and witnesses involved.   A supervisor's attempts to dissuade an employee from participating as a witness constituted unlawful interference with the EEO process.

442.    Lee was adversely affected when she was removed from her position and detailed to a position that negatively impacted her health, and then told she would never be returned to her position as the INC Secretary for Atkins; Due to her role in the 2003 petition and her June 2003 meeting with Birch and managers.

443.    Plaintiff was adversely affected by the Agency's illegal conduct targeting Lee, because Plaintiff could not ask any employee in the future to sign a petition regarding alleged Agency misconduct including violations of Title 7, due to the retaliation and discrimination targeting Lee.  Plaintiff's rights as part of a term, condition, and benefit of Federal employment, to work in an environment free of retaliatory conduct, was violated, one more example of the on-going pattern of HWE harassment occurring in the SF Division.

444.    Atkins and CPI Heath put out the same message when they discriminated and retaliated against Janene Gordon for participating in Plaintiff's 8/04 EEOC hearing.

445.    The named discriminating officials were aware of Marilyn Lee's participation in signing the 2003 petition and her June 2003 meeting with managers, and they were aware also that Plaintiff circulated the 2003 petition.

446.    The EEOC has interpreted "adverse employment action" to mean any adverse

treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity. An on-going pattern of hostile work environment harassment can be considered an adverse employment action by law.

447.    Management's refusal to return Lee to her regular bid position as INC secretary due to her participation in signing the 2003 petition and her June 2003 meeting with managers, was based on a retaliatory motive and is reasonably likely to deter the Plaintiff and others from engaging in future protected activity.

448.    Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

449.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

450.    **Chronological incidents of on-going illegal conduct - included in subsequent EEO complaints filed:**  Plaintiff was singled out and treated disparately than other employees when her work computer was accessed in 8/05 by headquarters' personnel working for the US PIS, in an attempt to find misuse of the government computer by Plaintiff. This happened on several occasions in 2005 and 2006, as addressed in several of Plaintiff's EEO complaints, as part of the on-going HWE harassment.

451.    Plaintiff was treated disparately when she did not receive a monetary award, far exceeds year-end merit, or a write-up for an 11/04 employee assault case in which the employee was seriously injured, while others involved in the case did.

452.    Plaintiff eventually did receive a write-up for her role in the 11/04 case, 8 months after everyone else, and only after she filed an EEO addressing the disparity.

453.    **11/04 Employee Assault Case**:    On Wednesday, November 10, 2004, an employee was assaulted and seriously injured while on-duty.

454.    Plaintiff was initially assigned as the Case Agent in charge of the case, and directed the initial investigation of the case for the first seven days.  The employee assault occurred on the Wednesday prior to a Holiday weekend.  Plaintiff had leave scheduled which she cancelled and worked through the holiday, weekend and evenings.

455.    Management provided no personnel to assist Plaintiff with the investigation, even though the employee was seriously injured, and Plaintiff recruited her own volunteers to assist with the investigation and to follow leads for the first seven days of the investigation, working late at night into the early morning hours.

456.    During the first seven days of the investigation, Plaintiff contacted local police departments, made and distributed an award poster, contacted the FBI for technical support and conducted several night-time operations, coordinated subpoena requests, organized the investigation including the development of suspects tied to the 11/10/04 employee assault, distributed and assigned leads to be pursued, and organized voluminous case files.

457.    Management did not intervene or provide assistance to Plaintiff until November 17, 2006, seven days after the employee assault, at which time Plaintiff was advised that a briefing would be held, and a task force formed.

COMPLAINT    PAGE  - 95 -

458.     On November 17, 2004, Plaintiff conducted a 30 minute briefing for approx. 30 inspectors to bring them up to date on the investigation.  Management formed a task force and named Jeff Kovacs, Plaintiff's supervisor, as the task force leader.  Plaintiff continued to work on the task force.

459.     Two of the External Crimes (EC) team leaders, Pat Dorn and Marius Greenspan, were also assigned to work on the task force with some of their team members, reporting to Kovacs.

460.     Plaintiff was scheduled to be out of town for two weeks, soon after the employee assault, but her work-related trip and subsequent vacation in Hawaii was canceled by management because they stated Plaintiff was too valuable to the investigation to allow her to leave.

461.     During the first seven days of the investigation, several suspects were developed who were directly connected to the 11/04 employee assault.  The task force members continued to pursue leads as delegated by task force leader Kovacs, meeting daily for briefings and discussing what each task force member was doing.

462.     On 12/1/04, task force leader Kovacs learned via a fax left on the fax machine, that three members of the task force had received tips from the FBI and were secretly conducting investigations and interviews with the FBI without notifying Kovacs and the rest of the Task Force.

463.    On 12/1/04 Inspector Kovacs confronted Inspectors Pat Dorn and Quan Howard regarding their separate investigation, on-going for five days that they had not disclosed to him or other task force members.

464.    During the 12/1/04 meeting, a verbal altercation ensued regarding the three task force members hiding information and conducting an investigation with the FBI that they kept hidden from Kovacs and the other task force members for five days.

465.    Dorn and Howard advised Kovacs that the reason they kept their activities hidden was that the FBI did not want to work with Plaintiff and another inspector on the task force, both of whom had filed numerous EEOs within the Division, and who repeatedly had their reputations disparaged because of those EEOs.

466.    Plaintiff knew the allegations made by Dorn and Howard were false. During the verbal altercation, Plaintiff left the room and immediately phoned the FBI agent, because she knew there had been no issue working with the FBI. The FBI agent told Plaintiff he had no problem working with Plaintiff or anyone else on the task force and denied making comments to anyone to that affect.

467.    Plaintiff immediately returned to where the verbal altercation was still on-going, and confronted Dorn and Howard regarding the FBI agent's denial of statements made by Dorn and Howard regarding the FBI not wanting to work with Plaintiff and the other inspector. Howard was upset that Plaintiff had contacted the FBI agent regarding his and Dorn's allegations, which Plaintiff knew to be false.

468.    Dorn and Howard made negative comments about Plaintiff and the other Inspectors' ability to work with the FBI, in an effort to defuse the tensions surrounding their failure to disclose their activities to the rest of the task force, knowing that Plaintiff and the other Inspector already had tainted reputations due to the EEOs they filed. Negative comments, unsubstantiated about Plaintiff and the other inspector, serve to exacerbate an already HWE.

469.    Several hours after the verbal confrontation, AIC Campbell came to the Richmond domicile and met with Dorn. AIC Campbell never met with Kovacs or other task force members, nor did he address the verbal altercation and failure of the three inspectors to notify Kovacs, the task force leader, what they were doing relative to his case.

470.    No attempt was made by management to contact the FBI agent involved and obtain a written statement refuting (or substantiating) the comments made by Dorn and Howard attacking Plaintiff's ability to work with the FBI. Management felt no responsibility to exonerate Plaintiff's reputation after allegations that she could not work with the FBI were yelled out so the entire Richmond domicile could hear. This is one more example of the HWE targeting Plaintiff and those filing EEOs.

471.    Plaintiff and two other task force members documented what occurred on the day of the verbal altercation and the circumstances surrounding the three inspectors hiding information from Kovacs and the other task force members for almost one week.

472.    A December 10, 2004, email to AICs Campbell and Bethel outlined that the FBI had taken over the postal employee assault case, and that Dorn, Howard and Vincent had been working with the FBI for five days before Kovacs found out, and that Kovacs only found out

they had been working with the FBI and conducting a separate investigation when a fax was inadvertently left on the fax machine.

473.    Shortly after Plaintiff learned that the three inspectors had hid information from task force members and then lied about why they hid the information, Plaintiff requested to be removed from the task force due to the lack of integrity shown by the three inspectors and her hesitancy in working with inspectors she felt she could not trust.

474.    Assault cases are routinely handled by Kovac's Security/Prevention team. However, the 11/04 case was transferred to the Oakland EC team as a result of the discord from the three inspectors hiding relevant information from the rest of the task force, negatively impacting the working relationship between inspectors.

475.    The Agency's 3/8/07 EEO response stated in reference to Plaintiff who was initially named the case agent, "It became apparent to inspector Howard that she was focusing on the wrong suspect(s)," and, "As her investigation progressed during the first few days, she effectively disregarded his suggestions and the dialogue and cooperation between the two as well as Team Leaders Kovacs and Dorn deteriorated and in fact became contentious."

476.    AIC Diaz's 11/21/07 Declaration also stated, "there were disagreements between T/L Kovacs and the Oakland External Crimes T/L Pat Dorn with Inspector Quan Howard as to the course of the investigation and the suspects that the Security Team investigation focused on." Diaz stated, "Because of the disagreements a parallel investigation developed, conducted by T/L Dorn and his designated task force members including Quan."

477.    Diaz's 11/21/07 Declaration is inaccurate and does not accurately reflect what occurred between Kovacs, Dorn and Howard and the course of the investigation.  Diaz made no attempt to verify the accuracy of what Howard told her, accepting as fact his statements to her, when she has direct knowledge of Howard's propensity to be less than forthright on numerous occasions in the past, which continues to date.

478.    Disparate from the Agency's contention in their 3/8/07 EEO response, and Diaz's 11/21/07 Declaration, the dialogue and cooperation only deteriorated on 12/1/04, when it was discovered Dorn, Howard and Vincent failed to advise Kovacs and the other task force members about tips received from the FBI and their subsequent investigations based on those tips, hiding information and their activities from the rest of the task force for five days, which was only disclosed by accident when the fax was discovered.

479.    The failure of these three inspectors to provide tip information they received on suspects resulted in the other task force members continuing to look at the initial set of suspects developed, who were peripherally connected to the 11/04 case, for one week longer than was necessary, impeding the quick resolution of the case.

480.    These three inspectors were never disciplined for their behavior of hiding information, impeding an on-going investigation, making untrue and disparaging comments about their co-workers, and allowing the FBI to take control of the postal case.  In fact, they all were rewarded with monetary awards and or far-exceeds merits.

481.    Numerous statements made by the Agency in EEO responses regarding the 11/04 case and awards given as a result of the effort and role of the three inspectors on the

11/04 investigation compared to Plaintiff's role, was either grossly exaggerated and/or outright false. This inaccurate, false and/or misleading information deliberately placed on the record by the Agency Representative was relied on when the EEOC AJ assigned the EEO on this case issued a Summary Judgment dismissing this case, resulting in Plaintiff filing a Civil Complaint herein.

482.    On 7/12/05, Jennifer Vincent received a monetary award due in part to her role in the 11/04 case, as well as for her assignment on the EC team. This was prior to any guilty pleas, trials and/or convictions on the 11/04 employee assault case.  Vincent's write-up in support of her monetary award stated that she was "one of two lead inspectors" on the 11/04 employee assault case – the other person referred to being Quan Howard.

483.    On October 7, 2005, EEOC AJ David Kelley put in writing that Plaintiff had prevailed in some of her EEO cases from her 8/04 EEOC hearing.

484.    In December 2005 Plaintiff sent three letters to EEOC AJ Kelley asking for interim relief off the Threat and Assault assignment since he had put in writing in October 2005 that Plaintiff had prevailed in some of her cases, and she believed her assignment there was punitive.

485.    On December 14, 2005, during a holiday luncheon, awards were given out to some of the task force members for the 11/04 employee assault case.  Plaintiff did not attend the luncheon due to the on-going HWE, knowing the managers would be present and typically tried to avoid any function were she knew managers would be present.

486.    During the holiday luncheon, Jeff Kovacs received a monetary award and a write-up for his role in the 11/04 case. Quan Howard received a write-up for his role in the 11/04 and subsequently received a far-exceeds year-end merit in part due to the 11/04 employee assault case. Plaintiff was advised she would be receiving a BOSE radio.

487.    On 2/7/06 INC Atkins and AIC Marian Post came to the Richmond domicile to give Plaintiff a Bose radio for the 11/04 employee assault case. Post gave Plaintiff the radio and shook her hand while Atkins stood there. Plaintiff received no write-up for her role in the 11/04 case, nor was one mentioned.

488.    Plaintiff was treated disparately from others involved in the 11/04 case when she did not receive a write-up for her role in the 11/04 case as others did. Plaintiff was also treated disparately when she was the only key person involved on the 11/04 case that did not receive a monetary award. Kovacs and Jennifer Vincent each received a monetary award for the 11/04 case, and Quan Howard received a far-exceeds year end merit award, in part due to the 11/04 case. They all received write-ups for their role in the case.

489.    A far-exceeds year end merit is equal to a 1-2 step increase in salary.

490.    Vincent was the only female on the 11/04 case receiving a monetary award, and was under the age of 40, disparate from Plaintiff, who was over the age of 40, who never received a monetary award.

491.    Plaintiff filed a pre-EEO complaint on 2/18/06 and an EEO on 4/11/06 (for EEO complaint #14 as addressed below) regarding the pre-retirement training issue, in which she

also addressed the disparity of not receiving a write-up or a monetary award for her role in the 11/04 case, further addressing the disparate treatment and the HWE that continued to target her.

492.    On August 7, 2006, Acting INC Ferguson and AIC Diaz came to the Richmond Domicile and provided Plaintiff a write-up that was dated 12/14/05. This was eight months after other inspectors received their write-ups for the 11/04 case, and only occurred because the disparity in not receiving a write up was addressed by Plaintiff in the pre-EEO dated 2/18/06 and EEO complaint dated 4/11/06 for EEO complaint #14 below.

493.    The write-up managers gave to Plaintiff on 8/7/06 was the same write-up used for Kovacs, with his name deleted and Plaintiff's name inserted, even though Plaintiff had nothing to do with some items in the write-up.

494.    Plaintiff never did receive a corrected write-up that adequately addressed her role in the 11/04 case, nor was she asked to provide one to support the receipt of a monetary award.

495.    Write-ups can and do support monetary awards given on significant cases, yet Plaintiff's write-up did not accurately reflect her activities on the 11/04 case.

496.    The 8/31/06 Agency EEO Response stated that Supervisor Kovacs would testify that he did not submit a certificate/write-up for McDermott, "probably due to an oversight," and in the same EEO response the Agency stated there was a write-up for McDermott but it had been misplaced for 8 months by the INC secretary. In yet another Agency EEO response dated 2/9/07 the Agency stated that AIC Bethel, "does not know why a separate write-up was not done for Inspector McDermott and that it was an oversight that she was provided with Inspector

Kovacs' write-up."

497.    Plaintiff avers that her not receiving a write-up was no "oversight" as maintained by the Agency. Management did not approach Kovacs to request a write-up on Plaintiff's role in the 11/04 case when they realized the "oversight." Instead, some unknown person took Kovacs' write-up, deleted his name and inserted hers and then gave it to Plaintiff in an attempt to show that Plaintiff was being treated equally and that the write-up for her existed all along. This only occurred after Plaintiff filed an EEO on the disparity in her not receiving a write-up.

498.    The Agency was aware that they could not go to Kovacs for a "write-up" for Plaintiff after the failure to provide her a write-up was addressed in Plaintiff's 2/18/06 pre-EEO Complaint on EEO #14, since they were aware Kovacs testified on Plaintiff's behalf in her 8/04 EEOC hearing and Kovacs would tell Plaintiff that management came to him and requested a write-up for her well after everyone else received their write-ups and after Plaintiff had already addressed the disparity in her EEO complaints.

499.    The Agency never stated who issued the order to use Kovacs' write-up and delete his name and insert Plaintiff's name and then call it Plaintiff's write-up.   The Agency 3/8/07 EEO response admitted that Kovacs did not "generate" Plaintiff's write-up that she received in 8/06.

500.    Agency EEO responses stated there was no disparity and that Plaintiff's write-up had been misplaced by Anita Cabana, INC Secretary, for 8 months along with the write-up for several other inspectors.   The Agency did not provide names of any other inspectors who received their write-ups eight months late because they had been "misplaced."

501.    The Agency did not obtain an affidavit from Anita Cabana substantiating that she "misplaced" Plaintiff's "write up," for eight months, and the names of the other inspectors whose "write-ups" were also misplaced.  Cabana did not return a phone call from Plaintiff regarding this matter.

502.    The write-ups are inside large, heavy, dark blue binders, and as such a group of them are not easily "misplaced."

503.    The circumstances surrounding when Plaintiff's write-up was typed, by whom, why Kovacs was not asked to provide a unique write-up for Plaintiff when the "oversight" was discovered, who made the decision to take Kovacs' write up and insert Plaintiff's name, and when this occurred, is relative to the allegations of disparate treatment and on-going HWE.

504.    Plaintiff was adversely affected when she did not receive a write-up for the 11/04 case which she could place in her Official Personnel File (OPF) and which could have been included in her year-end accomplishments further used for promotional opportunities within the Agency and after she left the Agency.  Additionally, the write-up Plaintiff was provided did not address her role in the 11/04 case and as such could not be added to her year-end accomplishments for a more significant year-end merit award.

505.    Plaintiff was also adversely affected when she received a radio for the 11/04 case, while others received monetary awards and/or a far-exceeds year end merit equal to 1-2 step increase in salary.

506.    Employee certificates and write-ups are routinely placed in the mail or provided to an Inspector's team leader when an inspector is not present when awards are given.

However, Plaintiff's certificate and write-up was not placed in the mail after she was provided the BOSE radio in 2/06, because at that time a write-up for her did not exist.

507.    The Agency EEO response stating management forgot Plaintiff's write-up on 2/7/06 when they gave Plaintiff the Bose radio lacks merit since it could have subsequently been mailed to Plaintiff at any time.

508.    Plaintiff asserts there never was a write-up for her role in the 11/04 case until after she filed an EEO on the disparity, and then someone in the Agency took Kovacs write-up and deleted his name and insert Plaintiff's name and then claimed the write-up existed all along but was "misplaced" for eight months.

509.    Division computerized "Award" records provided by Plaintiff in her 2/20/07 EEO response did not list any award, radio or write-up for Plaintiff, disparate from all the other inspectors who received a monetary award, radio and/or write-up on the 11/04 case, who were listed in some manner in the Division computerized "Award" records.

510.    Absence of any computerized record for Plaintiff's write-up or BOSE radio award in the Division computerized "Award" records lends credibility to Plaintiff's allegations that her write-up was not typed and entered into the computer award records at the same time as awards for everyone else, but was typed at a later date and was not entered in the Division computerized "Award" records.

511.    The Agency could not agree who recommended Plaintiff for the award. The Agency 11/26/07 EEO response contained a Declaration from Sally Diaz dated 11/21/07, in which Diaz stated, "During my discussion with AIC Bethel, I recommended Inspector

McDermott for an award for her involvement in the investigation... and that she receive a $500 Bose radio...." Disparately, in the previous Agency EEO response dated 12/22/06 the Agency stated the decision to give Plaintiff a radio was, "made by AIC Bethel," and the Agency's 2/9/07 EEO response stated AIC Bethel recommended Plaintiff for the radio, stating, "He would also state that he recommended Inspector McDermott for the Bose radio as were other inspectors who were involved in that investigation such as Inspector Quan Howard and Team Leader Patrick Dorn."

512.    The Agency 2/9/07 EEO response stated Kovacs and Vincent were the only two who received monetary awards as a result of the 11/04 case; However, Division computerized "Award" records obtained by Plaintiff also listed a write-up for Lance Gregory for the 11/04 case, and a $1,350 cash award for Pat Dorn, which the Agency previously failed to include in Discovery to Plaintiff and which Plaintiff found on her own.

513.    The Agency stated Howard received a Bose radio for the 11/04 case and denied that he received a far exceeds year-end merit award due in part to the 11/04 case, even though Division award records specifically list Howard as receiving a far exceeds merit in FY05 along with four other inspectors.

514.    The Agency 3/8/07 EEO response stated the Division computerized "Award" records for Howard were wrong. The Agency refused to provide copies of the write-ups for Howard's far exceeds year-end merits to determine if any were awarded in any part due to the 11/04 case.

515.    Every other Division computerized "Award" record supported awards given out

for the 11/04 assault, discounting the Agency's allegations that the information regarding

Howard's far-exceeds year end merit was wrong.

516.    The Agency did not provide Plaintiff any PS Forms 1727 and write-ups they

submitted in support of the monetary awards and/or far exceeds merit awards given as a result

of the 11/04 case.

517.    Records detailing and supporting why Howard received his far-exceeds year-end

merit award appeared to have been deleted from the Division computerized "Award" records.

518.    The Agency stated the BOSE radio Plaintiff received was valued at $500.00 and

was therefore equal to a monetary award.  Disparately, Plaintiff avers that a radio and a cash

award are not equal.

519.    Non-receipt of a monetary award constitutes an injury in fact, as well as the

disparity in the non-receipt of Plaintiff's own unique write-up for her role in the 11/04 case

which could have been relied upon in determining monetary awards and/or placed in her OPF

for future use and referral.

520.    The Agency 3/8/07 EEO response stated that Plaintiff, "subsequent to her receipt

of the Bose radio in February 2006, she made no issue of disparate treatment or the non-receipt

of the write-up and certainly did not file a discrimination complaint within 45 days of receiving

the Bose radio. It was a non-issue until she received the write-up in August 2006."

521.  -  Quite opposite from the Agency's contention in their 3/8/07 EEO response,

Plaintiff specifically addressed in her 2/18/06 pre-EEO complaint and her 4/11/06 final EEO

complaint for EEO #14, the disparity of awards and not receiving a write-up for her role in the

11/04 case while everyone else significantly involved did, stating, "I was given a radio with no certificate or write-up to date." In fact, Plaintiff's alleged that it was only after she addressed in EEOs the disparity in awards and write-ups that she eventually received a write-up in 8/07, eight months after everyone else.

522.    Blatantly inaccurate and false statements by the Agency representative such as outlined in the 3/8/07 EEO response above were repeatedly placed on the record to confuse the record, in which the EEOC AJ then relied on in determining Summary Judgment dismissing several of Plaintiff's EEOs, subsequently addressed in this Civil Complaint.

523.    The Agency 3/8/07 EEO response addressed that Plaintiff may not have deserved even a BOSE radio for her role in the 11/04 employee assault case, minimizing and placing into the record inaccurate and blatantly false information regarding her role in the 11/04 case while inflating the role of the other three inspectors. The Agency 3/8/07 EEO response further stated in reference to Plaintiff, "she knows full well the level of her involvement in the investigation and that she deserved no more than a Bose radio."

524.    The Agency submitted multiple EEO responses which stated Plaintiff's role on the 11/04 employee assault case was insignificant, that she impaired the investigation and antagonized the FBI, and that her role did not merit a monetary award, and even questioned whether Plaintiff deserved the radio she was awarded.

525.    Comments in the Agency 3/8/07 EEO response illustrates the on-going hostility and antagonism directed toward Plaintiff by the Agency Representative, as testified to during Plaintiff's March 2008 Damages hearing. The March 2008 Damages hearing addressed the

numerous correspondence the Agency Representative sent to Plaintiff as late as 2008, disparaging her character and integrity, and served to highlight the extent of the on-going hostility and antagonism directed toward Plaintiff up until 2008.

526.    The Agency's 12/6/07 EEO response stated Plaintiff never met with the AUSA involved in the case. This is a false statement, and one more small example of the Agency representative routinely placing information on the record, knowing it to be false and inaccurate, which was relied on by the EEOC AJ when ruling on Summary Judgment on several of Plaintiff's EEOs.

527.    In reference to the 11/04 case, AIC Bethel sent Plaintiff an email on 11/23/04 and thanked her for, "stepping up, I very much appreciate your enthusiasm, hard work and sacrifice (canceling your vacation in Hawaii)." Plaintiff worked directly on the 11/04 case until. it was transferred to the EC team on 1/3/05, working almost 300 hours in November 2004 when the case was first assigned to her on 11/10/04, fully justifying a monetary award and a unique write-up that she should have received along with everyone else.

528.    The Agency's reasons why Plaintiff did not receive a write-up for her role on the 11/04 case and a monetary award are pre-text for discrimination due to her continuing to file EEO complaints, and is part of on on-gong pattern of discrimination and harassment escalating a HWE.

529.    Plaintiff has received NO monetary awards since filing EEOs in 1998, while prior to filing EEOs she had received numerous monetary awards and three far-exceeds year-end merits.

530.    Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

531.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS
### ACT OF 1964, AS AMENDED; 42 U.S.C. 2000e ET SEQ.)
### EEO 14 (AGENCY NO.: #6H-000-0001-06)

532.    **EEO #14: Denied pre-retirement training class/On-going pattern of discrimination, retaliation and HWE**:  This is the 14th EEO complaint filed by Plaintiff since 1998, alleging on-going discrimination (gender), harassment, retaliation and a HWE, due to her EEO activities.

533.    Plaintiff was discriminated and retaliated against when she was the first postal inspector in over 20 years who was denied pre-retirement training in the city of choice, in retaliation for her on-going EEO activity, as part of the HWE harassment.

534.    In October 2005 Plaintiff requested approval to attend a pre-retirement training class in Albuquerque, NM in March 2006.  The Agency pays for one pre-retirement training class for all postal inspectors within 5 years of retirement as part of a term, condition and benefit of their Federal employment. The Agency pays for the class only.

535.    Plaintiff had family flying into town and was on annual leave in April 2006 when the pre-retirement training class was offered in SF and she could not attend.  Plaintiff initially heard no response from management on her request to attend the class in Albuquerque, NM.

536.    The Agency's on-going incidents of illegal conduct, the punitive assignment to the Threat and Assault assignment for 2 ½ years, and the on-going HWE, continued to negatively affect Plaintiff's physical and mental health.

537.    In December 2005 Plaintiff took sick leave for work-related stress from 12/30/05 through 1/16/06, after hearing no response from AJ Kelley or the Agency regarding her three requests for interim relief from the Threat and Assault assignment that was negatively affecting her physically and mentally and exacerbating her condition. This was the 3rd time Plaintiff took sick leave for work-related stress due to the effects of the Agency's on-going illegal conduct.

538.    On 1/24/06 SF INC Bill Atkins was notified that Oscar Villanueva, INC of Los Angeles (LA) was being detailed to Washington DC.   Atkins was to be "detailed" to LA as the acting INC effective 7/1/06, against his wishes.

539.    Atkins made comments to several employees in the SF Division that he did not want to be detailed to LA.   The Acting INC LA position was the same level and same pay as Atkins' SF INC position, and was not a promotional opportunity for Atkins.

540.    The Agency denied that Atkins LA "detail" was punitive due to on-going EEOs and an employee's DOL stress claim naming Atkins.   Atkins' "detail" to LA resulted in Agency costs due to Atkins' detail to LA, the cost of Acting SF INC Bernard Ferguson's detail from St. Louis to SF to replace Atkins, and the costs of the Inspector who replaced Ferguson in St. Louis, to include hotel, per diem, and trips home ever 2-3 weeks, for a four month period for these three people.

541.    The Agency has a form entitled, "Inspection Service Detail Assignment" which states the purpose and benefit of a "detail," which outlined the Agency reason why Atkins was "detailed" to LA. This form regarding Atkins' LA detail was not provided to Plaintiff.

542.    On 1/26/06, just two days after Atkins became aware of his punitive LA detail, AIC Post advised Plaintiff's supervisor, Jeff Kovacs, that she had a problem with <u>Plaintiff</u> attending the pre-retirement training class in the city of her choice.

543.    On 1/30/06, Plaintiff received a PS Form 13 from AIC Post stating that management was approving the pre-retirement training class in San Francisco only. AIC Post referred Plaintiff to an email she said she sent to team leaders on 12/6/05, a copy of which she refused to provide to Plaintiff.

544.    The pre-retirement training in SF is only offered once per year.

545.    On 1/30/06, Plaintiff sent an email to AIC Post asking for something in writing explaining why her request to attend the pre-retirement training in Albuquerque, NM was denied, when there was no additional cost to the Agency and other inspectors in the past had been allowed to attend this training in the city of their choice. AIC Post did not respond to Plaintiff's 1/30/06 email, nor did she respond to a 2nd email request Plaintiff sent her asking why her request was being denied.

546.    Plaintiff believed she was being further singled out, discriminated, harassed and retaliated against due to her on-going EEO activities, as there was no legitimate reason for management to deny her request.

547.    On approximately 1/30/06, immediately after Plaintiff sent the email about the pre-retirement training class to AIC Post, INC Atkins was overhead by Inspector Jennifer Lim while he was speaking to Ed Lawee in a public hallway regarding Plaintiff filing an EEO on the pre-retirement training issues and asking Lawee if Plaintiff could file an EEO on it. Atkins was heard loudly calling Plaintiff a "Fucking Bitch," (herein referred to as "FB") stating he did not want her in San Francisco and did not want her in the SF Division.

548.    It is unknown exactly how many other Postal Inspectors over-heard Atkins' "FB" comment and his statements that he did not want Plaintiff in the SF Division, but Lim advised Plaintiff that at least one other inspector overheard the conversation.

549.    The "FB" comment by INC Atkins, the head of the SF Division, made in a public hallway after learning Plaintiff may be filing another EEO on the pre-retirement training issue, further exacerbates a HWE for Complainant and taints her in the eyes of her co-workers who overheard him, and further illustrates management's negative, hostile and antagonistic attitude toward Plaintiff for utilizing her Title 7 rights.

550.    The Agency stated in their 11/26/07 EEO response regarding Atkins' "FB" conversations, "If made, the comments were not patently derogatory, offensive or defamatory. In the context made, the manager was merely expressing exasperation and the comments were not sufficiently severe or pervasive to alter the conditions of Complainant's employment." The EEO response then went on to say the comments didn't happen.

551.    Plaintiff was not advised of Atkins' "FB" conversation until 3/1/06 when Lim was at the Richmond domicile. Lim had already discussed the Atkins/Lawee conversation with

at least one manager, AIC Sally Diaz.

552.    In the Agency 12/22/06 EEO response, the Agency refused to provide the names of every person in the Division that Lim discussed the "FB" comment with, and refused to provide the names of the managers that approached Lim about the "FB" comment.

553.    At the time Plaintiff was denied pre-retirement training in the city of her choice, INC Atkins and AIC Post had been involved in an on-going personal relationship, and Plaintiff believed they were in collusion in discriminating and retaliating against Plaintiff by denying her attendance at the pre-retirement training class, because of her history of filing EEOs.

554.    Numerous inspectors in the SF Division attended the pre-retirement training in the city of their choice during the past 17 years that Plaintiff has been domiciled in the SF Division.  Plaintiff named four male inspectors in her EEO complaint who she was aware attended this pre-retirement training outside of SF, in the city of their choice.  None of the four had filed EEO complaints.

555.    Plaintiff was the first inspector in SF ever denied attendance at the pre-retirement training class in the city of choice since Plaintiff first arrived in the SF Division in 1990. Atkins subsequently denied a request by another inspector for pre-retirement training in the city of his choice, **after** denying Plaintiff's request.  Atkins denied this inspector's request in an effort to legitimize his decision to deny Plaintiff this training in the city of her choice.

556.    Plaintiff's cost to pay for the pre-retirement training class herself would be $600 and would have to occur closer to her date of retirement. Plaintiff subsequently signed up for

the class paying for it herself, however, the class was cancelled due to insufficient sign-up numbers. Plaintiff never attended this pre-retirement training class.

557.   Plaintiff was adversely affected by being forced to pay for the class herself, and not be allowed time to put into practice what she learned in the class prior to her retirement, disparate from every other inspector. Additionally this was one more example of the on-going pattern of the HWE harassment targeting Plaintiff.

558.   Plaintiff was denied a term, condition and benefit of her Federal employment, by being denied attendance a the pre-retirement training in the city of her choice, disparate from every other inspector in SF prior to her, due to her history of filing EEOs and the on-going retaliation targeting her. A term and condition of Plaintiff's Federal employment is that she will not be treated disparately or retaliated against for utilizing her Title 7 rights.

559.   The Agency's EEO response dated 4/20/06 stated that Atkins has a "policy" of only allowing participation in these retirement seminars in the city where the employee works, because to allow travel to other cities creates the **"impression of government largess."** Atkins also stated that if approved discretionary travel was allowed that, **"the requests would never stop and everyone would ask for officer survival training or firearms travel at any city in the country so they could extend those visits."**

560.   Plaintiff avers that no one in the SF Division has ever asked for discretionary travel to attend officer survival or firearms training in another city as stated by Atkins in the EEO counselor report dated 4/20/06, and his explanation is completely non-credible and is pre-

text for discrimination. In the Agency 12/22/06 EEO response the Agency refused to provide any instances of such requests ever being made.

561.    Atkins' "policy" on attending the training in SF only was never provided to Plaintiff even though she requested a copy. Plaintiff avers there was no SF Division "policy" stating that the pre-retirement training had to be taken locally, disparate from Atkins contention that he had a "policy" to this effect.

562.    The Agency paying for the pre-retirement training class is a **National** policy, not a local **Division** policy. The National Policy does not state that the location where the training will be attended is "discretionary with the manager," as indicated in the Agency 12/22/06 EEO response, nor was any documentation provide by the Agency supporting their contention.

563.    In the Agency's 12/22/06 EEO response, the Agency refused to provide any documentation supporting their position that an inspector is required to take pre-retirement training class in the city where they work.

564.    The Agency failed to articulate a legitimate, non-discriminatory reason for denying Plaintiff pre-retirement training in the city of choice. The reasons provided by Atkins in the 4/20/06 Agency EEO response are pretext for discrimination.  Plaintiff was denied this training to discriminate and retaliate against her due to her continued EEO activity and not for any legitimate business reason since there was no cost to the Agency and other inspectors in SF and across the country were allowed to attend this training in the city of their choice.

565.    Atkins' statement that he denied Plaintiff pre-retirement training in the city of her choice due to the appearance of "government largess" is non-credible, given INC Atkins

1  was removed from his position as SF INC in May 2007 due in part to allegations of his own

2  "government largess."

3      566.    INC Atkins flew to Hawaii and Guam numerous times for "work" only to

4
   continue his "work" trip on to Japan for personal reasons to visit family members. Atkins was
5
6  subsequently investigated by the Postal OIG in part to determine the circumstances surrounding

7  "work" trips he and other managers took which were paid by the Agency.

8      567.    While Atkins was taking his "work" trips to Hawaii and Guam, postal inspectors
9
10 on the Security/Prevention team were denied trips to Hawaii to conduct legitimate security

11 work, due to budget constraints. A 10/4/05 email from the Security Team Leader requested that

12 three inspectors cancel their upcoming scheduled trips to Hawaii due to the budget constraints.

13
      568.    On 2/7/06 Atkins and Post came to the Richmond domicile to give Plaintiff a
14
15 Bose radio for the 11/04 employee assault case as addressed above.  Neither addressed

16 Plaintiff's request for a response on why she was denied attendance at the pre-retirement

17
   training class in the city of her choice.
18
19     569.    On 2/9/06 Plaintiff sent a 2nd email to AIC Post requesting a response to her

20 initial 1/30/06 email on why Post denied Plaintiff's attendance at the pre-retirement training

21 class in Albuquerque, NM. Post again did not respond.

22
      570.    On 2/10/06 Plaintiff contacted an EEO counselor because she felt she was being
23
24 discriminated and retaliated against when she was denied attendance at the pre-retirement

25 training class, disparate from every other inspector in the country for the past 20 years.

26

27

28

COMPLAINT    PAGE  - 118 -

571.    Plaintiff addressed in her 2/18/06 pre-EEO complaint and her subsequent EEO complaint that she was denied the pre-retirement training class in the city of choice.  Plaintiff also provided information regarding other incidents targeting her that supported her allegations of the on-going disparate treatment, retaliation and HWE, including, disparate awards and recognition on the 11/04 employee assault case, assigning her to work for Diaz who was previously named in EEOs as a discriminating official, Diaz negatively tainting her to others in the Division and excluding her from a closed-door meeting with her new team members, management refusing to transfer Plaintiff off a "punishment" assignment while others were allowed off the assignment with much less time on the assignment, and the "FB" conversation held in a public hallway between Lawee and Atkins in which Atkins stated he did not want Plaintiff in San Francisco or the SF Division, immediately after learning Plaintiff may be filing an EEO on the pre-retirement training issue.

572.    Ten days after Plaintiff filed a pre-EEO complaint on 2/18/06  addressing the pre-retirement issue, on 2/28/06 AIC Post sent an email to the entire Division stating that the SF pre-retirement training class offered April 12, 2006 was, "the only class that division management was authorizing for this fiscal year."

573.    In the April 2006 pre-retirement training class held in SF, other inspectors from other Divisions were allowed to attend. INC Atkins was the only INC in the entire country who alleged to have a "policy" that inspectors could not attend this training outside of their own Division due to the appearance of "government largess."

574. Post's 2/28/06 email was the only document SF management distributed to the Division regarding the pre-retirement training not being allowed outside of SF. This was approx. 5 months after Plaintiff's initial 10/05 request to attend this training, and after she had already had annual leave approved for the time period the class would be offered in SF and therefore unable to attend. The next SF class was scheduled one year later in 4/07, at which time Plaintiff had already left the Agency.

575. On 3/1/06 while Jennifer Lim was visiting the Richmond domicile she told Plaintiff about the "FB" conversation she overheard on approximately 1/30/06 between Atkins and Lawee at the 390 Main Street facility in SF. Lim told Plaintiff that at least one other inspector overheard the Lawee/Atkins conversation.

576. On 1/31/06 Lim told Plaintiff that she would provide Plaintiff a written statement regarding what she overheard, but then Lim stated she feared retaliation if she came forward. Lim never provided a written statement to Plaintiff.

577. Lim later provided a brief EEO affidavit which excluded some of the information she had previously relayed to Plaintiff regarding the "FB" conversation. Lim's EEO affidavit acknowledged the conversation between Atkins and Lawee about EEOs being filed on the pre-retirement training class, and that Atkins was upset and talking loudly. Lim's EEO affidavit stated, "I thought I heard, but am not certain, that INC Atkins stated, "That bitch." Lim stated that Atkins did not say "Judy," but just said "she," and that Atkins also said, "I don't want her here. I don't want her in this Division."

578.    Atkins provided an EEO affidavit in reference to the Atkins/Lawee "FB" conversation, stating the conversation never took place.  Lawee's EEO affidavit stated he did not recall the conversation.  Six months after Lawee submitted his EEO affidavit stating he did not recall the "FB" conversation, Lawee received a monetary award from Atkins who stated during the ceremony that the award was for, "keeping him out of trouble."

579.    In the Agency 12/22/06 EEO response the Agency refused to state whether Atkins went to Lawee on approx. 1/30/06 to discuss Plaintiff's email about the pre-retirement training and why she was being denied attendance in the city of her choice, citing any conversation that occurred as protected by the attorney-client privilege.

580.    Conversations shouted in a public hallway, overheard by others, have no expectation of privacy and as such are not protected by attorney-client privilege.

581.    Managers' statements of having no recall of the "FB" conversation lack credibility.  One month after the "FB" conversation occurred, Lawee relocated his office from the public hallway where he had been located for the past approx. 10 years, to a secluded office in a corner wing of the building behind locked doors where inspectors had limited access.  Lawee's EEO affidavit confirmed that by 3/1/06 he had relocated his office from the public hallway.

582.    Lawee's new office area where he relocated to, had previously been occupied by the Crime Lab which they vacated 2-3 years earlier, which left vacant offices.  The remaining office space belonged to three Headquarters' Technical Services employees, two who vacated

1   their office space in June 2005 when they left the agency and a 3rd person who retired shortly

2   thereafter, leaving vacant offices.

3       583.    Lawee could have relocated his office at any time the above officers began to be

4   vacated during the past several years, but chose to relocate his office from the public hallway

5

6   less than one month after being overheard in the "FB" conversation - a conversation which he

7   stated in his EEO affidavit that he could not recall.

8       584.    Plaintiff avers Lawee relocated his office to a private secluded office area after

9

10  he was advised that someone overheard the "FB" conversation, and he moved his office to

11  ensure that he would not be overheard in any future conversation which would reflect

12  negatively on management as had occurred in the "FB" conversation with Atkins.

13      585.    **Sally Diaz's negative comments regarding Plaintiff:** On 3/9/06 team changes

14

15  were made and disseminated to the Division in which Sally Diaz was named as Plaintiff's new

16  supervisor on the Security/Prevention team.  Plaintiff was advised by two separate people that

17

18  Diaz made negative comments about Plaintiff being assigned to work for her.  Plaintiff was

19  advised that Diaz stated that she wanted to get rid of a couple people assigned to her new team,

20  including Plaintiff.  In one instance the negative comments were made in front of a group of

21  team leaders when Diaz stated that Plaintiff could not work for her because they had, "issues."

22

23      586.    Plaintiff viewed this as one more attempt by Diaz to undermine her abilities and

24  reputation, and to alienate Plaintiff from co-workers, as part of the on-going HWE harassment.

25      587.    When management assigned Plaintiff to work for Diaz on 3/9/06, Plaintiff had

26

27  named Diaz in several EEO complaints as a discriminating official, and management was aware

28

COMPLAINT       PAGE   - 122 -

that Diaz had previously made negative comments about Plaintiff to co-workers as addressed in Plaintiff's prior EEO complaints.

588.    The Agency disregarded Plaintiff's allegation of discrimination and retaliation and the HWE involving Diaz, by assigning Plaintiff to work for her.

589.    In the Agency 12/22/06 EEO response the Agency refused to state whether Diaz had made negative and/or derogatory comments about Plaintiff after Diaz was named her supervisor. The Agency never requested a statement from Diaz asking if she made negative comments about Plaintiff after Plaintiff was assigned to work for her in March 2006.

590.    Diaz's comments to supervisors further negatively tainted Plaintiff, exacerbated the already HWE and showed the extent of the on-going hostility and antagonism towards Plaintiff.

591.    In March 2006, at least two new criminal teams were formed, a Fraud team and a Revenue Investigations team. Plaintiff was not transferred to either team, but remained on the Threat and Assault assignment, where she had now been punitively assigned for almost 3 years.

592.    Plaintiff was left on the Threat and Assault assignment longer than any other inspector was forced to stay on this punitive assignment in order to retaliate against her for filing EEOs. In the Agency 12/22/06 EEO response the Agency refused to provide records of the exact length of time every inspector spent on the Threat and Assault assignment.

593.    At least six other inspectors were transferred off the Threat and Assault and/or Security assignments to work criminal assignments, after only being assigned there from 2 months to 1 ½ years, while Plaintiff was not allowed off this assignment for 3 ½ years.

COMPLAINT    PAGE  - 123 -

594.     In early 2006 a new inspector told Plaintiff that while at the US PIS training academy the student inspectors were told to try to avoid the Security team if at all possible, indicating it was not a desirable assignment. This comment was made in front of Plaintiff and a supervisor. New inspectors assigned to the SF Division saw that Plaintiff was assigned to this undesirable assignment for years.

595.     Several days after the 3/9/06 team changes were made, team changes were again made and Diaz was no longer Plaintiff's supervisor. Plaintiff was again reporting to Kovacs on the Security/Prevention team along with several other inspectors who had been assigned to the Security/Prevention team. Plaintiff was still assigned to the Threat and Assault assignment.

596.     On 3/14/06 Diaz, who was domiciled in SF, came to the Richmond Domicile and had a closed-door meeting with two of Plaintiff's new team members who now reported to Kovacs. Plaintiff was the only other inspector in the office, and was excluded from the meeting.

597.     Diaz excluding Plaintiff from the meeting with her two new team members, immediately after Diaz made negative comments about Plaintiff on two occasions and immediately after the other two inspectors were assigned to work with Plaintiff, further isolated Plaintiff from her new team members and perpetuated a HWE.

598.     An Agency EEO response dated 11/26/07 included a Declaration from Sally Diaz dated 11/21/07. Diaz's 11/21/07 Declaration and her 6/5/06 EEO affidavit stated her meeting with the two inspectors on 3/14/06 at the Richmond domicile was not a business meeting or a closed-door meeting, but that it was a "personal conversation," which lasted one

hour. Disparately, a 8/31/06 Agency EEO response clearly indicated Diaz's meeting was work related stating, "Inspector Diaz was there incident to a project involving her detail with the Headquarters Security Group," and "Inspector Diaz would testify that while at the Richmond BMC she took the occasion to speak with Inspector King about the IC team."

599.    The Agency provided no documents to support that the three inspectors, Diaz, Stiles and King, did not charge "work" hours for the time spent behind closed doors excluding Plaintiff for this allegedly "personal" conversation.

600.    On 4/4/06 Plaintiff was contacted by telephone by EEO Counselor Debra Sutton at which time Plaintiff declined redress on EEO #14 (6H-000-0001-06) and told Sutton she would be filing a formal EEO complaint. Plaintiff also advised Sutton that she was aware Bill Atkins, INC, had called Plaintiff a "FB," in a public hallway and stated he did not want Plaintiff in SF or the SF Division.

601.    After speaking with Plaintiff, Sutton immediately contacted Atkins about the conversation she had with Plaintiff, telling Atkins that Plaintiff refused redress and was filing a formal EEO complaint. Sutton told Atkins that Plaintiff was aware Atkins had called her a "FB" in a public hallway stating he did not want in the SF Division. This was the first time Atkins became aware that Plaintiff was aware of his "FB" conversation.

602.    Immediately after Atkins spoke with Sutton on 4/4/06, Atkins then went to Plaintiff's supervisor, Jeff Kovacs, and commented to Kovacs about Plaintiff filing numerous EEOs. Atkins addressed with Kovacs that Plaintiff's work conduct was unacceptable, and implied to Kovacs that he should take some type of disciplinary action against Plaintiff. This

incident is the subject of EEO #15 (66-000-0037-06) for which Plaintiff has filed a Civil Complaint C-07-06300 SI.

603.    On 04/11/06, Plaintiff filed a formal EEO complaint on EEO #14, which addressed the pre-retirement training class, and included other incidents of on-going discrimination, harassment and retaliation involving monetary awards and write-ups as addressed in EEO #13 above, and Diaz making negative and disparaging comments about Plaintiff.

604.    In May 2006 the SF Division had the lowest "voice of the employee" survey scores in the entire county.

605.    On May 2, 2006, Plaintiff was advised that Atkins, Post, and their supervisor Tom Brady, Deputy Chief Inspector (DCI) had scheduled an upcoming trip to Hawaii, at the Agency's expense, under the "guise" of participating in OMC audits being conducted by the US PIS, when they were going to be going scuba diving.  Rarely, if ever, do INCs, AICs or DCIs conduct OMC audits.

606.    The Security team who normally conducts the OMC audits had been denied travel to Hawaii for the past two years due to travel budget constraints, and on 10/4/05 the Security team leader sent an email to three team members canceling their scheduled work trips to Hawaii due to budget constraints, stating local Hawaii inspectors would do the work.

607.    Plaintiff's EEO response dated 5/4/06 and her EEO affidavit dated 5/30/06 in response to the Agency's reason for denying her pre-retirement training due to the appearance of "government largess," addressed that the only "government largess" occurring was Atkins,

COMPLAINT     PAGE  - 126 -

Post and Brady scheduling trips to Hawaii in approx. June 2006 at a cost to the Agency under the guise of work, when they planned to go scuba diving.

608.    Postal Inspectors domiciled in Hawaii took scuba diving lessons so they could go scuba diving with the three managers once they flew to Hawaii in June 2006.

609.    Within one week of Plaintiff's EEO affidavit being submitted outlining the appearance of misuse of authority by the three managers, their June 2006 Hawaii trip was cancelled by someone at US PIS' headquarters.  In the Agency 12/22/06 EEO response the Agency refused to state why the three managers' June 2006 Hawaii trip was cancelled.

610.    At the time Plaintiff submitted her EEO affidavit and the three managers' June 2006 Hawaii trip was canceled, headquarters' management was on notice regarding the allegations of abuse of authority, yet took no action to investigate.  Subsequently, after Atkins and Post were removed from their positions in May 2007, an investigation was conducted by the Postal OIG which dealt in part with alleged travel improprieties by managers.

611.    On July 1, 2006 Atkins was detailed out of the SF Division to the Los Angeles Division as the Acting INC, against his wishes. Bernard Ferguson was named the Acting SF INC.

612.    Problem managers, historically are not addressed in the US PIS, but are placed on "details" or "special projects" as in 2003 when two of the three managers were "detailed" out of the SF Division after the 2003 petition signed by 49 employees was submitted, as addressed in EEO #10 above. This conduct is still happening today.

613.    In 2006 SF employees completed numerous surveys regarding their concerns about AIC Post. The surveys were sent to DCI Brady who took no action to investigate employee allegations and concerns.

614.    In Plaintiff's FOI request, the Agency refused to provide copies of the completed employee surveys on AIC Post. Completed employee surveys regarding Post would have supported Plaintiff's allegations that headquarters' management was on notice yet took no action to investigate or intervene into allegations, resulting in subsequent discrimination and harassment complaints being lodged against Post, not only by Plaintiff but by another inspector as recently as 2007.

615.    Management continued to single out and monitor Plaintiff's work computer in an attempt to find her misusing the government computer as they had done in August 2005. DAlvarez, a contractor working for the U.S. PIS in Headquarters' technical services, again accessed Plaintiff's work computer in 2/15/06, 4/5/06, 8/10/06.

616.    Plaintiff contacted David Alvarez and asked him why he was continuing to access her work computer. Alvarez said it was probably due to security patches for computer security installs. Alvarez denied that US PIS mangers instructed him to access Plaintiff's work computer.

617.    Plaintiff determined that Alvarez accessed Plaintiff's work computer during periods when there were no security installs being made, disparate from the reason he provided for accessing her computer. On several dates when DAlvarez accessed Plaintiff's work

computer, Plaintiff verified with several other inspectors and support personnel that their work computers were not accessed by DAlvarez.

618.    Plaintiff was singled out by USPIS headquarters managers and her work computer accessed on numerous occasions, disparate from how others not filing EEOs were treated, in an attempt to find misuse of her government computer to find reason to fire her in retaliation for her continuing to file EEO complaints and speak out about the Agency's illegal conduct.

619.    In October 2006 Atkins returned to the SF Division after his detail to LA ended.

620.    On 11/30/06 EEOC AJ issued his MOO stating that the agency was found liable for discrimination, harassment, retaliation and a sexually HWE, on-going for years.

621.    On approx 12/13/06, INC Atkins presented Inspector Ed Lawee an "award" during a Christmas holiday luncheon, with Atkins stating the award was for, "keeping me out of trouble." Atkins presented this award to Lawee after Lawee provided a sworn EEO affidavit in a pending EEO (#14) in which Lawee denied hearing Atkins call Plaintiff a "FB" in a public hallway stating that he did not want Plaintiff in the SF Division.

622.    Lawee is the Agency Representative on Plaintiff's pending EEO complaints and has assisted inspectors in writing negative, hostile and antagonistic letters relative to Plaintiff's EEOs in which he has attacked her honesty and integrity.

623.    Ed Lawee reports to Larry Katz, Chief Legal Counsel in US PIS Headquarters, not Atkins. No other Agency Representative in the past has received an "award" from any SF

1     INC. Plaintiff requested documentation stating the reason Lawee received this "award" from

2     INC Atkins to show the collusion between the two, but her request was denied.

3

4        624.    Plaintiff has continued to seek medical treatment for the on-going effects of the

5     Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

6        625.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff

7

8     has suffered damages in an amount to be determined at trial.

9              **EEO 15 (AGENCY NO.: #66-000-0037-06) (Civil Case #: C-07-06300 SI)**

10        626.    **EEO #15: (Management setting Plaintiff up for Disciplinary Action after**

11     **learning she was filing another EEO complaint):** This is the 15th EEO complaint filed by

12

13     Plaintiff since 1998, alleging on-going discrimination, harassment, retaliation and a HWE, due

14     to her EEO activities.

15        627.    Plaintiff filed a Civil Complaint on this EEO on December 13, 2007, Civil

16

17     Complaint #C07-6300 SI. Incidents and issues in EEO #15 relevant to the Agency's on-going

18     pattern of discrimination, harassment and retaliation, and the HWE, as addressed in this Civil

19     Complaint are included herein.

20        628.    As addressed in EEO #14 above, on 4/4/06 immediately after Atkins learned

21

22     from EEO counselor Sutton that Plaintiff declined redress, was filing a formal EEO complaint

23     on EEO #14, and was aware of Atkins' "FB" conversation, Atkins immediately requested a

24     meeting with Plaintiff's Supervisor, Jeff Kovacs. Also present during the meeting was AIC

25     Post, Kovacs' supervisor.

26

27

28

629.    Atkins addressed with Kovacs the number of EEOs Plaintiff has filed.  Atkins then addressed with Kovacs that Plaintiff sent an email to a Postal Police Officer (PPO) which Atkins said was disrespectful, rude and/or inappropriate, and went on to disparage Plaintiff to her supervisor stating that Plaintiff had failed to perform her duties.

630.    During the 4/4/06 meeting, Atkins did not have copies of the email or any other documents relative to his allegation of Plaintiff's misconduct.

631.    The PPO email that Atkins was referring to had been sent by Plaintiff 12 days earlier, but Atkins was addressing it immediately after EEO Counselor Sutton contacted him as addressed in EEO #14 above.

632.    Plaintiff's allegedly rude and inappropriate email to the PPO said, **"This is not the type of incident where the USPIS would get involved.  It is not even close to being a credible threat.  I just wanted the statement to include with the IR for my file."**

633.    Plaintiff sent the email to the PPO after their supervisor sent them an email wanting to know why the information was not sent to Plaintiff in a timely manner.  Plaintiff sent the above email to support the PPO in that the referral was not that significant and she only needed it for her records.

634.    During the 4/4/06 meeting, Kovacs stated Atkins did not directly order him to take disciplinary action against Plaintiff, but Kovacs stated it was "implied" that Atkins expected Kovacs to take some type of disciplinary action against Plaintiff.

635.    Kovacs contacted Plaintiff that same day and had a meeting with her advising her about Atkins' comments.  Plaintiff told Kovacs that management coming to him was not

about an email she sent to the PPO, but was retaliation after learning from Sutton that morning that Plaintiff was aware of his "FB" comment and that Plaintiff was declining redress and filing another formal EEO complaint.

636.   Kovacs "verbally counseled" Plaintiff and the next day on 4/5/06 Kovacs sent an email to AIC Post with a copy to Plaintiff, stating that he "verbally counseled" Plaintiff. This email was then placed in Plaintiff's Level 2 Team folder by Kovacs.

637.   Kovacs' 4/5/06 email indicated he did not know what Atkins was referring to regarding some of his comments he made about Plaintiff not responding to a threat incident, and that since the incident with the email happened 12 days earlier, it was untimely addressed.

638.   No one lodged a written complaint against Plaintiff for the email she sent to the PPO, and no investigation was conducted into Plaintiff's alleged inappropriate behavior and/or failure to perform her duties.

639.   Plaintiff objected to the official "verbal discussion" she received from Kovacs. Via email Plaintiff requested that Atkins and Post explain what was so rude and/or inappropriate about her email to the PPO that she deserved an official "verbal discussion." Plaintiff received no response.

640.   Plaintiff's email was not rude or inappropriate but was addressed by management as pretext for discrimination and retaliation targeting Plaintiff for refusing redress and continuing to file EEOs. Management was attempting to further establish a paper trail to set Plaintiff up for more serious disciplinary action in the future, up to and including removal.

641.   A manager attempting to dissuade employees from participating in the EEO

1    process constitutes unlawful interference with the EEO process.

2        642.    A verbal discussion is the first step in disciplinary action.

3        643.    Disciplinary action must be progressive in nature.
4
5        644.    Plaintiff was adversely affected when she was given disciplinary action without

6    just case, which was recorded and disseminated and then placed in her official Level 2 Team
7
     folder, to be used as part of her year end merit, and setting her up for future more serious
8
9    progressive disciplinary action, including removal, as part of the on-going pattern of HWE

10   harassment by management

11       645.    Kovacs provided a written sworn Declaration to Plaintiff dated 5/12/08 stating
12
     he did not believe Plaintiff's email was rude or inappropriate, and that he was advised on two
13
14   separate occasions by Agency attorneys Ed Lawee and Monique Rutter, that they did not

15   believe Plaintiff's email was rude either.

16       646.    Kovacs's Declaration stated that Atkins did not "directly order" him to take
17
18   disciplinary action against Plaintiff but that it was "implied."

19       647.    Kovac's Declaration stated that the verbal counseling was an "Official
20
     Discussion," which is first step in the disciplinary process, and as such he placed a copy of the
21
22   email documenting the official discussion in Plaintiff's Level 2 Team Folder. Kovacs stated he

23   routinely placed records of disciplinary action into an employee's Level 2 team folder.

24       648.    The 5/6/08 EEO response by the Agency provided an "offer of proof" for what
25
     Kovacs would testify to regarding this incident, in direct opposition to what Kovacs stated in
26
27   his Declaration. Kovacs provided his 5/12/08 Declaration after being advised by Plaintiff of

28

1  the Agency Representative's "offer of proof" in their 5/6/08 EEO response, which Plaintiff

2  knew was not factual.

3

4      649.    This was not the only "offer of proof" submitted by the Agency in their EEO

5  responses that was not factual or accurate, and is one more example of the Agency knowingly

6  placing on the record inaccurate information which the EEOC AJ relied on in ruling Summary

7  Judgment dismissing EEO complaints.

8

9      650.    According to US PIS rules and regulations, "verbal counseling" is the first step

10 in disciplinary action; However, the Agency EEO response stated that "verbal counseling" is

11 not disciplinary in nature and can only be disciplinary if documented and placed in an

12 employees' Official Personnel Folder (OPF).

13

14     651.    Plaintiff's request for Atkins and Post to put in writing the reason they believed

15 her email was rude, inappropriate or disrespectful was ignored.

16

17     652.    The reasons management gave for contacting Plaintiff's supervisor, a rude

18 and/or inappropriate email, was pretext for discrimination, and done in retaliation for Plaintiff

19 continuing to file EEO complaints.

20

21     653.    This was the 2nd time Atkins reacted negatively immediately after finding out

22 Plaintiff was filing an EEO, the first time being on 1/30/06 regarding the pre-retirement training

23 issue with the resulting "FB" conversation and Atkins stating he did not want Plaintiff in the SF

24 Division.

25

26     654.    Atkins' repetitive negative reactions to Plaintiff filing EEO complaints directly

27 reflects on the continuing hostile and antagonistic work environment targeting her.

28

**COMPLAINT      PAGE   - 134 -**

655.    INC Atkins and AIC Post were in collusion to set Plaintiff up for more serious disciplinary action in the future to include removal, in retaliation for continuing to file EEO complaints.

656.    Just one month after Kovacs gave Plaintiff a "verbal discussion," the lowest level of disciplinary action, management detailed Quan Howard to the Security Team supervising Plaintiff effective 5/16/06.

657.    Howard was placed as Plaintiff's supervisor because management was aware Howard was trying to be promoted and Howard would be more supportive than Kovacs to management's on-going illegal conduct targeting Plaintiff. Kovacs testified in Plaintiff's 8/04 EEOC hearing on her behalf. Howard's previous negative and untruthful comments disparaging Plaintiff during the 11/04 employee assault case were detailed in EEO #13 above.

658.    Howard's subsequent incidents of on-going discrimination and retaliation targeting Plaintiff after he became her supervisor were the basis for EEO complaint #16 below.

659.    Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

660.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**(VIOLATION OF TITLE VII OF THE CIVIL RIGHTS**
**ACT OF 1964, AS AMENDED; 42 U.S.C. 2000e ET SEQ.)**
**EEO #16 (AGENCY No.: 66-000-0047-06)**

661.    **EEO#16: Management's on-going incidents of discrimination, harassment, retaliation, and HWE targeting Plaintiff:**    This is the 16th EEO complaint filed by Plaintiff

since 1998, alleging on-going discrimination (gender), harassment, retaliation and a HWE, due to her EEO activities.

662.    On 10/31/06 Plaintiff filed EEO #16 (#66-000-0047-06), which outlined a series of discriminatory, harassing and retaliatory incidents of management targeting her, which lead her to take sick leave for work-related stress leave from 8/30/06 – 9/12/06 due to the effects of the on-going illegal conduct and the HWE.

663.    This was the 4th time Plaintiff was forced to use her own personal sick leave for work-related stress leave due to the effects of the Agency's on-going illegal conduct targeting her.

664.    On 5/16/06 Quan Howard was named the Acting Supervisor of the Security team, and as such became Plaintiff's supervisor.

665.    At the time Howard was named Plaintiff's supervisor, he had previously been involved in harassing and hostile behavior against Plaintiff in 12/04 as addressed in EEO #13 above.   Management was aware of Howard's prior conduct towards Plaintiff when they named Howard as her supervisor.

666.    Howard was in the process of applying to become a supervisor, and subsequently on 8/25/06 was notified that he was promoted to a Team Leader supervisor position effective 8/30/06 reporting to AIC Marian Post.  Post's on-going illegal conduct targeting Plaintiff was addressed in prior EEOs above.

667.    In June 2006, Howard rejected Plaintiff's suggestion of a cost/time savings by having EC inspectors conduct a security surveys when responding to Post Office (PO)

burglaries, instead of Security/Prevention inspectors subsequently driving to the same PO, sometimes hours away, to conduct a security survey after a PO burglary. Plaintiff's suggestion was found to lack merit. However, months later, when someone else made the same suggestion, it was taken as a valid suggestion and implemented.

668.    In June 2006, as a result of an inspector leaving the Agency, Howard's team inherited several pending cases which he transferred to various members on his team.

669.    On June 29, 2006, Howard transferred Plaintiff a $500,000 employee embezzlement (ICF) case for which Plaintiff had no background, training, and experience, and for which she had no knowledge of or access to computer data bases relevant to Postal ICF investigations.

670.    On the same day Plaintiff was assigned the ICF case, Howard told her she was to meet with the Assistant United States Attorney (AUSA) on the case later that afternoon.

671.    This was the largest ICF case in the SF Division and probably the largest ICF case ever worked in the SF Division and/or the entire country. There were other inspectors in the Division that had extensive ICF experience who were not assigned this case

672.    Howard's 1/26/07 EEO affidavit stated the ICF case was assigned to Plaintiff, "because of her knowledge of postal operations and conducting security surveys." Neither of these is relevant to conducting an ICF investigation, which requires extensive knowledge of Postal financial operations, window clerk operations, and postal computers, programs and data bases, none of which Plaintiff had knowledge of.

673.    Transferring the large ICF case to Plaintiff adversely affected her by assigning her a disparately larger workload than other team members, none of whom had filed EEOs, and then being told that she might no make her year-end goals because she wasn't performing her regular duties in addition to the ICF case.  Additionally, the ICF case and case files transferred to Plaintiff were incomplete and in disarray, which Howard was aware of when transferring the ICF case to Plaintiff, knowing she would be required to devote a lot of time to the case.

674.    Plaintiff advised Howard that she would be working full time on the ICF case in order to organize the case for federal prosecution.  Plaintiff sent three emails periodically detailing the work she was doing on the ICF case, advising that she was unable to perform any of her regular duties until the ICF case files were in order and she completed the work requested by the AUSA to move forward with prosecution on the case.

675.    Plaintiff spent 132 work hours in July 2006 and 86 work hours in August 2006 on the ICF case, which was a significantly higher number of work hours than any of her team members were required to use for cases that Howard transferred to them in June 2006.

676.    In Howard's 7/20/06 email to Plaintiff, he acknowledged all the work Plaintiff was doing on the ICF case and acknowledged the lack of cooperation by the Inspector who had previously been assigned the ICF case, and the inspector's supervisors' failure to monitor the case's progress.  Disparately, in Howard's EEO affidavit dated 1/26/07 Howard indicated the ICF case files were in order when the case was transferred to Plaintiff when he stated the, "case files and reports were updated prior to reassignment to Inspector McDermott."    Howard's

1   1/26/07 EEO affidavit also stated this $500,000 ICF case was a "routine money order

2   investigation," knowing that this statement was false.

3
4       677.    In 7/06 INC Bill Atkins was "detailed" to LA as the Acting INC, against his

5   wishes.  INC Atkins commented to people in the SF Divisions that he did not want to be

6   detailed to LA.

7
8       678.    Atkins' "detail" to LA occurred shortly after a female who named him in her

9   CA-2 stress claim had her claim approved by the DOL, and after Plaintiff and others had named

10  him in numerous EEO complaints.

11
12      679.    Atkins and AIC Post remained in contact with each other while Atkins was on

13  "detail" in LA from 7/1/06 – 10/30/06.  Plaintiff avers they were in collusion to continue to

14  discriminate and retaliate against Plaintiff and to set her up for additional disciplinary action in

15  excess of the "verbal discussion," as addressed in EEO #15.

16
17      680.    The Agency 8/7/07 Discovery response referring to EEO #16 stated, "Atkins

18  was not involved in any of the decisions, events or personnel decisions in August-October 2006

19  that are the basis of the subject matter of this action."

20
21      681.    Bernard Ferguson was named the Acting SF INC from 7/06 – 10/06 while

22  Atkins was on detail to LA.

23      682.    On 8/7/06 Plaintiff received her write up for the 11/04 employee assault case

24  from Acting SF INC Bernard Ferguson and AIC Diaz.  This was approx. 8 months after

25  everyone else on this case received their write-ups, and was provided to Plaintiff only after she

26
27  addressed the disparity of her **NOT** receiving a write-up in an EEO complaint.

28

683. The write-up was the same one used for Kovacs, with his name deleted and Plaintiff's name inserted which addressed things not relevant to Plaintiff's participation in the 11/04 case.

684. Plaintiff addressed to Ferguson and Diaz on 8/7/06 that her assignment to the Threat and Assault assignment was punitive. Plaintiff also addressed that AIC Post had recently insisted she attend a Basic Security Training class being held for new inspectors.

685. Plaintiff had previously told AIC Post that she objected to being required to attend the Basic Security Training Class because it was specifically being held for new inspectors, and Plaintiff had 20 years experience as a postal inspector with three years Security training. Plaintiff believed that Post ordering her to attend a Basic Security Training class given her background and experience was humiliating and degrading, and was being done to further harass and retaliate against her for continuing to file EEOs, not for any business need, especially since the Division had many new inspectors who could have benefited from taking the class instead of Plaintiff.

686. On 8/8/06 Acting INC Ferguson told Plaintiff she did not have to attend the Basic Security Training Class for new inspectors, over-ruling AIC Post's prior insistence that Plaintiff attend.

687. On approximately 8/21/06, after returning from two weeks vacation, AIC Marian Post learned she and Atkins were named as discriminating officials in yet another EEO complaint filed by Plaintiff on 8/16/06 (EEO #15). AIC Post also learned at this time that

1    Acting SF INC  Bernard Ferguson over-ruled her order for Plaintiff to attend the upcoming

2    Basic Security Training Class.

3
       688.    AIC Post subsequently continued her campaign of harassment against Plaintiff,
4
5    including scrutinizing and interfering with her job performance, using Quan Howard as her

6    puppet.

7
       689.    Howard set Plaintiff up to fail at her job by excluding her from an email he sent
8
9    on Friday, 8/18/06  that notified other team members in advance of an upcoming airport audit

10   scheduled for Tuesday, 8/22/06.  Howard waited until the day before the audit while Plaintiff

11   was in Clear Lake, CA on 8/21/06 for the entire day, and then called Plaintiff and notified her
12
     of the airport audit the following day and then told her that she was in charge of the audit.
13
14   Plaintiff was given no advance time to prepare for the audit, disparate from her team members

15   who all were given advance notice to prepare.

16
       690.    When Plaintiff objected to not being given advance notice to prepare for the
17
18   audit that she was to be in charge of the following day, Howard assigned the audit to another

19   team member.  Subsequently, Howard sent Plaintiff an email on 8/21/06 and attached the

20   emails he sent team members regarding the audit, in which Plaintiff had been exclude.
21
22     691.    Plaintiff was the only inspector on the team who was **NOT** provided advance

23   notice of the upcoming 8/22/06 airport audit. The Agency 9/3/07 EEO response stated that

24   Plaintiff was out of the office on 8/18/06 and that was why she was excluded.  Disparately,
25
     Plaintiff's work hour entries support that Plaintiff was in the Richmond office on 8/18/06 and
26
27   worked 10.5 hours and could have easily been contacted by Howard.  Additionally, Inspectors

28

all have work issued cell phones so they can be contacted 24-7, further calling into question the integrity of the Agency's response.

692.    Plaintiff was adversely affected when she was set up to fail at her job , when she was not given advance notice of the airport audit, disparately from other team members, as part of the on-going HWE harassment.

693.    On August 23, 2006, **just days** after AIC Post learned that she and INC Atkins were named in yet another EEO filed by Plaintiff, and that Plaintiff did not have to attend the Basic Security Training class that AIC Post previously insisted she attend, AIC Post sent Plaintiff an email about an incorrect data entry error Plaintiff made over six months earlier in 2/06.  Post stated she was checking the July objectives when she found the data error dating back to February 2006.

694.    AIC Post had previously been counseled by INC Atkins about the proper chain of command she was to use, which was to contact a team leader if she had an issue with an inspector, not contact the inspector directly.  INC Atkins reiterated this in a Team Leader meeting to all team leaders because of issues some of them were having with Post contacting inspectors directly.

695.    Plaintiff asked Howard why AIC Post was sending her an email on a six month old data entry error instead of her team leader.  Howard told Plaintiff he was out of town and said he had asked AIC Post to send the email for him because he did not have access to his computer.

696.    Records Plaintiff obtained and included in her EEO showed Howard did have his computer and in fact sent numerous emails during the same period that AIC Post sent Plaintiff the email on the six month old data entry error.

697.    Plaintiff confronted Howard after learning he did have his computer when AIC Post sent the email on the data entry error, and Plaintiff asked Howard if she was being singled out and treated differently than others by having her work scrutinized by AIC Post immediately after filing an EEO naming Post. Howard became upset at Plaintiff confronting him about his apparent lie to her that he had no access to his computer.

698.    On August 28, 2006, Plaintiff submitted a case file to Howard to close. Howard refused to close the case, stating it needed more information. Plaintiff believed Howard was further harassing her as all the information he was requesting was already in the case file.

699.    The Agency's EEO response dated 5/6/08 stated Howard's request for additional information on the case prior to closing it was, "a routine administrative request and Inspector Howard was attempting to comply with the ISIIS requirements to close investigative case file." However, Plaintiff's next supervisor found the case file was in order without any additional information being provided to him and closed the case as requested by Plaintiff.

700.    Later that same day on 8/28/06, Howard called Plaintiff and told her that she needed to go to post offices and give standup speeches because she was behind everyone else on the team in the number of speeches given. Howard said he would hate to see Plaintiff **NOT** make her year-end goals.

701.   Plaintiff believed Howard was alluding that he would be giving her an unsatisfactory year-end merit.  Howard's comment about hating to see Plaintiff not make her year-end goals was made two months after he assigned Plaintiff the large ICF case on 6/29/06, doubling her workload, disparate from what he gave to other team members.

702.   Howard specifically set Plaintiff up to fail by over-burdening her with the ICF case which more than doubled her work load, knowing it would be impossible for Plaintiff to perform her normal duties, and then told Plaintiff if she did not also perform her regular duties in addition to the ICF case, she would not make her year-end goals, insinuating that she would receive a non-satisfactory year-end merit.

703.   Plaintiff has never previously received an unsatisfactory year-end merit during her career. If an inspector receives three non-satisfactory year-end merits, they can be removed from their position as a postal inspector.

704.   Management singling out EEO filers to give them unsatisfactory year-end merits, without just cause, has been done by management in the past, on more than one occasion,  as part of an on-going pattern and practice of HWE harassment targeting those utilizing Title 7 rights.

705.   Plaintiff's work hours used on the ICF case far exceeded the work hours any other team member used on cases Howard transferred to them.  None of the other team members had filed EEOs. Additionally, a 10/10/06 email listed Plaintiff responding to 25 assault complaints while the other six people listed showed the highest number of assault complaints any of them responded to was four.

706.    On 8/28/06, the same day Howard told Plaintiff he would hate to see her NOT make her year-end goals, he called her at approx. 6:00 p.m. while Plaintiff was driving home for the day.    Howard told Plaintiff she was to conduct an "emergency" OMC audit the following day by herself at the Eureka Post Office (PO), 220 miles away. When Plaintiff advised Howard she was on sick leave the following day, the OMC audit was no long an "emergency," and Howard told Plaintiff she could drive to Eureka on Wednesday when she returned to work, after first driving to Richmond to obtain her computer and work car, conduct the audit on Thursday, and write her report and return home on Friday.

707.    Plaintiff immediately believed this was just one more incident of Howard harassing her and setting her up to fail, by notifying her at 6:00 p.m. of an "emergency" audit the following day, after earlier that day telling her that he would hate to see her not make her year-end goals. Plaintiff was given no time to prepare for the OMC audit, and was told she would be conducting the OMC audit by herself, even though Howard was aware it was a problematic office.  Plaintiff was not given an opportunity to read prior OMC audit reports for the Eureka PO prior to conducting the audit, which is standard operating procedure.

708.    The Eureka PO was in the middle of several congressional interest inquiries, was the center of on-going media attention, and the postmaster was removed from his position. Plaintiff had never conducted an OMC audit at a large post office by herself, or one with the on-going issues at Eureka.

709.    Howard told Plaintiff she would be conducting the OMC audit by herself and offered her no assistance, contrary to his assertion in his 1/26/07 EEO affidavit, in which he

stating he offered Plaintiff assistance. Howard's assertion that he offered Plaintiff help with the audit but she refused, is in direct opposition to Agency EEO responses stating Howard had to make numerous calls to supervisors in an attempt to find a replacement for Plaintiff when she was unable to go and notified him she could not go at the last minute. Apparently Howard had no one available even though he alleged that he offered Plaintiff assistance with the OMC audit.

710.    Management was aware that Plaintiff's OMC experience was primarily doing the "security" sections of OMC audits as addressed in a prior email she sent to a supervisor on 8/3/06 regarding her experience in Security.

711.    Plaintiff had no prior experience conducting OMC audits by herself at a large Post Office, which is significantly different from a small Post Office or an Associate Office which uses a different audit program.

712.    Several OMC audits and investigations had previously been conducted at Eureka, which is a large PO that processes mail for several Associate Post Offices. In the past, two postal inspectors were always sent to Eureka to conduct the OMC audits and/or investigations together.

713.    When Plaintiff ultimately was unable to conduct the OMC audit because she took sick leave, Howard sent **two** postal inspectors in her place to conduct the audit. A subsequent scheduled OMC audit in Eureka in 11/06 showed that two inspectors were again assigned to conduct the OMC audit, further showing the disparity of treatment when Plaintiff is involved and management attempts to interfere with her job performance as part of the on-going HWE harassment.

COMPLAINT        PAGE   - 146 -

714.    On 8/29/06 Plaintiff saw her medical provider and explained the Agency's on-going harassment and retaliation targeting her, and the attempts to interfere with her job performance, escalating during the past week, and the physical and mental effect it was having on her.    Plaintiff's medical provider placed her off work from 8/30/06 – 9/12/06 for work-related stress, and Plaintiff used her sick leave.    This was the 4th time Plaintiff was placed off work for work-related stress.

715.    On 8/29/06 Plaintiff faxed her sick leave slip and medical report directly to a co-worker at Division Headquarters who put the documentation in Howard's mailbox.    Plaintiff immediately called Howard and advised him she was taking sick leave for work-related stress leave and that the medical documentation was in his mailbox.    Howard loudly exclaimed, "You're taking stress leave?"    In the room with Howard at the time was Team Leader Jim Thiede.

716.    Howard's 1/26/07 EEO response stated he told Thiede that Plaintiff was on stress leave because Thiede was Howard's acting AIC at the time.    Division Weekly Bulletin records provided in Plaintiff's EEOs do not support Howard's contention that Thiede was the Acting AIC during the week in question, placing in dispute the reason Howard advised Thiede that Plaintiff was on stress-leave.

717.    While Plaintiff was off work from 8/30/06 through 9/12/06, Howard sent her two letters to her residence requesting that she complete detailed Family Medical Leave (FMLA) forms, even though Plaintiff was not using FMLA leave but was using her own sick

1    leave.  Howard stated in his letters that Plaintiff's sick leave could be denied if she did not

2    comply in filling out the FMLA forms requesting in-depth medical information.

3
          718.    On September 8, 2006, Plaintiff sent a letter to Acting SF INC Bernard Ferguson
4
     outlining the harassment and retaliation targeting her, by AIC Marian Post and Howard,
5
6    including their attempts to set Plaintiff up to fail at her job, causing Plaintiff to take two weeks

7    sick leave due to work-related stress.  INC Ferguson conducted no investigation into Plaintiff's

8
     allegations.
9
          719.    Plaintiff's numerous attempts to obtain documents relative to any agency
10
11   investigation involving the harassment by Howard and Post, and the subsequent release of her

12   medical information by Howard, were initially ignored.  Plaintiff eventually received a letter
13
14   dated 6/28/07 from Acting SF INC Verrochio stating Howard had not inappropriately released

15   her medical information.

16
          720.    While Plaintiff was off work from 8/3/06 – 9/12/06, Howard inappropriately
17
18   advised several of Plaintiff's co-workers that she was off work on sick leave for work-related

19   stress.

20
          721.    The agency's 5/6/08 EEO response stated that Howard advising other employees
21
22   that Plaintiff was off work for work-related stress, "would not constitute an improper disclosure

23   of an employee's medical information." Plaintiff contends that Howard's disclosures to others

24   that she was on sick leave, as well as stating she was on work-related stress, violates Privacy
25
     and HIPAA laws, and was done to further harass Plaintiff and taint her to others in the Division.
26

27

28

722.    Inspector Jimmy Woo contacted Plaintiff while she was off work in September 2006 on work-related stress leave to see if she was okay, and another person sent Plaintiff a card hoping Plaintiff was doing okay.

723.    Howard admitted in his 1/26/07 EEO affidavit that he told several people Plaintiff was on sick leave.

724.    In a 2/5/07 EEO affidavit Jimmy Woo stated Howard called him to obtain help for the OMC audit in Eureka and told him that Plaintiff was off work on sick leave. Woo stated that **he did not recall** Howard telling him anything about her medical condition. Woo did not state why he later felt compelled to contact Plaintiff at home to see if she was ok if he was not advised Plaintiff was off work on stress leave.

725.    The Agency 9/3/07 EEO response stated in relation to Woo contacting Plaintiff at home while she was on two weeks stress leave, " For some reason, Inspector Woo, made a decision to call her, possibly because they were long-term colleagues at the division." A letter from Acting SF INC Verrochio dated 6/28/07 stated, "Inspector Woo confirms he then called you out of concern as you were long-time colleagues at the San Francisco Division."

726.    After Howard told Woo that Plaintiff was on stress leave, Woo subsequently told at least one other person that Plaintiff was on stress leave, who advised Plaintiff that Woo was aware she was on stress leave. This further substantiates Plaintiff's allegations that Howard told Woo Plaintiff was off work due to work-related stress, and that was the reason Woo contacted Plaintiff at home.

COMPLAINT        PAGE  - 149 -

727.    Plaintiff returned to work on 9/13/06. Howard contacted Plaintiff several times that day and again insisted that she complete the FMLA forms requesting in-depth medical information, and also told her she had to file a CA-2 stress form.  Plaintiff advised Howard that she was not completing FMLA forms because she was using sick leave not FMLA, and that she was not filing a CA-2 stress form unless he ordered her to.

728.    On 9/14/06, the 2nd day Plaintiff had returned back to work, Howard then insisted that the medical documentation that Plaintiff provided was inadequate to support her return to work.  Plaintiff advised Howard by email that that he was harassing her by continuing to insist that she complete the CA-2 stress form, refusing to close a case for her, and insisting that she fill out the FMLA forms when she was taking sick leave, not FMLA.

729.    Only after Plaintiff complained to INC Ferguson did Howard stop insisting that she file a CA-2 stress form. INC Ferguson's 1/22/07 EEO affidavit acknowledged that Plaintiff had contacted him about Howard insisting she file a CA-2 stress Form. In his EEO affidavit Ferguson stated that he advised both Howard and Plaintiff that it was Plaintiff's decision to file a CA-2 stress form.  Disparately, Howard's 1/26/07 EEO affidavit stated he did not insist Plaintiff file a CA-2 stress form or complete the FMLA forms, which he knew was a complete fabrication.

730.    At approx. 7:00 p.m. on 9/14/06, Howard called Plaintiff and placed her off work due to insufficient medical documentation to support her sick leave for 8/30/06 – 9/12/06. Howard was angry and upset with Plaintiff and mentioned the email Plaintiff sent him earlier

that day stating he and AIC Post were harassing her.   Howard told Plaintiff she would have to use her sick leave for time he placed her off work.

731.    Plaintiff had already returned to work for two full days when Howard placed her off work, which is not standard operating procedure.

732.    Pam Dixon, Human Resources Specialist, subsequently advised at least one manager that Howard should not have placed Plaintiff off work after she had returned to work for two full days.   Howard previously had a 90 day managerial detail in August 2005 and attended a week long Supervisor Training in 2006, and was well aware that he had no authority to place Plaintiff off work after she had worked two full days, but he did it to further harass Plaintiff as part of the on-going HWE harassment.

733.    Howard's 1/26/07 EEO affidavit stated, "Inspector McDermott resumed work without informing me."   However, phone and emails records and documents provided in Plaintiff's EEO refute Howard's allegations of not knowing when Plaintiff returned.   Howard knew when Plaintiff returned to work because he called Plaintiff several times on 9/13/06 on her first day back to work, in addition to her medical note which he was provided on 8/29/06 stating Plaintiff was returning to work on 9/13/06.   Howard knew exactly when Plaintiff returned to work, disparate from statements in his 1/26/07 EEO affidavit.

734.    Howard was aware that Plaintiff conducted interviews out in the field on 9/13/06 and was able to perform the duties of her job, which she had done for two full days when he placed her off work at 7:00 p.m., on 9/14/06.

735.    The Agency 8/7/07 EEO response and Howard's 1/26/07 EEO affidavit stated "Acting INC Bernard Ferguson instructed me to place her off work," on 9/14/07.  In direct conflict with Howard, INC Ferguson's 1/22/07 EEO affidavit stated, "I was not personally involved in this decision."

736.    The Agency subsequently had to pay Plaintiff administrative leave for the three weeks Howard placed her off work from 9/15/06 – 10/2/06, because Howard violated Postal rules and regulations by placing Plaintiff off work after she had already returned to work for two full days.

737.    Placing someone off work after they have returned to work for two full days is against Postal rules and regulations and was done to further harass Plaintiff as part of the on-going pattern of HWE harassment.  The involuntary placement of Plaintiff in an enforced leave status exceeding 14 days is disciplinary in nature and is an adverse action.

738.    On 2/27/07 Pam Dixon, Human Resources Specialist, told Plaintiff that Dixon had no authority to place Plaintiff off work or return her to work. Dixon's comments are disparate from a 10/19/06 email from Howard stating Dixon gave the clearance for Plaintiff to return to work on 10/3/06.  Ferguson's 1/22/07 EEO affidavit stated Plaintiff was cleared to return to work by Howard after discussing it with Human Resources.  This was disparate from the Agency 8/7/07 EEO response which stated that INC Ferguson reviewed Plaintiff's 9/28/06 medical and made the decision to return Plaintiff back to work on 10/3/06.

739.    A postal doctor did not clear Plaintiff to return on 10/3/06 as required. The postal doctor, Dr. Fahrid reviewed Plaintiff's 9/28/06 medical report a month after Plaintiff had

1  already returned to work.  Dr. Fahrid made a statement in writing to the Agency that if Plaintiff

2  continues to be a problem she may need to be sent for a FFD medical exam.

3      740.    Plaintiff was treated disparately when she was placed off work on 9/14/06 until
4
5  she provided additional medical documentation, while another female inspector who had been

6  off work for work-related stress in approx. March 2006 was allowed to return to work and

7  remain at work until she was able to provide additional medical documentation that was
8
9  requested, with the caveat that she relinquished her service weapon.  Plaintiff was not given this

10  same opportunity as the other inspector to remain at work until additional medical

11  documentation was obtained, but was placed off work to further harass her and retaliate against

12  her for filing EEOs.   The other female had never filed an EEO complaint.
13
14      741.    The Agency's EEO response dated 8/7/07 denied that the other female was

15  allowed to remain at work, without her service weapon, until she provided additional medical

16  documentation, knowing that statement to be false.
17
18      742.    Plaintiff was again treated disparately when the above female's sick leave was

19  approved while Plaintiff's sick leave from 8/30/06-9/12/06 was subsequently denied and she

20  had to use annual leave, adversely affecting her.

21      743.    On 9/18/06 Howard sent a letter to Plaintiff requesting additional medical
22
23  documentation to support her sick leave from 8/30/06 – 9/12/06.  In Howard's 9/18/06 letter to

24  Plaintiff, he took the questions directly off a FMLA form and copied them onto Inspection

25  Service letterhead and then requested that Plaintiff's doctor complete the form providing in-
26
27  depth medical information, citing ELM Section 513.364.

28

744.    ELM Section 513.364 did not support Howard's requests for the specific information he requested from Plaintiff in his 9/18/06 letter to her, and in fact the medical documentation Plaintiff initially provided on 8/29/06 was sufficient to justify her sick leave according to what was required in ELM Section 513.364 as cited by the Agency.

745.    ELM Section 513.364 was the only regulation the Agency cited to support the Agency's request for additional medical documentation, disparate from Howard's EEO affidavit dated 1/26/07 which stated he also provided Plaintiff with ISM Section 144.212.

746.    Howard's first letter to Plaintiff dated 8/31/06 included no citations but stated she had to complete Form WH-380 for family Medical leave.  Howard's 2nd letter to Plaintiff dated 9/1/06 contained no citations but stated she had to complete Form WH-380 for family medical leave.  This letter stated that "failure to do so may result in your sick leave request being denied." Howard's third letter to Plaintiff dated 9/18/06 cited the ELM 513.364 and included questions he took directly of the FMLA form (WH-380) which he then put on Postal Inspection Service letterhead and sent to Plaintiff and told her to respond within two weeks.

747.    On 9/28/06 Plaintiff provided additional documentation from her treating physician including all the additional in-depth medical information requested by Howard in his 9/18/06 letter to her.  Plaintiff hand-delivered to 390 Main Street, her medical information in an envelope addressed to Howard marked "confidential" and "restricted."

748.    On 9/28/06 Howard instructed the mailroom clerk to open Plaintiff's letter addressed to Howard, containing Plaintiff's personal medical information, and fax it to Howard at another location.  The mailroom clerk submitted an EEO affidavit on 2/2/07 acknowledging

that he did this after being ordered to do so by Howard. Management's 6/28/07 letter to Plaintiff stated Howard did nothing wrong by directing the mailroom clerk to do this.

749.    Plaintiff was initially informed that the mailroom clerk opened the envelope with her medical information when another employee in the Division saw him and contacted Plaintiff who then contacted the mailroom clerk and verified that it did happen. It is unknown how many employees saw Plaintiff's restricted, confidential medical information.

750.    The Agency EEO response dated 8/7/07 acknowledged that the mailroom clerk does not have a higher security clearance than any other support person which would allow him access to employee's medical records.

751.    On 10/2/06 Plaintiff was still off work she was contacted by telephone by Keith Silva, Team Leader, who stated that AIC Post contacted him and said Plaintiff was cleared to return to work, and that Plaintiff was being transferred to a newly formed team, the Contract Employee Mail Theft Team (CEMT), at the Richmond Domicile, reporting to Silva beginning 10/3/06. Silva was friends with Plaintiff and had never been named in her EEO complaints as a discriminating official nor had he joined in the harassment. Employee mail theft investigations are Plaintiff's area of expertise.

752.    Plaintiff's transfer to the CEMT team, marked the end of her 3 ½ years on the punitive Threat and Assault assignment, for which she had been reminded daily that the reason she had been placed in a menial, degrading job which did not fit her background, skills or expertise, was due to her on-going EEO activity, as part of the on-going HWE harassment by the Agency.

753.    Plaintiff repeatedly advised management during the past 3 ½ years that she believed the Threat and Assault assignment was retaliatory and discriminatory for her continuing to file EEOs, and that the assignment did not utilize her background, skills and experience.  Only after Plaintiff used sick leave for work-related stress leave on three occasion while assigned to the Threat and Assault assignment, was she finally removed from the assignment.

754.    For 3 ½ years Plaintiff watched at least eight other inspectors transferred off the punitive assignment while she was forced to remain there, years longer than any of the other inspector, not being given a viable assignment to utilize her background, training and skills, like other inspectors, adversely affecting her.

755.    Plaintiff was told she was being assigned to the CEMT team because of her background and experience in mail theft investigations and because she could train the other three team members, who had no employee mail theft experience.

756.    On October 10, 2006, Plaintiff sent a letter to INC Ferguson stating she felt she was being harassed by the Agency when Howard placed her off work on 9/14/06 after she had already returned to work for two days and had provided him her medical documentation. Plaintiff requested information relative to who authorized placing her off work on 9/14/06, and who cleared her to return to work on 10/3/06.  Plaintiff received no response.

757.  · Plaintiff obtained her medical file which substantiated that a postal medical doctor did not place her off work on 9/14/06 after working two full days, and a postal medical doctor did not clear her to return to work on 10/3/07.

758.    Plaintiff continued to learn that her confidential medical information had been released, this time to Postal Managers. In approx. October 2006, after Plaintiff returned from her two weeks of stress leave in 9/06, Tom Bourdon, a Postal Manager at the San Francisco BMC in Richmond, approached her and said he heard from another Postal Manager, Dr. Saba, that Plaintiff was on stress leave and that Plaintiff was taking early retirement.

759.    At Plaintiff's request, Dr. Saba provided Plaintiff a written statement dated 8/23/07 acknowledging that someone told him Plaintiff was off work retired, but stated he could not recall who told him, just that it was at a Threat Assessment Training (TAT) meeting (which is attended by Postal Inspectors). Dr. Saba stated he could not recall speaking to Bourdon about Plaintiff.

760.    The Agency 9/3/07 EEO response stated that Dr. Saba was not advised by any Inspection Service personnel about Plaintiff's work-related stress leave.   The Agency did not address whether they contacted Bourdon to address Plaintiff's allegations that Bourdon was told by Dr. Saba that she was on stress leave and taking an early retirement.

761.    Bourdon refused to provide Plaintiff a statement regarding the incident, stating he had been advised by three people not to provide one.  Bourdon stated no one from the inspection service interviewed him about the comments Dr. Saba made to him which he had relayed to Plaintiff.

762.    The Agency's 5/6/08 EEO response stated that AIC Sally Diaz interviewed Dr. Saba about this incident, and Dr. Saba said he was unaware of Plaintiff's stress leave; However, no Memorandum of Interview of Dr. Saba was prepared, nor did the Agency obtain a statement

from Dr. Saba, which would be standard operating procedure. Diaz did not contact Tom Bourdon and obtain a statement from him regarding his comments to Plaintiff that Dr. Saba told him Plaintiff was on stress leave and taking an early retirement.

763.    An unknown postal inspector advised Dr. Saba in a TAT meeting some time between 8/29/06 and October 2006, that Plaintiff was off work on stress leave. Dr. Saba in turn, commented to Bourdon about Plaintiff being on stress leave, and Bourdon in turn relayed the information to Plaintiff in October 2006.

764.    The Agency 9/14/07 EEO response stated that any comment Bourdon made to Plaintiff about him being told by Dr. Saba that she was on stress leave was a result of Plaintiff's transfer to the External Crimes team in 2/07 in which she subsequently left the Agency; However, Bourdon approached Plaintiff in October 2006, well before the 2/07 EC transfer and his comments were referring to the period Plaintiff was off work for two weeks in September 2006 for work-related stress.

765.    On 10/25/06 Howard again released Plaintiff's confidential medical information when he approached Plaintiff and several of her new team members and a support clerk in a public hallway, and began explaining to Plaintiff's new supervisor, Keith Silva, why Plaintiff's sick leave from 8/30/06 -- 9/12/06 was not approved. This was the 3rd incident involving Howard releasing Plaintiff's confidential medical information.

766.    On 10/25/06, Deputy Chief Inspector (DCI) Tom Brady met with Acting SF INC Ferguson, and US PIS Attorney Ed Lawee and Howard in SF regarding Plaintiff's latest EEO

and the release of her medical information, yet Brady did nothing to intervene in the on-going discrimination and HWE targeting Plaintiff, allowing it to continue.

767.    The SF INC at the relevant time herein reported to DCI Tom Brady who reported to Lee Heath, Chief Postal Inspector.

768.    Headquarters' managers including Lawrence Katz, Legal Dept., were aware of Howard's violations of the Privacy Act and HIPAA violations releasing Plaintiff's medical information and yet they took no action to address it.

769.    Plaintiff contacted the Postal OIG and requested an investigation into Howard releasing her medical information.  Postal OIG referred the case back to the SF INC stating it was an "administrative" matter for the INC to address.  FOI requests for information on what investigation was taken by SF management were denied.

770.    Management did not conduct an investigation into allegations that Quan Howard released Plaintiff's confidential medical information, other than a letter from Acting INC Ron Verocchio dated 6/28/07 stating Howard had done nothing wrong.  Verroccio's letter contained statements about what inspectors allegedly told him relative to allegations by Plaintiff, but he provided no supporting documentation of his "alleged" investigation into the matter.

771.    Howard continued to discriminate and retaliate against Plaintiff even when she no longer reported to him.

772.    On October 27, 2006, Plaintiff submitted her year-end accomplishments to Howard for his approval.  One month later, On November 21, 2006, after the deadline to submit year-end accomplishments had passed, Howard responded in an email saying he was not

approving her accomplishments and was returning them to her for further action. Howard didn't explain what further action was needed. Plaintiff believed this to be further harassment targeting her.

773.    After Plaintiff was assigned to the CEMT team, she sent an email to all the Division EC Team Leaders requesting information for the CEMT team to help them with their assignment. Howard was the only team leader that did not respond with the requested information.

774.    Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

775.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
### (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; 42 U.S.C. 2000e ET SEQ.)
### EEO #17 (No AGENCY No. Assigned)

776.    **EEO #17:  Quan Howard's 12/1/06 letter denying Plaintiff's sick leave/ Plaintiff w/FFD Threat/Ed Lawee assisted with 12/1/06 Howard letter containing hostile and antagonistic remarks directed at Plaintiff**:  This is the 17th EEO complaint filed by Plaintiff since 1998, alleging on-going discrimination (gender), age discrimination, harassment, retaliation and a HWE, due to her EEO activities.

777.    On 11/30/06 EEOC AJ David Kelley issued a Memorandum and Opinion and Order (MOO) in which the Agency was found liable for discrimination, harassment, retaliation and a sexually HWE on-going for years. Plaintiff was found to be the most credible witness

1    while several Agency witnesses were impeached and/or found to be non-credible.  The MOO

2    indicated Plaintiff should be made as whole as possible.

3
4        778.    Management told people in the Division that they were upset that Plaintiff was

5    telling Division employees that she prevailed in her EEO hearing.  Management attempted to

6    minimize Plaintiff's success to others in the Division, telling them that that Plaintiff had not

7    prevailed in all of her EEOs and that she had not won any money.

8
9        779.    One day after management learned Plaintiff prevailed in her 8/04 EEOC hearing,

10   Quan Howard sent a letter to Plaintiff dated 12/1/06 denying her sick leave from 8/30/06-

11   9/12/06, and threatened to send her for FFD medical exam.

12
13       780.    Howard had not been Plaintiff's supervisor for over two months at the time he

14   and Ed Lawee sent Plaintiff the 12/1/06 letter.  Anything being sent to Plaintiff should have

15   been sent by her new team leader, Keith Silva, not Howard, which would be standard operating

16   procedure.

17
18       781.    Managers stating that Plaintiff should be sent for a FFD exam was addressed in

19   Plaintiff's 8/04 EEOC hearing.  Managers today continue to make these same comments 10

20   years later, without cause, continuing the on-going pattern of discrimination and retaliation as

21   part of the HWE harassment.

22
23       782.    Quan Howard submitted an EEO affidavit dated 1/26/07 in which he stated he

24   did not perceive Plaintiff to have a medical condition during the time she was off work for

25   work-related stress.  Disparately, just one month prior to Howard completing this EEO affidavit

26   he sent the 12/1/06 letter to Plaintiff stating that he wanted to send her for a FFD medical exam.

27

28


COMPLAINT        PAGE   - 161 -

Conflicting statements from Howard further support Plaintiff's allegations that the threat to send her for a FFD was made to harass and retaliate against her, and not because Howard felt there was a legitimate reason to send her for a FFD exam.

783.    Howard threatening to send Plaintiff for a FFD medical exam after having just received the 9/28/06 medical report from Plaintiff's treating psychologist stating Plaintiff was fit for duty and able to perform her job, was done to further harass Plaintiff, as part of the on-gong HWE harassment, especially given Howard submitted an EEO affidavit stating he did not perceive Plaintiff to have a medical condition.

784.    The 12/1/06 letter's reference to sending Plaintiff for a FFD medical exam was done to harass her and to put out the message to Plaintiff that if she took sick leave in the future, the Agency would be sending her for a FFD exam in an attempt to remove her from her position as a postal inspector.

785.    Howard did not deny Plaintiff's sick leave when she submitted her additional medical report on 9/28/06, but denied it two months later - one day after AJ Kelley issued his 11/30/06 MOO in which Plaintiff prevailed.

786.    According to Postal rules and regulations, the 9/28/06 medical report Plaintiff provided from her doctor was sufficient to support her sick leave used.  The 9/28/06 medical report included all the additional information Howard requested, and therefore there was no legitimate business reason for Howard to deny Plaintiff's sick leave.

787.    Plaintiff was adversely affected when she was forced to use two weeks annual leave for the sick leave she used due to work related stress from 8/30/06 – 9/12/06.

COMPLAINT        PAGE   - 162 -

788.    Plaintiff was adversely affected in that she was the only person in SF denied sick leave after providing the specific medical documentation from her physician that management requested she provide, and yet still have her sick leave denied, forcing her to use her own annual leave.    As addressed in EEO #16 above, the female who remained at work until she provided additional medical documentation in support of her work-related stress leave in March 2006 was approved to use her sick leave for the time she was off work, disparate from how Plaintiff was treated.

789.    Howard's 12/1/06 letter included statements and explanations about the Agency's position on EEO issues filed by Plaintiff.    Howard's 12/1/06 letter contained numerous negative derogatory and antagonistic comments directed at Plaintiff.

790.    Plaintiff's EEO complaint herein questioned whether the Ed Lawee, Agency Representative helped Howard write the 12/1/06 letter due to the hostile and antagonistic content of the letter which mirrored those sent to Plaintiff by Lawee.

791.    Plaintiff later learned through Discovery that Lawee helped Howard write the 12/1/07 letter which became one of the subjects in EEO complaint #18 below.

792.    Ed Lawee is bias, hostile and antagonistic toward Plaintiff as supported by numerous correspondence he continued to send to Plaintiff up until 2008.

793.    On approximately 12/13/06, Ed Lawee received an "award" during a Christmas holiday luncheon from INC Atkins for "keeping him out of trouble" as addressed in EEOs above.

794.   This was the 7th EEO complaint Plaintiff had filed naming INC Bill Atkins as a discriminating official since 2003, the 4th EEO naming AIC Marion Post, and the 2nd EEO filed naming Quan Howard.

795.   Plaintiff sent five letters to management regarding Howard's on-going harassment and discrimination targeting her, his refusing to accept her medical reports to substantiate her sick leave, and the unauthorized release of her medical information. Plaintiff requested that an investigation be conducted, yet no investigation was conducted.

796.   The on-going discriminatory and retaliatory behavior is condoned by Chief Postal Inspector Lazaroff and Chief Legal Counsel Lawrence Katz, who continue to stand by and let the behavior continue. These managers are responsible for ensuring that their US PIS managers abide by anti-discrimination laws; However, that is not occurring.

797.   Plaintiff also addressed in this EEO that Howard continuing to harass her even when he no longer supervised her.   Howard refused to accept Plaintiff's year-end accomplishments and was the only EC team leader who refused to respond to Plaintiff's request for information for her new CEMT team, as part of the on-going HWE harassment.

798.   On February 27, 2007, Plaintiff submitted a travel voucher for a $40.00 investigative expense, only to be told by AIC Post that Plaintiff needed to re-submit her request through the impress fund, which she did. To date, 1 ½ years later, Plaintiff has not been paid.

799.   Plaintiff filed a pre-EEO on this case on 12/26/06, and received no response from the Agency.

800.   Plaintiff contacted the Agency numerous times regarding the status of this case, and the Agency responded that the issues in this case were already addressed in EEO #16 and would not be addressed further.

801.   Howard denying Plaintiff's sick leave by letter dated 12/1/06, one day after the 11/30/06 MOO was issued, threatening to send her for a FFD medical exam and Ed Lawee's role, and the on-going HWE harassment were not investigated by the Agency in any of Plaintiff's prior EEO complaints as they stated.

802.   The Plaintiff contacted the Agency and the Office of Federal Operations by letter or telephone numerous times in an effort to ensure the Agency investigated the issues in this EEO complaint.

803.   Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

804.   As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; 42 U.S.C. 2000e ET SEQ.)
### EEO 18 (Agency No.: 66-000-0036-07)

805.   **EEO #18:  Punitive Transfer to External Crimes Oakland team:** This is the 18th EEO complaint filed by Plaintiff since 1998, alleging on-going discrimination (gender), age discrimination, harassment, retaliation and a HWE, due to her EEO activities.

806.   On November 30, 2006, EEOC AJ David. Kelley issued a Memorandum Opinion and Order (MOO) addressing Plaintiff's 8/04 EEOC hearing, in which the Agency was

found liable for illegal conduct. The MOO stated Plaintiff is, *"entitled as nearly as possible to be made whole through appropriate remedies and relief."* A Damages hearing was tentatively scheduled by AJ Kelley for April 2007.

807.    SF Division personnel were aware that Plaintiff prevailed in her 8/04 EEO after the 11/30/06 MOO was issued. Ed Lawee released copies of the 11/30/06 MOO to SF managers.

808.    Management was upset that Plaintiff was telling people that she prevailed in her EEO hearing, telling employees that Plaintiff did not win all her EEO complaints and that she did not win any money.

809.    On 12/1/06 one day after the 11/30/06 MOO was issued, in which Plaintiff prevailed, her sick leave used months earlier was denied and she was threatened with a FFD medical exam as addressed in EEO #17 above.

810.    On 2/5/07, just 67 days after AJ Kelly's MOO was issued, Plaintiff was verbally advised by her current supervisor on the CEMT team, that management was transferring her to the External Crimes (EC) team in Oakland, CA, reporting to Postal Inspector James Rickher, effective 3/5/07. Plaintiff's supervisor was advised by management to not tell Plaintiff about her pending transfer until a later date. Plaintiff's supervisor chose to advise Plaintiff about her pending transfer as soon as he was notified on 2/5/07.

811.    Plaintiff considered her transfer to a training team of new inspectors, working an assignment she had never worked, and reporting to a male supervisor she testified in her 8/04

hearing joined in the harassment against her, to be retaliatory due to her prevailing in her 8/04 EEOC hearing and her on-going EEO activities.

812.    Plaintiff previously testified in her August 2004 EEOC hearing about Postal Inspector James Rickher, her new supervisor, and how he joined in the harassment against her in 1999, when he first met her due to the rumors management spread about her.

813.    At the time Plaintiff was notified of her pending transfer to the EC team, SF Management had been provided a copy of the MOO and was aware that AJ Kelley had ruled in his 11/30/06 MOO, that Plaintiff had prevailed and she was, *"entitled as nearly as possible to be made whole through appropriate remedies and relief."*

814.    The position Plaintiff held prior to her punitive transfer in 7/03 was working Employee Mail Theft investigations at the Richmond Domicile, reporting to a supervisor not named as a discriminating official in EEOs or joining in the harassment.

815.    At the time Plaintiff was notified of her pending transfer to the EC team, SF managers were aware that Plaintiff had retained legal counsel and was in the middle of global settlement negotiations with the Postal Attorney regarding damages for her then 18 EEO complaints.

816.    In 2/07 when Plaintiff was notified of her pending transfer, she had only been on the Contract Employee Mail Theft (CEMT) team for four months, beginning in October 2006 when the team was newly formed. While on the CEMT team, Plaintiff reported to a male supervisor who has never been named as a discriminating official in EEO complaints, or named as joining in the harassment against her.

COMPLAINT        PAGE  - 167 -

817.    Plaintiff was advised the CEMT Team was being disbanded, with one CEMT position retained and placed on the newly formed International Team.  The CEMT position was assigned to an Inspector who was domiciled in San Jose, CA who would have to commute an extra 2-3 hours per day to San Francisco to report to his new team located in SF.

818.    The one CEMT position could have been assigned to any team at any location in the Division without affecting operations.

819.    Six months after the CEMT team was disbanded, and after Plaintiff left the Agency, and Atkins was removed from his SF INC position, the CEMT positions in the Division were again increased and one position was assigned to each of the EC teams to include San Francisco and Oakland, further discrediting INC Atkins reasons for initially disbanding the CEMT in 3/07.   These changes occurred after INC Atkins left the Agency in May 2007 and was replaced by Acting INC Ron Verrochio.

820.    Plaintiff was previously advised that the reason she was initially placed on the CEMT was due to her expertise in employee mail theft investigations, and because she could other train team members who had little to no experience in employee mail theft investigations. Plaintiff had been integral in training team members on the CEMT, three of whom had no prior employee mail theft experience.

821.    Approx. 2 weeks prior to Plaintiff being verbally advised that she was being transferred to the EC Oakland team, SF managers completed EEO affidavits (some 20-30 pages long) (for pending EEO #16 (#66-000-0047-06).

COMPLAINT        PAGE  - 168 -

822.    Bill Atkins, INC provided an EEO affidavit dated January 21, 2007, stating he had no knowledge of Plaintiff's on-going discrimination complaints while he was detailed as the Acting INC in LA from 7/06 – 10/06, knowing that statement was not true.

823.    Bill Atkins and Marion Post were in contact with each other while Atkins was detailed to LA, and Atkins was aware of allegations of on-going discrimination and retaliation complaints Plaintiff continued to file naming him, AIC Post, Quan Howard and other managers. The on-going personal relationship between Atkins and Post was discussed in EEOs above.

824.    Marian Post, AIC, prepared an EEO affidavit on January 23, 2007, which was 26 pages long on this same EEO. In this affidavit, Post indicated she resented having to divulge information, and she resented and was insulted by Plaintiff questioning her integrity.

825.    Less than two weeks after Atkins and Post signed these EEO affidavits, Plaintiff was verbally advised on February 5, 2007, that she was being reassigned to EC Oakland.

826.    Plaintiff addressed in her prior EEO complaints, the collusion between managers Atkins and Post in the on-going campaign of discrimination, harassment and retaliation targeting Plaintiff, on-going for years, and which headquarters' management was on notice was occurring and failed to intervene.

827.    Plaintiff's allegations of collusion of illegal conduct by Atkins and Post is supported by the ultimate removal of both these two managers from their positions in May 2007 for alleged improprieties, which involved in part, each other.

COMPLAINT      PAGE  - 169 -

828.  **Details Of Incident:**  On February 23, 2007, Plaintiff received a phone call from her new team leader, James Rickher, welcoming her to his EC Oakland team. This was prior to the distribution of any official written notification regarding team transfers.

829.  Rickher told Plaintiff that management did not give him a reason why Plaintiff was being assigned to his EC team. Rickher told Plaintiff he had voiced to management in the past that he wanted a female inspector, and that he wanted a senior inspector, but he stated he was not given a reason why Plaintiff specifically was chosen to be transferred to his team.

830.  During this 2/23/06 phone call, Rickher told Plaintiff that she would be keeping her same work car, that her office in would be the office next to the lunchroom, and that she would probably be assigned the Napa territory since there was not much happening in that territory and she was the least senior person to the team.

831.  Rickher asked Plaintiff if the Napa territory was ok with her and Plaintiff told him to place her wherever she was needed. One manager told Rickher that he might want to assign Plaintiff the Napa territory which was close to her home, in order to make Plaintiff's reassignment easier for her to accept.

832.  Rickher told Plaintiff that he had no problems with Plaintiff, but was told by others in the Division that Plaintiff would file an EEO against him once she came to his team.

833.  After Plaintiff spoke with Ricker, the team transfers were officially put in writing that same day and disseminated to the Division, with transfers effective 3/5/07. Inspectors on the five SF Division EC teams showed that most of them have only been postal inspectors for approx. 3 years or less.

834.    When the email came out on 2/23/06 announcing the new team assignments, Plaintiff had already left the office for the day and did not see the email but was advised it had been distributed.

835.    On Monday, 2/26/07 Plaintiff called in sick.   On 2/26/07, James Rickher distributed a territory list for his new team members, naming the territories each inspector would be working.  Plaintiff was excluded from the list, even though she was to report to his team within one week.  Rickher's email stated Plaintiff would be included once she reported to the team.

836.    Plaintiff returned to work 2/27/07 after being off work the previous day, and saw Rickher's email excluding her from the EC Oakland territory list.    After Plaintiff saw that she was excluded from a territory on her new team, Plaintiff submitted a 3971, Annual Leave request on 2/27/07 for the following three weeks beginning 3/5/07, through her Team Leader Keith Silva, with a copy to Rickher.

837.    Plaintiff believed she was excluded from the EC territory list because managers had advised Rickher that Plaintiff would file a stress claim and would not be reporting to his team because of the EC transfer, which management knew Plaintiff viewed as punitive and in retaliation for prevailing in her 8/04 EEOC hearing and her EEO history

838.    Plaintiff had a 2nd conversation with Rickher on 3/3/07, her last day of work prior to taking three weeks of annual leave,  in which she told Rickher she was upset that he left her off the territory list, and felt it was because management told him she would not be reporting to his team.

839.    Ricker denied that anyone in management told him Plaintiff would not be reporting to his team because she would file a stress claim, as the reason for excluding her from the territory list.

840.    Team leaders do not issue team territory lists when it is <u>announced</u> someone is being transferred to their team, and then issue a 2nd territory list once that person <u>actually</u> <u>reports</u> to the team. This is never done by supervisors, even though this is what Rickher alleged he was doing.

841.    Plaintiff later submitted several more consecutive annual leave requests for time off work, in an attempt to fortify herself enough return to the HWE, working on a training team with new inspectors where her skills and experience would once again not be utilized, and reporting to a supervisor she testified in the 8/04 hearing had joined in the harassment against her.

842.    Plaintiff eventually determined she could not go back to the on-going HWE due to the negative effect on her health, and on 4/28/07 filed a CA-2 stress claim and has been off work since that time. In October 2007 she was placed on Leave without Pay (LWOP) once her sick leave was exhausted.

843.    The pre-EEO counselor contacted Ed Lawee for a response to EEO allegations during the pre-EEO counseling stage, rather than the managers that made the decision to transfer McDermott, and the supervisor involved, further emphasizing the Agency's discriminatory discrimination policy, practice and procedures of providing free legal assistance

to government witnesses and named discriminating officials while not providing free legal assistance to EEO filers.

844.   The Agency EEO responses dated 3/23/07 and 4/16/07, stated the reason Plaintiff was assigned to the EC Oakland team was because Plaintiff's CEMT team was disbanded, and Ricker had requested a female or a senior inspector be assigned to his team, and that a female was needed to deal with female suspects.

845.   Management's response for reassigning Plaintiff to the EC team was pre-text for discrimination.  When Plaintiff did not report to the Oakland EC team, Francisco Garcia was placed on the EC team instead.  Garcia, a male, was a new inspector who had just graduated from the US PIS training Academy, further negating the Agency's stated reason for placing Plaintiff on the EC Oakland team.

846.   Jennifer Vincent, a new female inspector with approx. two years in-service previously assigned to the EC Oakland team was allowed to transfer off that team at her request in 10/06 and was not replaced with another female, even though there were numerous new female inspectors reporting to the SF Division who could have been assigned in her place.

847.   In October 2006, several team changes were made within the Division, and at least three females (two with EC task force experience – Jennifer Lim and Victoria Fussell) were transferred to different teams and could have been transferred to the EC Oakland team, but were not.

848.   Six months prior to Plaintiff's 2/07 transfer to EC Oakland, at least two new female inspectors reported to the SF Division and were not placed on the EC Oakland team

**COMPLAINT     PAGE   - 173 -**

(McClain-Sanders, Wilkes-Huang). Female inspector Wilkes-Huang was placed on the EC San Francisco team, making her the 2nd new female inspector assigned to that team, while the Oakland EC team still had no female inspector assigned to that team. Female inspector McClain-Sanders was placed on the Narcotics team and later the Homeland Security team, while the EC Oakland team still did not have a female inspector.

849.    The EC Oakland team remained without a female inspector for approx. six months until Plaintiff was reassigned there in March 2007. At this same time, the San Jose EC team had no female inspector assigned to that team.

850.    There were 4 new male inspectors reporting to the Division in April and May 2006 who could have been assigned to the EC Oakland team.

851.    **Punitive Nature of the EC Transfer:** Plaintiff submitted a Declaration dated 3/23/07 as part of her EEOC Damages hearing which outlined why she believed the transfer to the EC team was discriminatory and retaliatory, and requested, through her attorney, that her transfer be deferred until on-going mediation talks were conclude. The Agency declined and stated, "the transfer will remain in effect." Ed Lawee was the US PIS contact relative to this request.

852.    The EC teams in the SF Division are historically training teams for new inspectors.

853.    In 2/07, Inspectors assigned to the five SF area EC teams had approximately one month to three years in-service as postal inspectors, and almost all were assigned to an EC team

immediately after they graduated from the US PIS training academy, with the exception of two senior males. Plaintiff had 20+ years in-service as a postal inspector.

854.    The inspectors assigned to the EC Oakland team (all males) were all under the age of 40 and many were in their 20s (Bracken, Muniz, Matheny, Brooks, Robinson), while Plaintiff was 49 years old.

855.    The two senior male inspectors were both assigned to the San Jose EC team. One inspector was transferred to the San Jose EC team in 3/07 team with known pending medical issues to address and he subsequently retired without ever reported to the EC team. The other senior inspector had similar circumstances, but after addressing his issues, instead decided not to retire as planned.

856.    These two male senior inspectors assigned to the San Jose EC team, both had prior EC experience, totaling approx. 12 years; Plaintiff had no EC experience during her entire 20+ year career.

857.    In 2/07 there were no senior females assigned to any of the five San Francisco EC teams.

858.    No senior female has been assigned to an EC team in the SF Division for almost ten years, with one exception. In approximately 2004 a female inspector was due to retire and she was re-assigned to the EC SF team in order to motivate her to retire. sooner. After only a few months on the EC team, when she did not retire, she was re-assigned to the Security/Prevention Team.

**COMPLAINT      PAGE   - 175 -**

859.    In the past several years, numerous **new** female inspectors have been assigned to the SF Division, any one of whom could have been placed on EC Oakland.  In 2/07, all female inspectors assigned to the EC teams were well under the age of 40 and closer to their mid-20s (Anglada, Wilkes-Wang, Vincent, Worrell, Martin) while Plaintiff was 49 years old and was eligible to retire in approx. 9 months.  These females were assigned to EC teams directly after graduating from the US PIS training academy.

860.    The EC teams generally do not work complex investigations, but frequently are involved in "blotter" arrests, where the local police have already arrested a suspect, and the Inspectors take "credit" for the arrest without doing any significant investigative work.

861.    Rarely is federal prosecution obtained for cases on the EC teams, which is disparate from cases Plaintiff previously investigated for Employee Mail Theft and Workers' Compensation Fraud cases.

862.    Assigning Plaintiff to an EC team does not allow her to use her expertise, background or skills and removes her off the CEMT assignment where she could have excelled, to an assignment where she had no chance to excel in the nine months prior to her retirement.

863.    On the EC team, Plaintiff would have to be trained and evaluated by the Supervisor she previously testified in her 8/04 EEOC hearing had joined in the harassment against her.

864.    Plaintiff's work expertise included nine years experience in employee mail theft investigations and three years experience in workers' compensation fraud cases.  Plaintiff

1   received "far exceeds" year-end merits while assigned to both those teams as well as a 3rd "far

2   exceeds" she received while on the Capital Investment team.

3       865.    When Plaintiff was transferred to the EC team in 3/07 there were three vacancies

4
    on the two SF Fraud teams which work more complex investigations where her expertise,
5

6   background, and experience could have been better utilized. The two Fraud supervisors had

7   never been named in any of Plaintiff's EEOs as discriminating officials or joining in the

8
    harassment.
9

10      866.    Effective March 5, 2007, Quan Howard was named as the team leader of the

11  newly formed International Team, responsible for investigations involving Contract Employee

12  Mail Theft (CEMT), Revenue Investigations, and International cases. The CEMT team was

13
    disbanded with one position retained on the International team and reassigned to an inspector in
14

15  San Jose. The San Jose inspector would have to commute 2-3 hours per day to report to his

16  team located in San Francisco.

17
        867.    Management named Howard the International Team Leader so Plaintiff could be
18

19  displaced from her position working CEMT, her area of expertise, knowing Plaintiff could not

20  work for Howard, who Plaintiff had named in several EEOs, and had lodged one complaint

21  against him for releasing her medical information to Division Employees.
22

23      868.    Quan Howard was named the team leader of the International Team, even

24  though he had no experience in any of the areas assigned to his new team. Howard had no

25  experience investigating CEMT, no experience in Revenue Investigations, and no experience

26  working International cases. Plaintiff had experience working all three areas covered under the
27

28

International Team, and was in the middle of an International investigation in Japan when she was notified she was being transferred to the EC Oakland team.

869.    Howard has spent almost his entire 12 year career on an EC team and was just promoted to a supervisory position on 8/30/06, reporting as the EC San Francisco team leader on 10/1/06, where he served in that capacity for just few months before he was reassigned as the International team leader.

870.    INC Bill Atkins prematurely disbanded the CEMT team on 3/5/07 to form the International Team, in order to justify transferring Plaintiff to a punitive assignment after learning she prevailed in her EEOC hearing and for her continuing EEO activities in which he was named.

871.    In 2/05 when INC Atkins disbanded the CEMT Team and formed the SF International Team, US PIS Headquarters' managers were was still in the process of determining the locations and functions of the nationwide "International Team" positions. As of 5/29/07, the date of Plaintiff's EEO affidavit, and three months after the International Team was formed, a "program" outlining the work to be performed by the "International Team" still had not been disseminated to the Divisions, nor had any "International" work been performed by the International team members in SF, further negating INC Atkins' reason for forming the International Team in the first place.

872.    A 11/16/07 FOI Agency Response stated the SF International Team had no records of local goals, national goals, no program, no records of international trips taken for investigations and "the inspectors on the team were not assigned and did not conduct

international-related work."    The FOI response also indicated there were no SF goals for the Revenue Fraud assignment and that "there is no current contractor mail theft position and/or contractor team."

873.    The 11/16/07 FOI Agency Response further supports Plaintiff's allegations that there was no reason for Atkins to disband the CEMT team and form an International team, and was done solely to attempt to legitimize Plaintiff's punitive transfer to the EC team.

874.    In May 2007 INC Atkins and AIC Post were removed from their positions. Shortly after Atkins was removed from his position in May 2007, the International team was disbanded and Quan Howard was reassigned by the new SF Acting INC, Ron Verrochio.  The CEMT positions were again increased and one position assigned to each EC team.  These changes after Atkins's removal, place in question the reason the initial changes were made by Atkins and whether they were done for business necessity or to further retaliate against Plaintiff.

875.    When Ron Verocchio, arrived to SF in May 2007 as the new SF INC, he also rescinded some of the team transfers made by Atkins in March 2007. Verocchio sent an email to the SF Division stating he wanted to ensure that people were in the right assignments for the right reasons.  Veroccio rescinded the transfer of a young female inspector under the age or 40 who was to have reported from the EC SF team to the Security/Prevention team.  Disparately, Plaintiff's transfer to the EC Oakland team remained in affect.

876.    Plaintiff's transfer to the EC Oakland team adversely affects her by increasing her commute 1-2 hours per day; altering her work reporting and commuting times; places her

on call on call 24-7 for emergency responses in her territory after having previously done that

for 3 ½ years; will cause her to work for a male she testified joined in the campaign of

harassment against her; will further and humiliate and degrade her by placing her on a training

team historically intended for new inspectors working on an assignment she has never worked

in 20+ years as  postal inspector and which does not utilize her background, skills and

expertise.

877.    Plaintiff's latest transfer to the Oakland EC team adversely affects her by

continuing the pattern of punitively retaliating against Plaintiff due to her EEO activity, by

placing her on a team that does not utilize her background, skills and expertise, in an attempt to

degrade and humiliate her while putting out the message to others in the Division what happens

to those who speak out about discrimination, in an effort to deter the EEO process.

878.    Management exacerbated the HWE by telling her new supervisor that she would

not report to his team because Plaintiff would file a stress claim, resulting in the supervisor

disseminating a team territory list excluding Plaintiff.

879.    The reasons given by management for transferring Plaintiff to the EC Oakland

team were pre-text for discrimination.   Management punitively transferring Plaintiff to the EC

team, was retaliatory and punitive based upon her status as an EEO Complainant, and was an

attempt by the agency to make the work environment so hostile for Plaintiff that it would force

her termination from the Agency. This is a pattern and practice with the agency with females

filing EEO complaints, several of whom were forced to leave the Agency in the past due to the

on-going discrimination, retaliation and HWE targeting them after filing EEOs..

880.   This was the 3rd time since filing EEOs that Plaintiff was punitively reassigned to an assignment that did not use her background, experience or skills, in retaliation for her EEO history.

881.   **INC Atkins and AIC Post's Removal From Their Positions:** In May 2007 INC Atkins and AIC Post were removed from their positions for alleged improprieties involving each other, which included in part, sexual harassment and retaliation allegations filed against them by an inspector completing training at the US PIS training academy in May 2007.

882.   In May 2007, Atkins, Post and several other US PIS managers were named in an EEO complaint by an inspector scheduled to report to the SF Division, alleging discrimination, harassment and retaliation for pursuing the EEO process.  Several managers involved attempted to intimidate and deter the EEO process.

883.   This attitude by US PIS managers reaffirms Plaintiff' assertion regarding the mindset of managers within the Agency that EEO complaints are not addressed properly and adequately, and that EEO filers become the target of the Agency's on-going illegal conduct. This was the same attitude during the time period Plaintiff filed EEOs, which is continuing to this day with the latest EEO filed in May 2007.

884.   INC Atkins was allowed to interview the victims who had lodged allegations against AIC Post, even though Atkins had a personal relationship with Post. Atkins saw no need for an independent and impartial party to conduct the victim interviews.  Atkins and other managers involved attempted to dissuade the EEO process, in violation of Title 7 laws.

885.    Within one week of Atkins' victim interviews, on Monday May 14, 2007, it was verbally announced that Atkins was retiring, and his pending retirement was put in writing on 5/17/07. AIC Post was subsequently removed from her position as SF AIC and transferred out of SF.

886.    Atkins and Post were named in eight and five of Plaintiff's EEO complaints at the time they were removed from their positions.  Their conduct was never previously addressed by Headquarters' managers even though they were on notice for years regarding allegations of misconduct, as addressed in Plaintiff's EEO complaints, FOI requests, and letters they received.

887.    The Inspector who filed the EEO complaint in May 2007 naming Atkins and Post was subsequently subjected to harassment and retaliation for his EEO activity, which is part of the Agency's on-going pattern of illegal conduct and HWE, condoned by headquarters' management.  One headquarters' manager involved, refused to provide an EEO affidavit as requested by the EEO Investigator regarding the May 2007 EEO complaint, without ramifications.

888.    The concurrent removal of Atkins and Post from their positions, further supports Plaintiff's allegations that due to their relationship there was on-going collusion between these two managers to discriminate, harass and retaliate against Plaintiff for continuing to file EEOs.

889.    INC Bill Atkins has been named as a discriminating official in 9 EEO complaints Plaintiff has filed, beginning in 2003 when he first reported to the SF Division. AIC Marian Post has been named in six, and AIC Sally Diaz have been named in four EEO

COMPLAINT        PAGE  - 182 -

complaints filed by Plaintiff, Quan Howard has been named in five, and Ed Lawee, Agency

representative has been named as a discriminating official in four EEOs and a witness in one

EEO.

890.    Atkins was named as a discriminating official in at least 15-20 EEO complaints

since 2003 when he became the SF INC, and has had two females file work-related stress

claims naming him, and this Plaintiff has now filed two civil lawsuits naming him.

891.    Headquarters' managers' failure to address Plaintiff's allegations of on-going

illegal conduct by SF managers dating back to 2003, resulted in yet another inspector filing

charges of sexual harassment and retaliation in May 2007, naming the same SF managers that

Plaintiff had already named in numerous EEO complaints, for which managers at headquarters

never addressed.

892.    Plaintiff has continued to seek medical treatment for the on-going effects of the

Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

893.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff

has suffered damages in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
### (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS
### ACT OF 1964, AS AMENDED; 42 U.S.C. 2000e ET SEQ.)
### EEO #19 (Agency No.: 66-000-0001-08)

894.    **EEO #19: Refusing Medical Report to Support Sick Leave Usage/ Disparate**

**Agency Discrimination Policies, Practices and Procedures**: This is the 19th EEO complaint

filed by Plaintiff since 1998, alleging on-going discrimination (gender), harassment, retaliation

and a HWE, due to her EEO activities.

895. **Excessive requests for medical documentation**: Plaintiff submitted a 8/24/07 medical report from her treating physician, in support of sick leave she used for work-related stress from 9/3/07 - 12/31/07, along with a PS. Form 3971, Request for or Notification of Absence.

896. Supervisor James Rickher sent Plaintiff a letter denying her sick leave request from 9/3/07 – 12/31/07 stating that the 8/24/07 medical report was inadequate to support sick leave used, citing the Employee Labor Manual (ELM) Section 513.364. Rickher advised Plaintiff that failure to provide sufficient medical documentation would result in Plaintiff being charged annual leave or sick leave for time she was off work from 9/3/07 - 12/31/07.

897. Plaintiff previously provided two medical reports on 4/19/07 and 5/17/07 supporting her sick leave which the agency accepted as sufficient to support Plaintiff's sick leave, which contained the same wording as the 8/24/07 medical report. The Agency did not state why the 8/24/07 medical report was insufficient, while two prior medical reports that contained identical wording were **not** acceptable.

898. On 9/6/07 Acting Supervisor Jim Thiede, acting on behalf of Rickher, sent a letter to Plaintiff requesting additional specific medical and non-medical information to support her sick-leave used from 9/3/07 – 12/31/07. This request for additional medical documentation exceeds what Plaintiff is required to provide to them under the ELM section they cited. According to the ELM section 513.364, the 8/24/07 medical report was sufficient for the purposes of approving Plaintiff's sick leave, in that it explained the nature of her injury and that she was not able to report to work until 12/31/07.

899.    The Agency provided no Postal policy, rule or regulation specifically authorizing them to receive the additional medical information requested in Supervisor Thiede's 9/6/07 letter to Plaintiff.    Thiede's request for additional medical information came just two months prior to Plaintiff's Damages Hearing on November 14, 2007.

900.    It is unknown if Ed Lawee had input into Thiede's 9/6/07 request for Plaintiff to provide additional in-depth medical information. Plaintiff's FOI requests for information on whether Attorney Lawee assisted Supervisors Rickher and Thiede in writing the letters denying Plaintiff's sick leave and requesting additional in-depth medical information were denied.

901.    Plaintiff was instructed to send the additional medical information directly to her supervisor, which is a violation of postal policy, instead of being told to send the medical documentation in a sealed envelope to the Human Resources department.

902.    Management's request for Plaintiff to send her medical information directly to her supervisor was done in order for the Agency to obtain and release her medical information to taint her to others in the Division, and so that that information could be provided to the Agency prior to Plaintiff's 11/06 Damages hearing.

903.    Plaintiff's medical information was previously released to others in the Division on at least three separate occasions, in violation HIPAA and Privacy laws.

904.    On 9/12/07 Plaintiff provided Supervisor Thiede additional medical information from her treating physician in a sealed envelope addressed to Pam Dixon, Human Resources Specialist, requesting that Thiede forward the sealed envelope directly to Dixon without local personnel viewing the confidential medical information.

905.   The Agency denying Plaintiff's sick leave because of insufficient medical documentation was pre-text for discrimination, since two others identical medical reports were accepted as adequate to support prior sick leave used.   Plaintiff is being singled out and harassed by excessive requests for medical documentation, in retaliation for her prior EEO activity as part of the on-going HWE harassment.

906.   Plaintiff is adversely affected by the Agency's excessive requests for medical information, when she is treated disparate from how other employees are treated, as part of the on-going HWE harassment in violation of her Federal employment rights.

907.   **The Agency's Discriminatory Discrimination Policies, Practices and Procedures:**   The US PIS's discrimination policies, practices and procedures are discriminatory towards   Plaintiff and all employees filing EEOs when government witness and named discriminating officials receive free legal assistance from government attorneys at every stage of the EEO process, while those filing EEO complaints do not receive this same free legal assistance.

908.   Plaintiff made a Discovery request regarding the 12/1/06 letter she received from Quan Howard denying her sick leave and threatening to send her for a FFD medical exam as addressed in EEO #17 above.   Due to the negative, hostile and antagonistic content of the 12/1/06 letter, which was almost identical to correspondence Plaintiff received from Lawee, the Agency Representative on her pending EEOs, Plaintiff requested information on whether Lawee assisted in writing the 12/1/06 letter signed by Howard.

**COMPLAINT        PAGE   - 186 -**

909.    On 9/17/07 Plaintiff learned through an Agency Discovery Response Ordered by EEOC AJ Jeanne Player, that Lawee provided advice, input and/or assistance with the 12/1/06 letter signed by Howard.  Lawee also admitted to assisting Howard with at least one other letter sent to Plaintiff.  Howard was the only supervisor addressed in Plaintiff's request for Discovery on Lawee's assistance to others in the Division.

910.    Lawee has provided free legal advice, input and/or assistance to others in the Division, besides Howard, on various stages of the EEO process relative to Plaintiff's EEOs.

911.    Lawee is bias, hostile, and antagonistic toward Plaintiff.

912.    In the SF Division of the US PIS, the Agency EEO Counselors have been instructed to contact the Agency attorney, Ed Lawee, for a response to the pre-EEO allegations, not to contact the named discriminating officials or government witnesses directly for their own response to allegations.

913.    In several of Plaintiff's pending EEO complaints in the Cause of Action herein, Ed Lawee responded directly to the pre-EEO counselor, instead of the EEO counselor directly contacting the individual who specifically was named in the EEO as participating in discriminatory conduct targeting Plaintiff.

914.    By letter dated 10/26/07 regarding the Final Interview for Plaintiff's pre-EEO counseling in this EEO, Ed Lawee was the person contacted by the Agency EEO Counselor Arlene Gordon for a response to Plaintiff's pre-EEO, not Supervisors James Rickher or Jim Thiede who were responsible for denying Plaintiff's sick leave and requesting additional medical documentation.

915.    EEOC regulations require pre-EEO counselors to be impartial and neutral parties interested in gathering the preliminary facts and issues, and 29 CFR 1614.105, 2(c) states:    EEO Counselors shall conduct counseling activities in accordance with instructions contained in Commission Management Directives.

916.    Pre-EEO counselors in the US PIS are not impartial, neutral, parties but are working on behalf of and in the best interests of the Agency.

917.    Neither EEOC Regulations nor Federal law state that the pre-EEO counselor will contact an Agency attorney to obtain a response to discrimination allegations made by a Complainant, instead of contacting the person directly who was alleged to have participated in the discriminatory conduct.

918.    The Agency has no written regulations, rules or policies which state that a US PIS attorney will be contacted once a request for pre-EEO counseling is made, and/or a formal EEO complaint is filed.

919.    Once a pre-EEO complaint is filed, almost all Agency witness statements made in response to the Agency pre-EEO counseling are filtered through an Agency Attorney.

920.    The Agency has no written regulations, rules or policies outlining the process of who is notified in the US PIS when EEO counseling is requested, when pre-EEOs are filed, and when formal EEO complaints are filed.

921.    The Agency has no written regulations, rules or policies regarding each person in the US PIS who receives copies of each pre-EEO and EEO complaint filed within the Agency,

1  from the point when an employee calls and requests EEO counseling up until the final EEO

2  complaint is filed.

3       922.    Using Agency personnel instead of independent non-agency personnel during

4
   the pre-EEO "counseling" stage is discriminatory toward Plaintiff and others filing EEO
5
6  complaints, since Agency personnel are not impartial parties, but are acting on behalf of the

7  Agency.

8       923.    On 10/22/07 and 10/25/07 Plaintiff was contacted by Agency EEO counselor
9
10 Arlene Gordon, who told Plaintiff that her EEO complaint would probably be dismissed.

11 Plaintiff was not offered re-dress.  Clearly this EEO counselor was not an impartial party but

12 was acting in the best interests of the Agency.
13
   924.    A review of Plaintiff's pending EEO complaints listed in the Cause of Actions
14
15 herein, shows that Ed Lawee is being contacted for legal assistance at every stage of the EEO

16 process, filtering Agency responses from the initial pre-EEO complaint stage, during the

17 investigation when EEO affidavits are provided, and after the Investigative files are submitted
18
19 to the EEOC for a hearing.

20      925.    Agency attorneys providing free legal assistance, input and/or advice to

21 government witnesses and named discriminating officials at all stages of the pre-EEO and EEO
22
23 complaint process, disparate from how Plaintiff and others filing EEO complaints are treated

24 who receive no free legal assistance, is discriminatory.

25      926.    Plaintiff and other EEO filers are adversely affected when the Agency provides
26
27 free legal assistance, input and/or advice at every stage of the pre-EEO and EEO process when

28

COMPLAINT      PAGE   - 189 -

Plaintiff either must either represent herself and address discrimination issues herself without the benefit of legal assistance, or hire an attorney for legal assistance at a substantial cost to the Plaintiff. Disparately, government witnesses do not have to represent themselves without legal assistance and do not have to pay for an attorney to represent them. The Agency discrimination policies, practices and procedures are clearly discriminatory.

927.    Plaintiff's letters to John Potter, PMG on 10/2/07 and to SF INC Torpey on 10/03/07 requesting information relative to the Agency's discriminatory discrimination policies, practices and procedures regarding the Agency only providing free legal assistance to EEO government witnesses and named discriminating officials, and not those filing EEOs, were denied.

928.    Ed Lawee's hostile and antagonistic conduct targeting Plaintiff was testified to in Plaintiff's March 2008 Damages hearing. Headquarters' management was advised of Lawee's hostile and antagonistic behavior toward Plaintiff, yet they have allowed him to remain the Agency Representative on her pending EEOs.

929.    Management continues to allow Lawee to be the Agency Representative in Plaintiff's pending EEO complaints, even though he has been named in four of Plaintiff's EEOs as a discriminating official and named as a witness in one.

930.    Management has allowed Lawee to approach government witnesses and provide assistance with letters and/or EEO responses to Plaintiff which clearly reflect his own hostile and antagonistic attitude towards the Plaintiff, further tainting her work environment and exacerbating a HWE for Plaintiff with her co-workers.

931.    Ed Lawee, continues to intentionally and with malice make antagonistic and hostile comments in correspondence to Plaintiff, including, an August 31, 2006 EEO response, stating, *"The Agency would submit that it is the Complainant who creates her own hostile work environment by repeatedly filing spurious claims of discrimination based on imaged or contrived acts of victimization."* And Lawee's November 9, 2006, EEO response, stating, *"There has been no discrimination or retaliation against Inspector McDermott. She is a frequent filer of EEO discrimination complaints and abuses the process in attempt to effectively immunize herself from being directed to perform her duties or supervisory oversight as well as to harass division management when decision are made she does not agree with. She purposely distorts and misrepresents the facts to create an aura of retaliation and a hostile work environment that is only a product of her own intransigence, hostility and anger......Yet she purposely and with no rational basis names the CPI in her relentless, obsessive agenda of contriving and concocting acts of discrimination. However, these are a product of her imagination with the sole purpose of attacking and harassing management personnel. Incidentally, this includes gratuitously malicious and disparaging rumors and innuendo that reflect on Inspector McDermott's own character, dignity and integrity."*

932.    Lawee's correspondence to Plaintiff containing intentionally hostile and antagonistic statements are calculated to upset and harass Plaintiff, who he is aware has to read and respond to his correspondence while pursuing her EEO complaints, and is one more example of the on-going HWE harassment targeting Plaintiff, that is occurring unmonitored.

933.    Lawee, as the Agency Representative, continues with his hostile and antagonistic comments in his letter dated December 6, 2007, stating, *"Complainant operates in a vacuum obsessed with portraying herself a victim such that stating facts accurately and the truth are incidental to her agenda of perpetuating the myth that there is an on-going pattern of discrimination by the agency." "....Despite her claim of an on-going pattern, they are in fact discreet, isolated yet routine events or decisions involving different managers or supervisors that Complainant disagrees with and proclaims as being discriminatory fueled by her anger and loss of any rational perspective." ".... This prior case as well the issues in the instant case and subsequent cases are emblematic of an individual consumed with anger and rage such that, that normal, events became discriminatory...." "...There are several other false statements and manipulations of truth by Complainant...." ".....It is Complainant who is the cause of her own hostile work environment in striving to contrive acts of discrimination that do not exist. She is compelled to convert routine, normal even innocuous events or decision that occur within the workplace into acts of discrimination to perpetuate her myth of being a victim and fuel her mission of using the EEOC forum to constantly attack and harass division personnel."*

934.    Plaintiff's attempts via letters and FOI requests to determine the extent that Ed Lawee and/or other Agency attorneys are involved in providing free legal assistance to government witnesses at various stages of her pre-EEOs and formal EEOs, have been denied.

935.    Once a formal EEO complaint is filed, Agency personnel are used to determine whether EEO complaints filed should be accepted for investigation in their entirety or whether the EEO complaint is accepted in part only and/or dismissed.

936.   Using Agency personnel instead of independent non-agency personnel to determine whether an EEO in its entirety or a portion of the EEO is accepted for investigation is discriminatory toward Plaintiff and others filing EEOs, since Agency personnel are not impartial parties, but are acting on behalf of the Agency.

937.   EEO issues not accepted for investigation by the Agency are not investigated and the information relative to the EEO complaints filed are not in the Investigative files subsequently sent to the EEOC AJ, as occurred in this EEO when the Agency dismissed the portion of the EEO addressing the Agency's discriminatory discrimination policies, practices and procedures.

938.   Using Agency personnel to determine the validity of issues raised in EEOs and what portion of an EEO complaint filed, if any, should be accepted for investigation serves to delay, deter, and undermine the EEO process when subsequent discovery and depositions must occur by Plaintiff, at a cost to her, to obtain the information that was excluded by the Agency during the Investigative stage of the EEO, adversely affecting Plaintiff and other EEO filers.

939.   Once a formal EEO complaint is filed, almost all Agency witness and discriminating officials' statements and EEO affidavits made in response to the EEO Investigator, are filtered through an Agency attorney.  Disparately, Agency attorneys do not provide free legal assistance, advice and/or input to Plaintiff or other EEO filers for their EEO affidavits.

940.   During the EEO "investigative" stage of the Agency's Accepted EEO Issues, Independent Agencies are not being used to conduct the EEO investigation.  The National EEO

Investigation Services Office (NEEOISO), is contracted by the USPS to conduct EEO investigations for the USPS, including obtaining written sworn affidavits from all relevant parties.

941.    The NEEOISO receives payment for their services from the USPS for the EEO investigations they conduct.

942.    On a least one occasion a postal mangers was "detailed" to work at the NEEOISO, reflecting on the lack of independence of the NEEOISO's investigation of Postal EEO claims. Plaintiff's two FOI requests for information on how often postal managers have been "detailed" to the NEEOISO were denied.

943.    Once the NEEOISO requests EEO affidavits from witnesses, Agency Attorneys are providing free legal assistance, advice and/or input to Agency witnesses and/or named discriminating officials for their EEO affidavits, while not providing this same benefit to Plaintiff and EEO filers.

944.    There is disparity in a term, condition and benefit of Federal employment when those filing pre-EEO and EEO complaints do not receive the same free legal assistance from Agency attorneys that named sexual harassers and discriminating officials receive.

945.    After the NEEOISO investigator has completed their investigation and submitted the Investigative files to the EEOC, Agency attorneys are subsequently allowed to approach government witnesses to obtain additional information and/or statements on behalf of the Agency. Disparately, Plaintiff and other EEO filers are not allowed the same opportunity to

approach and independently interview and/or obtain statements from government witnesses and named discriminating officials on their behalf after the completion of the EEO investigations.

946.    Most EEO witnesses will only cooperate with Agency attorneys, and will not willingly cooperate with EEO filers in providing statements, adversely affecting Plaintiff and EEO filers who can not obtain additional information from witnesses in their behalf in the same manner that the Agency can.

947.    Lawrence Katz, Chief Legal Counsel for the US PIS is notified of and/or provided copies of pre-EEO and/or EEO complaints Plaintiff has filed and has done nothing to stop the illegal conduct targeting her.

948.    The Agency maintains no records of EEOs filed within the US PIS, by Division and/or by Manager.

949.    The list of EEOs filed within the SF Division that Plaintiff received in response to a FOI request, was not accurate and did not list all the EEO complaints filed in SF.  If these same inaccurate reports are being relied upon when reporting data to Congress under the "No Fear" act, the Agency is minimizing discrimination issues within the Agency, which adversely affects Plaintiff and other EEO filers.

950.    Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition.

951.    As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS
ACT OF 1964, AS AMENDED; 42 U.S.C. 2000e ET SEQ.)
EEO #20 (No Agency No. Assigned)

952.  **EEO #20:  (Ref the status of EEO #17 investigation:**  This is the 20th EEO complaint filed by Plaintiff since 1998, alleging on-going discrimination (gender), age discrimination harassment, retaliation and a HWE, due to her EEO activities.

953.  When the Agency refused to investigate the issues in pre-EEO #17 above, Plaintiff filed this pre-EEO complaint regarding the status of EEO #17 in an attempt to have her issues addressed.  By letter dated 1/10/08 the Agency stated they were not going to investigate this pre-EEO complaint.

954.  Plaintiff has continued to seek medical treatment for the on-going effects of the Agency's illegal conduct and the HWE which has exacerbated her diagnosed medical condition

955.  As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

### IV.  THE AGENCY'S DISCRIMIANTION POLICIES,
PRACTICES AND PROCEDURES

956.  The Agency has an on-going pattern and practice of not investigating EEO complaints, not intervening where appropriate, not providing adequate anti-discrimination training, and not taking disciplinary action against those participating in illegal conduct and/or found to lack credibility in sworn testimony during the EEO process.

957.  The Agency has done nothing to remedy the illegal conduct the Agency was found liable for as addressed in the EEOC AJ Kelley's 11/30/06 MOO.

COMPLAINT        PAGE  - 196 -

958.    The Agency has shown a long term resistance to anti-discrimination efforts.

959.    The Agency does not investigate discrimination allegations in a timely and thorough manner. Agency managers as late as 2007 stated in EEO affidavits that just because harassment allegations are made does not mean they have to conduct an investigation.

960.    The Agency does not monitor their discrimination policies, practices and procedures to determine if they are effective.  An Agency manager as late as 2007 stated in an EEO affidavit that there was no discrimination involving Plaintiff but that it is a "personality conflict."  This is the same reason managers gave in the 8/04 EEOC hearing for not conducting an investigation into Plaintiff's discrimination allegations.

961.    The Agency's discrimination policies, practices and procedures are inadequate to deter the illegal conduct.

962.    Anti-Discrimination training within the Agency, done on the computer, is inadequate and ineffective as evidenced by on-going EEO complaints filed.

963.    Agency managers are encouraged to participate in discrimination, harassment and retaliation against those filing EEO complaints, in an effort to harass EEO filers, and deter the EEO process.

964.    Each management team arriving in the SF Division from 1998 to date, has continued to discriminate and retaliate against Plaintiff after their arrival in the SF Division, exacerbating an already HWE as part of the on-going pattern of illegal conduct condoned by the Agency.

965.    The mindset within the Agency is that those filing EEO complaints are "trouble makers," who will be singled out and further discriminated against and retaliated against, as a pattern and practice of HWE harassment condoned by the Agency.

966.    The Agency has an on-going pattern and practice of allowing retaliation to occur, unmonitored, against those filing EEO complaints, condoned by each subsequent Chief Postal Inspector (CPI) and Chief Legal Counsel of the US PIS from at least 1998 to date.

967.    The Agency's failure to address illegal conduct has resulted in on-going discrimination within the SF Division of the USPIS for at least the past 20 years, continuing to date.

968.    The Agency's failure to intervene and/or investigate Plaintiff's repeated allegations of illegal agency conduct by San Francisco US PIS managers, resulted in on-going discrimination, retaliation and a HWE targeting not only Plaintiff, but other employees filing EEOs as recently as 2007

969.    The Agency does not address and/or investigate manager's named and/or involved in discrimination, but place them on "details," or "special projects," without acknowledging and/or addressing the illegal conduct. This pattern and practice is still occurring today.

970.    None of the witnesses in Plaintiff's 8/04 EEOC hearing who were impeached, found to lack credibility, and/or who joined in the harassment, received any disciplinary action from the Agency, and in fact most were promoted.

971.    The Agency has no policy, practice or procedure in place to ensure that EEO witnesses who do not fully comply in answering EEO affidavits sent to them or refuse to provide documents requested by he EEO investigator, are disciplined.

972.    The Agency does not accurately document and track pre-EEO and formal EEO complaints.

973.    The Agency is improperly denying FOI requests in an effort hide their illegal conduct.

974.    The Agency has disparate policies, practices and procedures regarding discrimination complaints when they provide free legal assistance to named alleged discriminating officials and government witness at every stage of the pre-EEO and EEO process, while not providing the same benefit to those filing EEOs.

975.    Agency EEO counselors are not neutral, impartial parties, but are working on behalf of the Agency.

976.    The Agency Representative in Plaintiff's pending EEOs routinely placed information on the record, knowing it to be inaccurate and false, which was relied on by the EEOC AJ when determining summary judgment dismissing some of Plaintiff's EEOs.

977.    The Agency has no policy, practice or procedure in place to monitor the accuracy and integrity of information placed into the EEOC record by Agency Representatives.

978.    There is no process in place for Plaintiff and/or other EEO filers to obtain additional witness statements after the conclusion of the EEOC investigation, in the same manner that the Agency is able to do.

1    979.    Discrimination and retaliation within the Agency is condoned at the highest

2    levels of the US PIS.    Management is aware of what is occurring, have participated in the

3    illegal conduct themselves, and have allowed it to continue.

4

5    980.    The on-going discrimination, harassment, and retaliation in the SF Division has

6    been allowed to continue, unmonitored, by Ken Hunter, Former CPI, Lee Heath, Former CPI,

7    Alexander Lazaroff, CPI and Lawrence Katz, Chief Legal Counsel for the US PIS.

8

9    **V. JURY TRIAL DEMAND**

10

11    Plaintiff, JUDY A. MCDERMOTT, requests a jury trial for all issues triable by a jury.

12    **VI. PRAYER FOR RELIEF**

13

14    WHEREFORE, Plaintiff respectfully prays for and demands judgment against the Defendants

15    for each Cause of Action as follows:

16

17    (a)    For judgment against Defendants for each Cause of Action alleged herein;

18    (b)    For Declaration that JOHN E. POTTER and the U.S. POSTAL SERVICE are found to

19    have violated Plaintiff's rights under Civil Rights Act of 1964 and Title 7;

20    (c)    For an Injunction against JOHN E. POTTER and the U.S POSTAL SERVICE from

21    engaging in any future similar conduct in violation of the rights of other employees;

22    (d)    For Compensatory damages, including back pay, loss of earnings, front pay, loss of

23    benefits, loss of promotional opportunities, loss of annual and sick leave, loss of career opportunities, lost earning capacity, embarrassment, taxable consequences, humiliation and loss

24    of dignity, insult and damage to reputation, and other consequential damages, in an amount to

25    be determined at the trial of issues in this Complaint;

26    (e)    For pecuniary and non-pecuniary damages;

27    (f)    For any and all Equitable Relief;

28

1

2

(g)    For reasonable attorney's fees and costs; and

(g)    For such further other relief, to which the Plaintiff is entitled, as the Court deems just
3    and proper.

4

5                                                   Respectfully submitted,

6                                              BY: _Judy A. McDermott_

7                                                   Judy A. McDermott

8                                                   Plaintiff, Pro Se
                                                    366 Hibiscus Lane
9                                                   Suisun City, CA 94585
    DATED this **16**th day of July 2008            707/428-6513
10

11

12  **ATTACHMENTS**
    1.  Plaintiff's list of EEOS #1-20 filed from 1998 to date, and named discriminating officials
13       for EEOs #10-20 as listed in the Cause of Actions herein.

14                                    **VERIFICATION**

15
    I, JUDY A. MCDERMOTT, am the Plaintiff in the Cause of Actions herein. I have read the
16  foregoing Complaint and know the contents thereof. All facts alleged in the above Complaint
17  are true of my own personal knowledge, except for those allegations made therein upon
    information and belief and as to those allegations, I am informed and believe that each and all
18  of them are true. I declare under penalty of perjury and to the laws of the United States, that the
    foregoing is true and correct and that this document was executed by me on July 16, 2008,
19  Oakland, CA.

20  _Judy A. McDermott_

21  JUDY A. McDERMOTT

22  Plaintiff, Pro Se

23

24

25

26

27

28

**COMPLAINT      PAGE  - 201 -**

## CERTIFICATE OF SERVICE

I am a citizen of the United States, over the age of 18 years, residing at 366 Hibiscus Lane, Suisun City CA 94585

On the date of execution of this certificate of Service, I mailed a copy of the following document(s):

CIVIL COMPLAINT: JUDY A. MCDERMOTT  v.  JOHN E. POTTER and SUMMONS.

TO:   Joseph P. Russoniello      (via certified mail #7007 0710 0002 3254 9126)
      United States Attorney,
      Northern District of California
      C/O Civil Process Clerk
      450 Golden Gate Avenue
      Box 36055
      San Francisco, CA 94102    415/436-7200

      John Potter      (via certified mail #7007 0710 0002 3254 9133)
      Postmaster General, United States Postal Service
      475 L'Enfant Plaza, SW
      Washington, DC 20260    202/268-2000

      Michael Mukasey      (via certified mail#7007 0710 0002 3254 9140)
      Attorney General
      Department of Justice
      950 Pennsylvania Ave
      Washington DC 20530

I certify under penalty of perjury that the above is true and correct.

DATED:  July 16, 2008    MAILED BY:  Judy A. McDermott
                                   Plaintiff, Pro Se
                                   366 Hibiscus Lane
                                   Suisun City, CA 94585
                                   707/428-6513

| DATE | CASE # | ISSUE |
|------|--------|-------|
| 04/02/98 | No complaint filed | John Hummel Incident |
| 08/11/98 (#1) | HI-0076-98 (370-AO-X2553) | Denied Territory |
| 12/22/98 (#2) | HI-0028-98 (370-A1-X2054) | On-going Incidents HWE |
| 01/04/99 (#3) | HI-0036-99 (370-A1-X2055) | Team Transfer |
| 02/16/99 (#4) | HI-0056-99 (370-AO-X2552) | Disparate Merit/Awards |
| 06/19/99 (#5) | HI-0080-99 (370-A1-X2056) | Hall Meeting |
| 10/03/00 (#6) | HI-0012-01 (370-A1-X2507) | Hummel Incident |
| 12/26/00 (#7) | HI-0047-01 (370-A1-X2511) | Sexual Assault by Ken Innes |
| 5/15/01 (#8) | HO-0084-01 | Official Time Denied |
| 7/29/02 (#9) | HI-0075 -02 | AIC Nedd Threatening FFD |
| 10/20/03 (#10) | 66-000-0055-03   **370-2005-00127X** | Whistleblower Retaliation Transfer |
| 11/04/03 (#11) | Pre-EEO (consolidated w/10) | Interview by Internal Affairs Division |
| 02/03/05 (#12) | 66-000-0013-05  **370-2006-0054X** | Retaliation against Janene Gordon |
| 11/12/05 (#13) | 6H-000-0003-05 | Retaliation against Marilyn Lee |
| 04/11/06 (#14) | 6H-000-0001-06  **550-2007-00390X** | Denied pre-retirement training/HWE |
| 08/16/06 (#15) | 66-000-0037-06 (C-07-06300) Civil | Atkins ref PPO Incident/HWE |
| 10/31/06 (#16) | 66-000-0047-06  **550-2007-00302X** | AIC Post/Howard incident |
| 04/07/07 (#17) | Pre-EEO Filed | Management Denied Sick Leave |
| 04/07/07 (#18) | 66-000-0036-07  **550-2007-00400X** | Punitive Transfer to EC Team |
| 11/13/07 (#19) | 66-000-0001-08  **550-2008-00192X** | Excessive Requests for Medical/Disparate Agency Discrimination Policies, Procedures |
| 1/5/08  (#20) | Pre-EEO Filed | Status of EEO #17 |

## EE0 #10 – Alleged Discriminating Officials
**Lee Heath,** USPIS Chief Postal Inspector, 475 L' Enfant Plaza S.W., Washington DC
**Larry Katz,** USPIS Chief Legal Counsel, 475 L' Enfant Plaza S.W., Washington DC
**Alan Kiel,** SF INC, PO Box 882528, San Francisco, CA 94188
**Juliana Nedd,** SF AIC
**John Wisniewski,** Acting SF INC
**James Donnelly,** Acting SF AIC
**Anita Beppu,** SF Team Leader

## Pre-EEO #11– Alleged Discriminating Officials
**Lee Heath,** USPIS Chief Postal Inspector
**Larry Katz,** USPIS Chief Legal Counsel
**Alan Kiel,** SF INC (Retired)
**John Wisniewski,** Acting SF INC
**James Donnelly,** Acting SF AIC
**Greg Campbell,** Acting SF AIC
**Bill Atkins,** SF INC
**Robert Bethel,** SF AIC

## EEO #12– Alleged Discriminating Officials
**Lee Heath,** USPIS Chief Postal Inspector
**Larry Katz,** USPIS Chief Legal Counsel
**Bill Atkins,** SF INC
**Robert Bethel,** SF AIC
**Dennis Jones,** AIC
**Roy Geffin,** INC
**Sally Diaz,** SF Team Leader

**ATTACHMENT 1**

## EEO #13– Alleged Discriminating Officials
**Lee Heath,** USPIS Chief Postal Inspector
**Jim Birch,** USPIS Ombudsman Inspector (retired)
**Floyd Toogood,** USPIS Ombudsman Inspector
**Alan Kiel,** SF INC (Retired)
**John Wisniewski,** Acting SF INC
**Bill Atkins,** SF INC
**Robert Bethel,** SF AIC
**Sally Diaz.** Acting SF AIC
**Sheilah Castor,** SF Admin Specialist

## EEO #14– Alleged Discriminating Officials
**Lee Heath,** USPIS Chief Postal Inspector
**Larry Katz,** USPIS Chief Attorney
**Bill Atkins,** SF INC
**Marion Post,** SF AIC

## EEO #15– Alleged Discriminating Officials
**Lee Heath,** USPIS Chief Postal Inspector
**Larry Katz,** USPIS Chief Attorney
**Bill Atkins,** SF INC
**Marion Post,** SF AIC

## EEO #16– Alleged Discriminating Officials
**Lee Heath,** USPIS Chief Postal Inspector
**Larry Katz,** USPIS Chief Legal Counsel
**Bill Atkins,** SF INC
**B. Bernard Ferguson,** Acting SF INC
**Marion Post,** SF AIC
**Tom Brady,** Deputy Chief Inspector, Washington DC
**Quan Howard,** Acting SF Team Leader

## Pre-EEO #17– Alleged Discriminating Officials
**Lee Heath,** USPIS Chief Postal Inspector (Retired)
**Alexander Lazaroff,** USPIS Chief Postal Inspector
**Lawrence Katz,** USPIS Chief Legal Counsel
**Bill Atkins,** SF INC
**Marion Post,** SF AIC
**B. Bernard Ferguson,** Acting SF INC
**Quan Howard,** Acting SF Team Leader
**Ed Lawee,** US PIS Attorney

## EEO #18– Alleged Discriminating Officials
**Alexander Lazaroff,** USPIS Chief Postal Inspector
**Lawrence Katz,** USPIS Chief Legal Counsel
**Bill Atkins,** INC, SF
**Marion Post,** AIC
**Sally, Diaz,** AIC
**Ed Lawee,** US PIS Attorney
**Quan Howard,** SF Team leader

**ATTACHMENT 1**

## EEO #19– Alleged Discriminating Officials
**Alexander Lazaroff,** USPIS Chief Postal Inspector
**Lawrence Katz,** USPIS Chief Legal Counsel
**Ron Verrochio,** Acting SF INC
**Diane Torpey,** SF INC
**Sally Diaz,** SF AIC
**Ed Lawee,** US PIS Attorney
**Quan Howard,** SF Team Leader
**James Rickher,** SF Team Leader
**Jim Thiede,** SF Team Leader

## PRE-EEO #20– Alleged Discriminating Officials (Same as EEO #17)
**Lee Heath,** USPIS Chief Postal Inspector (Retired)
**Alexander Lazaroff,** USPIS Chief Postal Inspector
**Lawrence Katz,** USPIS Chief Legal Counsel
**Bill Atkins,** SF INC
**Marion Post,** SF AIC
**B. Bernard Ferguson,** Acting SF INC
**Quan Howard,** Acting SF Team Leader
**Ed Lawee,** US PIS Attorney

**ATTACHMENT 1**